IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PEGGY WALTON,

     Plaintiff,

v.                                                                    CIV No. 13-343 JB/KBM

NEW MEXICO STATE LAND OFFICE, et. al.,

     Defendants.

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Peggy Walton (Walton), by and through her undersigned attorneys, responds

to the Defendants' Motion for Summary Judgment (Doc. 38) as follows:

**I.
INTRODUCTION**

Walton was employed by the Defendant, New Mexico State Land Office (SLO), from August

25, 2008, until June 10, 2011, when the SLO terminated Walton's employment pursuant to a

reduction in force (RIF) plan.  In her Second Amended Complaint (Doc. 20) Walton has asserted:

1) claims of retaliation against the SLO under the New Mexico Human Rights Act, Sections 28-1-1,

et seq. NMSA (1978) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e,

et seq. (Counts II and IV); 2) a claim against the SLO under the New Mexico Whistleblower

Protection Act, Sections 10-16C-1 NMSA (1978) (Count V); and 3) a claim against the Defendant

Ray Powell (Powell) under 42 U.S.C. § 1983 based upon Powell's infringement of Walton's First

Amendment political affiliation rights (Count VI).[1]   The Defendants allege that the SLO

---

[1]  Walton intends to file an unopposed motion to dismiss her discrimination claims in Counts I and III
against the SLO under the New Mexico Human Rights Act and Title VII of the Civil Rights Act of 1964, as
amended, her claims in Count VI against Delma Bearden and Donald Britt under 42 U.S.C. § 1983, and all claims in
Count VI under 42 U.S.C. § 1983 based upon infringement of Walton's First Amendment free speech rights.

implemented the RIF plan for non-discriminatory reasons, and that all of Walton's claims therefore fail as a matter of law.  As discussed below, there is ample evidence that the implementation of the RIF plan was a pretext for illegal retaliation against Walton for engaging in protected conduct, and for Walton's political association.

Attached in support of this Response are: Exhibit A- Affidavit of Peggy Walton; Exhibit B- Excerpts from deposition of Elaine Olah; Exhibit C- Excerpts from deposition of Ray Powell; Exhibit D- Excerpts from deposition of Sandra Lopez; Exhibit E- Excerpts from deposition of Donald Britt; and Exhibit F- Evidence in Opposition to Defendants' Statement of Alleged Undisputed Material Facts.

## II.
## ADDITIONAL RELEVANT EVIDENCE

The following evidence shows genuine issues of material fact as to whether the implementation of the RIF plan was a pretext for illegal retaliation against Walton for Walton's reporting of the illegal conduct of an employee, and for Walton's political affiliation.

1.    Walton has been registered to vote as a Republican since approximately 1980.  (Ex. A, ¶ 3).

2.    From January 1988 to December 2001, Walton was employed at Miners' Colfax Medical Center in Raton, New Mexico, as an administrative assistant.  During that time Walton became acquainted with Patrick Lyons, a Republican, who at that time was the State Senator for the district which includes Colfax County.  Walton is politically affiliated with the Republican party, and with Mr. Lyons.  (Ex. A, ¶ 3).

3.    Mr. Lyons was elected to serve as the New Mexico Land Commissioner for a term

which began on January 1, 2007.  After Mr. Lyons was elected, Walton applied for employment at the SLO several times, but initially did not receive any response.  (Ex. A, ¶ 4).  In about January 2008, Walton spoke directly to Mr. Lyons and told Mr. Lyons that she had been applying for positions at the SLO, without response, and asked Mr. Lyons whether there were any positions in the SLO for which she was qualified.  Mr. Lyons told Walton that there were open positions, and that Walton should keep applying.  (Ex. A, ¶ 4).

4.      On June 18, 2008, Walton applied for a classified position at the SLO.  After Walton applied for that classified position, Mr. Lyons and others interviewed Walton.  Following those interviews, Walton was offered an exempt Secretary II position. (Ex. A, ¶ 5).  Walton accepted the exempt Secretary II position, and began her employment at the SLO on August 25, 2008.  (Ex. A, ¶ 6).

5.      Walton's first job assignment at the SLO was working in the Commercial Resources Division as a special projects coordinator and lease analyst.  On or about October 22, 2008, Walton accepted the position of director of the commercial leasing section of the Commercial Resources Division, a position for which she was qualified.  As director of the commercial leasing section Walton supervised the lease analysts, including Delma Bearden, an employee who had been hired in the first Powell administration. (Ex. A, ¶ 7).

6.      In early 2009, Mr. Lyons instructed Sandra Lopez, the SLO's Human Resources Manager, to transfer Walton from the exempt Secretary II position to the only vacant classified position in the Commercial Resources Division, which was an Economist A position, and then to reclassify that position to a General Manager I position.  Walton did not have the credentials to fill the Economist A position, and expressed that at the time to Ms. Lopez.  Walton understood,

however, that Ms. Lopez would follow Commissioner Lyons' directive to reclassify the Economist A position to a General Manager I position, which is a position for which Walton is qualified.  (Ex. A, ¶ 8).

7.     After the SLO transferred Walton to the Economist A position, Sandra Lopez refused to initiate the paperwork with the State Personnel Office (SPO) to reclassify the Economist A position to a General Manager I position.  Finally, after Ms. Lopez repeatedly refused, for over a year, to initiate the paperwork, Mr. Lyons directed Walton to bypass Ms. Lopez and to work directly with the SPO to accomplish the reclassification, and Walton did so.  The reclassification was accomplished and approved effective September 8, 2010.  After the reclassification, Walton continued to serve as the director of the commercial leasing section of the Commercial Resources Division.  (Ex. A, ¶ 9).

8.     Mr. Lyons served as Land Commissioner for two terms, the second of which expired on December 31, 2010, and did not run for re-election.  Ray Powell, a Democrat who had served as Land Commissioner immediately before Mr. Lyons' first term, defeated the Republican candidate for Land Commissioner, Matthew Rush, in the November 2, 2010 general election.  The campaign for Land Commissioner was very contentious.  During the campaign Mr. Powell repeatedly attacked the record of Mr. Lyons, and accused Mr. Lyons of engaging in unethical conduct and mismanaging State trust lands, and publicly stated that Mr. Rush would continue the same policies as Mr. Lyons if Mr. Rush was elected.  (Ex. A, ¶ 10).

9.     During the summer and fall of 2010, Walton attended a number of Republican campaign events, including rallies for Susana Martinez, a Republican running for Governor, which Mr. Rush also attended.  Walton also attended a campaign event for Mr. Rush at Rancho de Chimayo restaurant in Espanola.  Walton traveled to that event with Mr. Lyons and other employees of the

State Land Office. (Ex. A, ¶ 11).  Walton's support of Mr. Lyons and the Republican Party was known by employees in the SLO, including Sandra Lopez.  Walton had a photograph of herself and (now Governor) Susana Martinez, and a photograph of Mr. Lyons with a personal note from Mr. Lyons to Walton, on the wall in her office.  During the fall of 2010, Walton observed Sandra Lopez studying those photographs.  (Ex. A, ¶ 11).

10.     Walton voted for Mr. Rush in the November 2, 2010, general election.  Powell defeated Mr. Rush in election.  The day after the election, Walton told Ms. Bearden that she had voted for Mr. Rush, and Ms. Bearden told Walton that she had voted for Powell.  (Ex. A, ¶ 12).

11.     On or about November 17, 2010, Mark Corley, an associate of KRQE investigative reporter Larry Barker, approached Walton at the back entrance to the SLO building when Walton arrived at work, and informed Walton that Walton's personal human resources information had become known to him.  Mr. Corley interviewed Walton and asked Walton questions about the circumstances of her hiring, her transfer from the exempt Secretary II position to the classified Economist A position, and the reclassification of the Economist A position to the General Manager I position.  Walton believed, from the context of the interview, that KRQE intended to portray these events in a negative light, and that the Human Resources Manager, Sandra Lopez, had collaborated with others to furnish Walton's personal employment information to KRQE.  (Ex. A, ¶ 13).

12.     On or about November 18, 2010, Walton telephoned Commissioner-elect Ray Powell, to inform Powell about her communications with Mr. Corley.  Walton wanted Powell to know that KRQE was going to be broadcasting a negative story about Walton and the SLO.  On November 21 or 22, 2011, Powell, along with Harry Relkin, an attorney who Powell hired to serve as general counsel to the State Land Office, returned Walton's telephone call.  During the telephone

conversation Walton informed Powell and Mr. Relkin about the circumstances of her hiring, her transfer to the Economist A position, Commissioner Lyons' directions to Sandra Lopez to reclassify the Economist A position to the General Manager I position, and Ms. Lopez's refusal to follow Commissioner Lyons' directions. (Ex. A, ¶ 14).

13.     KRQE television broadcast the Larry Barker investigative report on November 23, 2010.[2]  The KRQE investigative report was titled: "Cronies move up as officials move out."  Anchor reporter Dick Knipfing introduced the news segment by saying, among other things, that Walton was "distinctly unqualified" for her position and that her hiring was "rigged."  Mr. Barker began his report with the statement: "Meet State Land Office employee Peggy Walton.  How she went from low-level political appointee to high-level division manager in two short years is a fascinating case study in abuse of power."  Mr. Barker accurately reported that Walton was hired in the Lyons administration as an exempt position, and then moved into the classified service before the election, but misleadingly and inaccurately described the circumstances of Walton's hiring, and the sequence of events that led to her being placed in the General Manager I position.  Then SPO Director, Sandra Perez, who had approved the reclassification, was interviewed.  Ms. Perez pointedly deferred to Mr. Lyons for an explanation.  The report ended with Mr. Knipfing stating:  "Governor-elect Susana Martinez has promised to fire any political appointee who has been improperly shifted into a classified job....  New Land Commissioner Ray Powell will inherit Walton.  It is not clear whether her job is protected."  (Ex. A, ¶¶ 15, 16).

14.     Powell watched the Larry Barker investigative report online within a few days after

_____

[2]  A copy of the televised report can be found online at:
http://www.krqe.com/news/larry-barker/cronies-move-up-as-officials-move-out.

KRQE broadcast the report.  (Ex. C, p. 55 lines 6-15).  Powell considers Larry Barker to be the "gold standard" in investigative reporting (Ex. C, p. 49 line 11 through p. 50 line 6), and believes that Larry Barker's reports are "thorough and vetted."  (Ex. C, p. 57 lines 7-13).  Powell testified that, after he viewed the story, Powell "had no reason to disbelieve it [what Larry Barker said about Peggy Walton]."  (Ex. C, p. 58, lines 1-12).  Powell understood that the "gist from that report" was that Patrick Lyons had hired Walton in an exempt position and then transferred her into a classified economist position.  (Ex. C, p. 60 lines 6-12).

15.     Exempt employees are employees who serve at the will of the agency head.  Exempt employees do not have the protections afforded to classified employees under the State Personnel Act.  Exempt employees exist so that the agency head has the ability to hire people who the agency head believes are going to assist in implementing the agency head's policies.  (Ex. D, p. 18, line 9 thorough p. 19 line 13; and Ex. C, p. 38, line 8 through p. 39 line 23)  Powell's understanding is that "historically what's happened is that the exempt employees that serve with one elected official leave the office and the new elected official has the opportunity to appoint people into that exempt position."  (Ex. C, p. 38, line 8 through p. 39 line 23).

16.     Powell took office as Land Commissioner on January 1, 2011.  Powell brought in his own team, including the following exempt employees who replaced exempt employees in the Lyons administration who resigned effective January 1, 2011: A) Robert Jenks, Deputy Commissioner (reporting to Commissioner Powell); B) Harry Relkin, Chief Legal Counsel (reporting to Deputy Commissioner Jenks); C) Donald Britt, Assistant Commissioner over the Commercial Resources Division (reporting to Deputy Commissioner Jenks); and D) Elaine Olah, Assistant Commissioner over the Administrative Services Division (reporting to Deputy Commissioner Jenks). (Ex. A, ¶ 17).

17.     Monday, January 3, 2011, was Walton's first day in the office in 2011.  When Walton arrived at work, there was a note on the door to her office which said, "This office is reserved for Donald Britt."  Mr. Britt was employed during the first Powell administration, and then was hired by Powell to serve again in Powell's second administration as an exempt employee.  (Ex. A, ¶¶ 17, 18).  Powell placed the note on the door to Walton's office before staff arrived to work on January 3, 2011.  (Ex. C, p. 63 line 2 through line 25).

18.     Beginning January 3, 2011, Mr. Britt was Walton's direct supervisor.  On January 3 or 4, 2011, Powell met with the Commercial Resources Division staff, along with Mr. Jenks and Mr. Britt.  During the meeting Powell expressed his opinion that the stewardship and leasing of State Trust Lands under the Lyons administration had not been handled properly, and he stated there would be federal investigations to find out who was involved.  Powell stated that "men in suits with guns" were going to come to the office and implied that those "men in suits with guns" would arrest anyone involved in any wrongdoing. (Ex. A, ¶ 19).

19.     On January 24, 2011, Mr. Britt and Ms. Bearden together accused Walton of illegally administering a land sale that had closed during Commissioner Lyons' term in the latter part of December 2010.  (Ex. A, ¶ 20).  Because Powell had made threatening remarks during the January 4, 2011, meeting about allegedly illegal conduct in the Lyons administration, and because Mr. Britt had been making comments to Walton about allegedly illegal conduct in the Lyons administration since January 4, Walton asked her attorney, Linda Hemphill, to contact Powell regarding Walton's concerns that Walton was being mistreated because of her previous association with the Lyons administration.  (Ex. A, ¶ 20).

20.     On January 27, 2011, Linda Hemphill delivered a letter to Powell in which Ms.

Hemphill informed Powell of Walton's affiliation with Mr. Lyons going back to Walton's employment at Miners' Colfax Medical Center, the circumstances of Walton's hiring and promotion during the Lyons administration, and Walton's belief that Sandra Lopez had inappropriately provided Walton's confidential personnel information to KRQE news. Ms. Hemphill, on Walton's behalf, asked Powell to admonish his staff that harassment of Walton because of her association with former Commissioner Lyons would be illegal. (Ex. A, ¶ 21). Powell does not remember taking any action to address the concerns raised in Ms. Hemphill's letter. (Ex. C, p. 68, lines 3, through p. 69 line 4).

21.     Although Powell does not remember taking any action with respect to the accusation in Ms. Hemphill's letter that Sandra Lopez had disclosed confidential information about Walton to Larry Barker, Powell's ordinary course of business would have been to provide a copy of the letter to Ms. Lopez's supervisors, which would have included Elaine Olah and Robert Jenks. (Ex. C, p. 71 line 3, through p. 73 line 11).

22.     At a February 8, 2011 Commercial Resources Division meeting, there were questions about two leases administered during the Lyons administration. Ms. Bearden pointed two fingers at two female Hispanic Republican staff members in an accusing manner and said, "you two girls worked in the front office" with former Commissioner Lyons, and implied that those employees knew of allegedly improper handling of those leases. Walton reported Ms. Bearden's conduct, which Walton felt was inappropriate harassment, to Mr. Britt. (Ex. A, ¶ 22).

23.     On or about February 9, 2011, Walton was told to attend the Assistant Commissioners meeting. Neither Powell, nor Mr. Britt, nor Mr. Jenks had ever asked Walton to attend one of those meetings before that date. During the meeting Walton reported about a request she had received for leasing acreage. At this meeting, Mr. Relkin rolled his eyes and exchanged glances with

Commissioner Powell when Walton was giving her report. (Ex. A, ¶ 23).

24.    On February 16, 2011, Walton was called into a meeting with Powell, which was attended by Mr. Relkin, Mr. Jenks, Ms. Olah, Mr. Britt, Ms. Sandra Lopez, and Ms. Amy Atchley. The purpose of the meeting was to inform Walton that Ms. Atchley was being moved from the Legal Division back to the Commercial Resources Division, where Walton would supervise her.  No reason was given to Walton for the transfer.  The transfer was a complete surprise to Walton.  During the Lyons administration, Ms. Atchley had been transferred from the Commercial Resources Division to the Legal Division because she had been very disruptive in the Commercial Resources Division, and Walton had written up Ms. Atchley for performance and misconduct on several occasions.  Ms. Atchley and a former SLO employee had spread a false rumor that Commissioner Lyons and Walton were involved in a romantic relationship.  Walton had previously reported to Ms. Lopez that Ms. Atchley had spread the false rumor.  Ms. Lopez and Mr. Jenks smirked at Walton throughout the meeting.  (Ex. A, ¶ 24).

25.    On or about February 18, 2011, Walton went to lunch with Mr. Lyons and expressed her concerns to Mr. Lyons about the allegations that a land sale that Walton had administered was "illegal."  There were other SLO employees in the same restaurant.  Shortly after that lunch, Assistant Commissioner Ralph Gallegos informed Walton that Powell does not believe in going to lunch with his employees, which led Walton to believe that Powell was aware that Walton had gone to lunch with Mr. Lyons.  (Ex. A, ¶ 25).

26.    During January, February and March 2011, Mr. Britt made several comments to Walton referring to Mr. Lyons.  Among other things, Mr. Britt said several times "have you seen Pat?" or "how's your buddy Pat" referring to Mr. Lyons.  Related to those comments, on or about

February 22, 2011, Mr. Britt told Walton "no one in the Land Office respects you." Then, on or about February 24, 2011, Mr. Britt told Walton about a meeting that he, Powell, and others, had with Larry Barker and taunted Walton referring to Larry Barker as "your friend Larry." (Ex. A, ¶ 26).

27.   During January, February, March and April 2011, Delma Bearden, who Walton supervised, became increasingly insubordinate and hostile towards Walton. Mr. Britt moved Ms. Bearden's office next to his and began to direct Ms. Bearden's work. Walton observed that Ms. Bearden and Mr. Britt had a very close relationship, and often met behind closed doors. Although Walton continued to supervise some aspects of Ms. Bearden's work, Mr. Britt had become Ms. Bearden's primary supervisor. During that same time frame, Ms. Bearden increasingly began to make derogatory comments of a sexual and racial nature, which Walton believed, based upon her training, were very inappropriate and violated SLO policies. (Ex. A, ¶ 27).

28.   During February, March and April 2011, Walton verbally reported her concerns about Ms. Bearden's conduct to Mr. Britt on numerous occasions, and on April 7 and 8, 2011, sent Mr. Britt emails in which Walton raised some of her concerns about Ms. Bearden's misconduct. Mr. Britt did not respond to Walton's email, and, to Walton's knowledge took no action to address Walton's concerns. (Ex. A, ¶ 28).

29.   On April 14, 2011, Walton attended a meeting of the State Trust Lands Advisory Board. The Trust Lands Advisory Board assists the Commissioner of Public Lands in the formulation of policies and programs for the trust. The meeting started at 10:00 A.M., Mr. Britt directed Walton to appear at 10:30 A.M. When Walton arrived, the meeting was underway. The Board members, Powell and employees of the SLO, including Mr. Britt and Ms. Olah, were already seated. The only available seat was directly across a conference room table from Powell, and Walton

11

sat there.  (Ex. A, ¶ 29).

30.     During the April 14, 2011, meeting Powell addressed the Board.  During his presentation, Powell referred to the Larry Barker report and then followed up by stating that he was concerned about employees in inappropriate roles, who were "protected" employees.  Powell stated that the "protected" employees "for some reason didn't have to meet the leadership criteria within the division, and somehow got directions from the front office."  Although Powell did not mention Walton by name, Powell was glaring directly at Walton in a very threatening and serious manner during the time he made those remarks. (Ex. A, ¶ 30).

31.     Throughout April 2011, Ms. Bearden's conduct escalated.  Ms. Bearden frequently made comments, which Walton believed were sexually or racially inappropriate.  Those comments made Walton uncomfortable, and Walton believed, based upon her training and knowledge of SLO policies, that those comments were improper and could subject the SLO to liability for creating a sexually or racially hostile work environment.  When Walton verbally addressed Ms. Bearden's behavior to Ms. Bearden as these incidents would occur, Ms. Bearden became even more contentious and accusatory.  Ms. Bearden repeatedly justified her behavior and comments to Walton by saying, "I have worked with this administration before", referring to her employment in the first Powell administration.  (Ex. A, ¶ 31).

32.     By memos to Mr. Britt dated April 29 and April 30, 2011, Walton described Ms. Bearden's inappropriate conduct, which Walton believed constituted illegal sexual, racial, and religious harassment.  Walton delivered those memorandum to Mr. Britt on May 6, 2011.  Walton reported her concerns to Mr. Britt, because the SLO's harassment policy provides that a report of harassment can be made to an employee's supervisor.  Following Walton's reports to Mr. Britt, Ms.

Bearden continued to make inappropriate comments of a sexual and racial nature.  (Ex. A, ¶ 32).

33.    From February 2011, through the end of her employment, Walton attended weekly leadership meetings headed by Powell and Mr. Jenks, which were attended by various management employees.  Many times when Walton gave her reports, expressed her opinion, or participated in the discussion, Powell and Mr. Jenks were aloof, would cut Walton off or make facial gestures.  Powell frequently intimidated and threatened in those meetings by making comments like: "if you don't like it here we will be glad to help you find a place of your liking."  (Ex. A, ¶ 33).

34.    On June 10, 2011, Powell submitted the RIF plan to the State Personnel Office and received approval from the State Personnel Office on that same date. (Ex. C, p. 140, lines 1-18).

35.    On June 10, 2011, Walton was called into a meeting with Ms. Olah, Mr. Britt and Ms. Lopez.  Walton was informed that her employment was being terminated effective June 30, 2011, because of a Reduction in Force (RIF) and that Walton would be on paid administrative leave immediately through June 30, 2011.  Walton was directed to pack her personal belongings and directed to turn in her keys and leave the building immediately.  Before June 10, 2011, no one ever informed Walton that her position could possibly be eliminated through a RIF.  (Ex. A, ¶ 34).

36.    By email dated June 10, 2011, at 1:09 p.m., Powell informed the entire staff of the State Land Office statewide that Walton's employment had been terminated.  Walton found this to be extremely unusual, and it was embarrassing and humiliating to her.  In Walton's almost thirty years working in State government, Walton has never seen such an announcement of the termination of an employee's employment. (Ex. A, ¶ 35).

**III.**
**DEFENDANTS' STATEMENT OF ALLEGED UNDISPUTED MATERIAL FACTS**

Walton disputes the following alleged undisputed facts set forth in Defendants's "Statement of Undisputed Material Facts: 1, 8, 9, 10, 11, 12, 13, 25, 27, 28, 29, 31, 32, 35, 36, 37, 38, 39, 40, 41.  Exhibit F hereto sets forth each of those alleged undisputed material facts, and describes, for each of those alleged undisputed material facts, the evidence upon which Walton relies to show issues of fact which preclude summary judgment.  In summary, there is ample evidence upon which the jury can infer that the SLO's design and implementation of the RIF was a pretext for retaliation against Walton.

**IV.**
**ARGUMENT**

**A.     Summary Judgment Standards.**

Summary judgment shall be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  "When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  Third, the court cannot decide any issues of credibility." Two Old Hippies, LLC v. Catch the Bus, LLC, 277 F.R.D. 448, 459 (D.N.M. 2011) (internal citations omitted) (Browing, J.); accord Bragg v. Chavez, 2007 WL 5232464 (D.N.M. Aug. 2, 2007) (Browning, J.), citing Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121,

14

1124-25 (10th Cir.2000).

Applying these standards, and the standards which this Court articulated in detail in <u>Cordova v. New Mexico Taxation & Revenue Dep't</u>, 2011 WL 7164459 (D.N.M. Dec. 28, 2011) (Browning, J.), Walton has shown genuine issues of material fact regarding the motivation of the defendants for implementing the RIF plan under which Walton's employment was terminated.  As discussed below, a reasonable inference to be drawn from the facts set forth in Walton's Affidavit (Ex. A), and the deposition testimony attached to this Response (Ex's B, C, D, and E), is that the RIF plan was a pretext for discrimination against Walton on the basis of Walton's political association with Patrick Lyons, and in retaliation for Walton's engaging in protected activities.

 **B.** <u>**Walton's retaliation claims under the NMHRA and Title VII**</u>

  **1.** <u>**The law regarding retaliation**</u>.

Claims of retaliation under the New Mexico Human Rights Act and Title VII are analyzed identically.  <u>See</u> <u>Lobato v. New Mexico Env't Dep't</u>, 733 F.3d 1283, 1296 (10th Cir. 2013).  The three-step approach to analyzing discrimination claims set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), applies to retaliation claims.  <u>Sanchez v. Mora-San Miguel Elec. Co-op. Inc</u>., 173 F.3d 864 (10th Cir. 1999).  Under that approach, the plaintiff must first set forth a prima facie case of retaliation by establishing (1) she engaged in a protected activity; (2) her employer took adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.  <u>Sanchez</u>, <u>id</u>., and <u>Ruby v. Sandia Corp</u>., 699 F. Supp. 2d 1247, 1266 (D.N.M. 2010) (Browning, J.).  "If the plaintiff meets this burden, the burden of production shifts to the

defendant to present evidence of a legitimate, nonretaliatory business reason for its decision." Sanchez, id.

In the context of summary judgment, if the defendant proffers a legitimate, nonretaliatory business reason for its employment decision, the plaintiff must present evidence that the defendant's proffered reason is "pretextual-i.e. unworthy of belief." Kelley v. City of Albuquerque, 375 F. Supp. 2d 1183, 1210-11 (D.N.M. 2004) aff'd, 542 F.3d 802 (10th Cir. 2008) (Browning, J). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.  To avoid summary judgment, a party must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." Kelly, id. (internal quotation marks and citations omitted).  The Tenth Circuit has recognized that protected conduct closely followed by adverse action may justify an inference of retaliatory motive.  See O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir.2001).

In the context of a RIF, a plaintiff may show pretext by presenting evidence that his or her termination does not accord with the criteria allegedly used to select those in the RIF, by showing that the evaluation under the RIF criteria was deliberately falsified or manipulated to effect the plaintiff's termination, or by producing evidence that the RIF was generally pretextual.  Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1168 (10th Cir.1998).  "Evidence tending to show pretext permits an inference that the employer acted for discriminatory reasons." Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1125 (10th Cir.2005) (citation omitted).

16

At the summary judgment stage, "the inference of discrimination permitted by evidence of pretext must be resolved in favor of the plaintiff." Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1125 (10th Cir.2005) (citation omitted). "Thus, once a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment." Bryant v. Farmers Ins. Exch., 432 F.3d at 1125 (citation omitted); and Cordova v. New Mexico Taxation & Revenue Dep't, CIV 08-0681 JB/ACT, 2011 WL 7164459 (D.N.M. Dec. 28, 2011) (Browning, J).

Complaints to superiors about discriminatory conduct constitute protected activity. O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1255 (10th Cir. 2001); and Pastran v. K-Mart, Corp., 210 F.3d 1201, 1205 (10th Cir.2000). "Furthermore, plaintiff does not have to prove the validity of the grievance he was allegedly punished for lodging; opposition activity is protected even when it is based on a mistaken good faith belief that Title VII has been violated." Rowland v. Franklin Career Servs., LLC, 272 F. Supp. 2d 1188, 1207 (D. Kan. 2003); citing Zinn v. McKune, 143 F.3d 1353, 1362 (10th Cir.1998). In order to establish a causal connection between the protected activity and the adverse employment action, the plaintiff must show evidence that the individual who took adverse action against him knew of the employee's protected activity. Anderson v. Phillips Petroleum Co., 861 F.2d 631, 635 (10th Cir. 1988)

**2.      Application of retaliation law to facts.**

Walton has presented evidence sufficient to show a prima facie case of retaliation. It is not disputed that Walton engaged in a protected activity when she submitted written complaints about Ms. Bearden's conduct to her supervisor, Mr. Britt, on April 7 and 8, and on May 5, 2011. Further,

it is not disputed that the SLO took an adverse employment action shortly after Walton engaged in that protected conduct, specifically the submission of a RIF plan to the State Personnel Office on June 10, 2011, under which Walton's employment was terminated.  The proximity of the protected activity and the submission of the RIF plan to the State Personnel Office alone is sufficient to establish a prima facie case of retaliatory motive.

Moreover, Walton has come forward with ample evidence that the RIF criteria was deliberately manipulated to effect her termination, and that the RIF was generally pretextual.  Among other things, Walton has shown evidence that the SLO did not consider any options to Walton's termination, that other options were available, that other divisions in the SLO had an organizational structure similar to the organizational structure of the Commercial Resources Division, and that the SLO failed to offer Walton a right of first refusal for other positions in the SLO as required by State Personnel Board Rule 1.7.10.9.  (See Ex. A, ¶¶ 36, 37, 38; and Ex. F).

Although Ms. Olah denies that she had knowledge of Walton's complaints, a reasonable inference to be drawn from the facts that Mr. Britt delivered copies of Ms. Walton's complaints to Ms. Lopez, the Human Resources Manager who Ms. Olah supervised, and that SLO policy required Human Resources to investigate and keep copies of the complaints, is that Ms. Olah did in fact know about Ms. Walton's complaints, and is now not being truthful.  In any event, Ms. Olah's denial is not conclusive evidence.  See Anthony v. Sundlun, 952 F.2d 603, 606 (1st Cir. 1991) (An actor's self-serving statement about his state of mind is not conclusive).  Further, even if Powell, who was the ultimate decision maker, did not know about Walton's protected activity, which is not likely, there is evidence from which the trier of fact could conclude that the SLO is liable for retaliation under the subordinate bias theory of liability approved by the Tenth Circuit in E.E.O.C. v. BCI Coca-

18

Cola Bottling Co. of Los Angeles, 450 F.3d 476, 485 (10th Cir. 2006).

In any event, a reasonable inference to be drawn from the following facts is that Powell's staff fully informed Powell regarding Walton's employment, including the fact that Walton had complained about Bearden's conduct, before Powell submitted the RIF plan to the State Personnel Office for approval: 1) Ms. Lopez, Ms. Olah, and others met with Powell to discuss the RIF plan, on at least one occasion before June 10, 2011 (See Ex. B, p. 146 line 21 through p.147, line 11); 2) Ms. Lopez had the opinion that Mr. Lyons had improperly moved Ms. Walton into the classified service; 3) Mr. Britt testified that he delivered copies of Ms. Walton's complaints about Ms. Bearden to Ms. Lopez, who was obligated to investigate those complaints.

Moreover, there is evidence that Powell was motivated to favor Ms. Bearden. Ms. Bearden worked for Powell in the first Powell administration, and emailed SLO information about a pending land sale directly to Powell's future staff members, Mr. Relkin and Mr. Britt, on August 19, 2010, which was more than two months before the November 2, 2010 general election. (Ex. A, ¶ 20). There is ample evidence that the SLO's reasons for the RIF are pretextual. The SLO is not entitled to summary judgment dismissing Walton's retaliation claims under the New Mexico Human Rights Act and Title VII.

C.    **Walton's claim under the New Mexico Whistleblower Protection Act**

Under New Mexico's Whistleblower Protection Act (WPA), a public employer may not take any "retaliatory action" against a public employee because the public employee "communicates to the public employer... about an action... that the public employee believes in good faith constitutes an unlawful or improper act."  N.M. Stat. Ann. § 10-16C-3 (West).  Here there is ample evidence that Walton communicated to her supervisor, Mr. Britt, in accordance with SLO's policy, conduct

19

of Ms. Bearden which Walton believed in good faith constituted improper and unlawful discrimination.  Ms. Walton's reporting of Ms. Bearden's conduct is clearly a protected activity under the WPA.

Defendants' assertion that Walton has not shown a protected disclosure is incorrect as a matter of fact and law.  Ms. Bearden's conduct was, at a minimum, improper.  Ms. Bearden's conducted violated SLO's policy against sexual, racial, and religious harassment, and Walton reported Ms. Bearden's conduct to her supervisor, Mr. Britt, in accordance with SLO policy.  Mr. Britt then forwarded Walton's complaint to the SLO's Human Resources Manager, Ms. Lopez, who was supervised by Ms. Olah.  Whether Ms. Bearden's conduct rose to the level of actionable harassment under either Title VII or the NMHRA is irrelevant.  Under the WPA retaliation against a public employee who reports conduct "that the public employee believes in good faith constitutes an unlawful or improper act" is illegal.  N.M. Stat. Ann. § 10-16C-3 (West).  As discussed in the preceding section, there are genuine issues of material fact as to whether the SLO terminated Walton's employment through the RIF in retaliation for Walton's reporting of Ms. Bearden's conduct.  The SLO therefore is not entitled to summary judgment dismissing Walton's WPA claim.

### D.    Walton's § 1983 claim against Powell

#### 1.    The law under § 1983

"The First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance." Mason v. Okla. Tpk. Auth., 115 F.3d 1442, 1451 (10th Cir.1997).  In cases of discrimination based on political association, courts in the Tenth Circuit apply the tests developed in Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63

20

L.Ed.2d 574 (1980).  Trujillo v. Huerfano Cnty. Bd. of Cnty. Comm'rs, 349 F. App'x 355, 359-60

(10th Cir. 2009).  Under the Elrod/ Branti framework, to survive summary judgment an employee

must show a genuine dispute of fact that (1) political affiliation and/or beliefs were substantial or

motivating factors in the adverse employment action, and (2) the employee's position did not require

political allegiance.  Trujillo, id. citing Poindexter v. Bd. of County Comm'rs, 548 F.3d 916, 919

(10th Cir.2008); accord Jantzen v. Hawkins, 188 F.3d 1247, 1251 (10th Cir. 1999).  The burden of

proof rests with plaintiff on the first issue and with defendant on the second.  Dickeson v. Quarberg,

844 F.2d 1435, 1441 (10th Cir.1988).  A disputed fact regarding the defendant's alleged conduct or

motive precludes summary judgment.  Jones v. Lincoln Cnty. Comm'rs, CIV06-0591JB/LCS, 2007

WL 5239190 (D.N.M. July 10, 2007) (Browning, J.).

### 2.    Application of § 1983 to Facts.

The evidence discussed in Sections II and III of this Response shows a genuine dispute of fact

with respect to the issue of whether Walton's political affiliation with the Republican party and with

Mr. Lyons were "substantial or motivating factors in the adverse employment action."[3]  At the time

Powell submitted the RIF plan to the New Mexico State Personnel Office for approval, Powell was

well aware that Walton was politically affiliated with both the Republican party and Mr. Lyons, who

was Powell's political adversary.  It is not disputed that in November 2010, Powell watched the

Larry Barker report in which Mr. Barker accused Walton of being a "crony" of Mr. Lyons, and

portrayed Walton as an unqualified political hire.  Powell considers Mr. Barker to be the "gold

standard" of investigative reporters, and found "no reason to disbelieve" Mr. Barker's inflammatory

---

[3]  Defendants make no argument that Walton's position required political allegiance to Commissioner
Powell, who is a Democrat.

statements about Walton.  It is also not disputed that in January 2011, Powell received a letter from attorney Linda Hemphill in which Hemphill described Walton's affiliation with Mr. Lyons, and cautioned that any retaliation against Walton because of her political affiliation would be illegal.

At the April 14, 2011, meeting of the State Trust Lands Advisory Board, Powell referred to the Larry Barker report, and then stated, while looking directly at Walton, that there were "protected employees" in the Lyons administration who "for some reason didn't have to meet the leadership criteria within the division, and somehow got directions from the front office."  The evidence which Walton has brought forward in this Response and its Exhibits supports reasonable inferences that Powell was well aware of Walton's political affiliation, was well aware that Mr. Lyons hired Walton as an exempt employee and then directed the transfer of Walton to the classified service before the 2010 election, and that Powell approved the RIF plan in retaliation for Walton's political affiliation.

Nelms v. Modisett, 153 F.3d 815 (7th Cir. 1998), which Defendants discussed in their Motion (Doc. 38, p. 23) is instructive.  There the Seventh Circuit found that the district court properly ruled that there was evidence to support an inference that the defendants were aware of the plaintiff's Republican party membership, but that plaintiff failed to show evidence that the RIF under which plaintiff's employment was terminated was politically motivated.  Nelms, 153 F.3d at 818. The Nelms court stated that the plaintiff's proof that "he carried the political card of the opposition party or that he favored the defendant's opponent in the election" was not, by itself, sufficient to show that the adverse employment action was politically motivated.  Id. There was no evidence in Nelms that the persons who terminated plaintiff's employment were motivated by the plaintiff's Republican party membership.

By contrast, in this case the jury can reasonably infer, based upon the evidence discussed

22

above, that Powell, the official who ultimately approved the RIF plan and submitted the RIF plan

to the State Personnel Board for approval[4], was motivated by Walton's political affiliation. As

discussed above, there is ample evidence that Powell knew about Walton's political affiliation with

Powell's political adversary, and was motivated to terminate Walton's employment because of

Walton's political affiliation.  Powell clearly displayed his political bias against Walton at the April

14, 2011, meeting of the State Trust Lands Advisory Board, when Powell referred to the November

2010 Larry Barker report (which Powell believed met the "gold standard" of investigative reporting),

and then to "protected employees" in the Lyons administration who "for some reason didn't have

to meet the leadership criteria within the division, and somehow got directions from the front office."

Powell made those comments while staring directly at Walton.  Mr. Britt, a member of Powell's

hand-picked staff, who met regularly with Powell, made numerous comments to Walton regarding

her association with Mr. Lyons.  Powell and members of Powell's staff demonstrated through

comments and facial gestures their distrust of Walton in the context of transactions completed in the

Lyons administration.

　　　Further, based upon the following evidence the jury can reasonably infer that Ms. Olah

designed the RIF to eliminate Walton's position at the behest of Powell or with Powell's

endorsement, because of Walton's political affiliation:  1) Ms. Olah was a member of Powell's hand-

picked team who Powell hired as an exempt employee to oversee Administrative Services, including

the Human Resources Manager, Sandra Lopez; 2) Ms. Lopez informed Ms. Olah that she objected

to Mr. Lyons' direction to transfer Walton from an exempt position to a classified position; 3) Ms.

---

[4] Defendants' statement that the RIF "was within the sole determination of Ms. Olah" is misleading.  (Doc. 38, p. 24).  It is not disputed that Powell is the official who approved the RIF plan and submitted the RIF plan to the State Personnel Board for approval.(Ex. C, p. 140, lines 1-18).

Lopez, Ms. Olah, and others met with Powell to inform Powell regarding the development of the RIF plan; and 4) there were alternatives to meeting the budgetary and FTE requirements of the General Appropriations Act under which Walton's position would not be eliminated, which were not evaluated.  Although Ms. Olah now claims she knew nothing about Walton's political affiliation before she developed the RIF plan, and that Powell did not direct the development of the RIF plan to target Walton, the jury is not obligated to accept Ms. Olah's denial.  In any event, as discussed above, Powell is the official who approved the RIF plan and submitted it to the State Personnel Office for approval.  There is ample evidence upon which the jury can infer that Powell's doing so was politically motivated.

WHEREFORE, Walton requests the Court to deny Defendants' Motion.

Respectfully submitted,

SOMMER, UDALL, SUTIN, HARDWICK,
& HYATT, P.A.,
Attorneys for Plaintiff
By: /s/ Jack N. Hardwick
Jack N. Hardwick
P.O. Box 1984
Santa Fe, New Mexico 87504-1984
(505) 982-4676

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of December, 2013, I filed the foregoing electronically through the CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Scott P. Hatcher                                         shatcher@hatchertebo.com

/s/ Jack N. Hardwick
Jack N. Hardwick