## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PEGGY WALTON,

     Plaintiff,

vs.                                                                     No. CIV 13-0343 JB/KBM

NEW MEXICO STATE LAND OFFICE,
RAY POWELL, DONALD BRITT and
DELMA BEARDEN,

     Defendants.

## <u>MEMORANDUM OPINION</u>[1]

**THIS MATTER** comes before the Court: on (i) the Defendants' Motion for Summary

Judgment on Plaintiff's Second Amended Complaint to Recover Damages for Discrimination

and Retaliation and for Violations of Constitutional Rights, filed November 6, 2013

(Doc. 38)("MSJ"); and (ii) the Motion for Summary Judgment of Defendants' Ray Powell,

---

[1]On August 27, 2014, the Court issued an Order (Doc. 85)("MSJ Order") in which it granted in part and denied in part the Defendants' Motion for Summary Judgment on Plaintiff's Second Amended Complaint to Recover Damages for Discrimination and Retaliation and for Violations of Constitutional Rights, filed November 6, 2013 (Doc. 38), stating: "The Court will, however, at a later date issue a Memorandum Opinion more fully detailing its rationale for this decision." MSJ Order at 1 n.1.

On August 27, 2014, the Court also issued an Order (Doc. 86)("QI Order") in which it denied the Motion for Summary Judgment of Defendants' Ray Powell, David Britt and Delma Bearden as to Count VI of the Second Amended Complaint on Grounds of Qualified Immunity, filed November 27, 2013 (Doc. 52), stating: "The Court will, however, at a later date issue a Memorandum Opinion more fully detailing its rationale for this decision." QI Order at 1 n.1. At a pre-trial conference held on September 3, 2014, the Defendants informed the Court that they intend to file an immediate interlocutory appeal on the denial of summary judgment on the basis of qualified immunity. <u>See</u> Clerk's Minutes at 1, filed September 3, 2014 (Doc. 89). This Memorandum Opinion is the opinion promised in the QI Order .

Because the Defendants intend to file an interlocutory appeal solely on the denial of qualified immunity, the Court will address only that issue in this Memorandum Opinion and will supplement the Memoranda Opinion, at a later date, to address the remaining issues from the MSJ Order.

David Britt and Delma Bearden as to Count VI of the Second Amended Complaint on Grounds of Qualified Immunity, filed November 27, 2013 (Doc. 52)("MSJ QI").  The Court held hearings on April 9, 2014, and April 10, 2014. The primary issues are; (i)  whether Plaintiff Peggy Walton was engaged in a protected activity to warrant protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and under the New Mexico Human Rights Act, N.M. Stat. Ann. § 28-1-7 ("NMHRA"); (ii) whether a reasonable jury could find that there is a causal connection between the adverse action taken against Walton and her engagement in the protected activity; (iii) whether Walton's complaints to Donald Britt ("Britt") constituted a disclosure of a protected disclosure under both the New Mexico Whistleblower Protection Act, N.M. Stat. Ann. § 10-16C-1 ("WPA"); (iv) whether adverse action was taken against Walton because of this protected disclosure; (v) whether a reasonable jury could find that Walton's political affiliations were a substantial or motivating factor in her termination; (vi) whether there was a violation of Walton's rights under the First and Fourteenth Amendments to the Constitution of the United States of America; and (vii) whether the termination of an employee because of her affiliation with a prior administration is clearly established under Tenth Circuit and Supreme Court precedent.  The Court will grant the MSJ as it pertains to Walton's Title VII and NMHRA retaliation claims, because Walton has not presented evidence establishing a causal connection between her engagement in a protected activity -- reporting Delma Bearden's ("Bearden") alleged misconduct -- and the adverse action taken against Walton -- her termination.  Additionally, the Court will grant the MSJ as it pertains to Walton's WPA claim, because Walton has failed to produce evidence establishing a connection between her protected disclosure and the adverse action taken against her.  The Court will deny the MSJ, however, as it pertains to Walton's Section 1983 claim for violations of Plaintiff's constitutional rights under the First and

Fourteenth Amendments.  Additionally, the Court will deny the QI MSJ in its entirety.

**FACTUAL BACKGROUND**

From January, 1988, to December 4, 2001, Walton was employed at the Miner's Colfax Medical Center in Raton, New Mexico, and during her time at the Miner's Colfax Medical Center, Walton became acquainted with Patrick Lyons, who was at that time a Republican New Mexican state senator.  See Plaintiff's Response to Defendants' Motion for Summary Judgment ¶ 2, at 2, filed December 19, 2013 (Doc. 55)("Response")(setting forth this fact); Affidavit of Peggy Walton ¶ 3, at 1, filed December 19, 2013 (Doc. 55-1)("Walton Aff."); Defendants' Response to Plaintiff's Additional Relevant Evidence ("Are") ¶ 2, at 1, filed January 17, 2014 (Doc. 59-1)("Defendants' Response")(not disputing this fact).[2]  Walton "has been registered to

---

[2]Rather than disputing Walton's additional facts in their Reply, the Defendants' attached an exhibit to their Reply, titled "Defendants' Response to Plaintiff's Additional Relevant Evidence ("ARE").  See Defendants' Response ¶¶ 1-36, at 1-9.  The Court will refer to this document as "Defendants' Response" when addressing Defendants' arguments in disputing Walton's factual assertions.

The Defendants do not dispute this fact but argue that it "is of marginal relevance to the issue in this Motion."  Defendants' Response ¶ 1, at 1.  The local rules state:

> The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact.  All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Contending that a fact is not relevant is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ. 56.1(b).  In O'Brien v. Mitchell, 883 F. Supp. 2d 1055 (D.N.M. 2012)(Browning, J.), the Court explained that, because the proper course is to determine relevance of facts in the analysis section, rather than in the factual background section, objecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.  See 883 F. Supp. 2d at 1058 n.1.  See Wilson v. Jara, 866 F. Supp. 2d 1270, 1276-79 (D.N.M. 2011)(Browning, J.)("Whether this fact is relevant is a legal argument, and the Court will not address [the cited case] at this time, but will consider it in its legal analysis.").

vote as a Republican since approximately 1980."  Response ¶ 1, at 2 (setting forth this fact).  See Walton Aff. ¶ 3, at 1; Defendants' Response, ¶ 1, at 1 (not disputing this fact).  Lyons was elected to serve as the New Mexico Land Commissioner ("Land Commissioner") for a term beginning on January 1, 2007.  See Response ¶ 3, at 2-3 (setting forth this fact); Walton Aff. ¶ 4, at 2.[3]

After Lyons was elected, Walton applied for employment at the New Mexico State Land Office ("Land Office") several times, but did not receive a response.  See  Response ¶ 3, at 3 (setting forth this fact); Walton Aff. ¶ 4, at 2; Defendants' Response ¶ 3, at 1 (not disputing this fact).  In January, 2008, Walton told Lyons that she had been applying for positions at the Land Office and that she had not received a response.  See Response ¶ 3, at 3 (setting forth this fact); Walton Aff. ¶ 4, at 2; Defendants' Response ¶ 4, at 1 (not disputing this fact).  Walton then asked Lyons whether there were any open position for which she was qualified, and Lyons informed Walton that there were open positions and that she should keep applying.  See Response ¶ 3, at 3 (setting forth this fact); Walton Aff. ¶ 4, at 2; Defendants' Response ¶ 3, at 1 (not disputing this

_____

The Court thus deems these facts as undisputed and will, if necessary, determine their materiality in the analysis section.

In the Defendants' Response, the Defendants argue that almost every additional fact that Walton asserts in her Response is disputed as not material or not relevant.  See Defendants' Response ¶¶ 2-36, at 1-9.  Arguments and concerns about the materiality and relevance of a fact do not dispute.  See D.N.M.LR-Civ. 56.1(b).  See also O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.)("[Defendant's] argument that the facts underlying the state criminal case are immaterial does not specifically controvert those facts, and the Court will therefore deem those facts admitted.").  For the remaining facts asserted in the Response that are disputed as immaterial or irrelevant, the Court will deem them undisputed, and the Court will not individually address the dispute that each fact is immaterial or irrelevant in the Factual Background section, but will individually address them, if necessary, in the analysis section.

[3]The Defendants do not address this fact; thus, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

fact).   On June 18, 2008, Walton applied for a classified position at the Land Office.   See

Response ¶ 4, at 3 (setting forth this fact); Walton Aff. ¶ 5, at 2; Defendants' Response ¶ 4, at 1

(not disputing this fact).   Walton was not offered a classified position, however, but instead was

offered an exempt Secretary II position, which she accepted, and she began work on August 25,

2008.   See Response ¶ 4, at 3 (setting forth this fact); MSJ (QI) ¶ 3, at 4 (also setting forth this

fact); Walton Aff. ¶¶ 5-6; Defendants' Response ¶ 4, at 1 (not disputing this fact).   An exempt

employee serves at the will of the agency head and does not have the protections afforded to

classified employees under the State Personnel Act, N.M. Stat. Ann. § 10-9-4(D)(exempting

certain government positions from the protections of the Personnel Act).   See Response ¶ 15, at 7

(setting forth this fact); Deposition of Sandra Lopez at 18:9-20:13 (taken December 4, 2013),

filed December 19, 2013 (Doc. 55-6)("Plaintiff's Lopez Depo.");[4] Deposition of Ray Powell at

38:8-39:23 (taken November 26, 2013), filed December 19, 2013 (Doc. 55-5)("Powell Depo.");

Defendants' Response, ¶ 15, at 4 (not disputing this fact).   Exempt positions exist so that the

agency head has the ability to hire people whom the agency head believes are going to assist in

implementing the agency head's policies.   See Response ¶ 15, at 7 (setting forth this fact);

Plaintiff's Lopez Depo. at 19:9-19:13; Defendants' Response, ¶ 15, at 4 (not disputing this fact).

The Land Commissioner after Lyons -- Ray Powell -- who had also served as Land

---

[4]The Defendants and Walton each attach, as exhibits, different portions of Lopez'
deposition in the Response and the Reply.   See Deposition of Sandra Lopez (taken December 4,
2013), filed December 19, 2013 (Doc. 55-6); Deposition of Sandra Lopez (taken December 4,
2013), filed January 17, 2014 (Doc. 59-3).   These two portions of Lopez' deposition do not,
however, correlate, and each portion contains testimony that the other lacks.   Compare
Deposition of Sandra Lopez (taken December 4, 2013), filed December 19, 2013 (Doc. 55-6)
with Deposition of Sandra Lopez (taken December 4, 2013), filed January 17, 2014 (Doc. 59-3).
For clarity, the Court will refer to the portion of Lopez' deposition that Walton attached to her
Response as "Plaintiff's Lopez Depo." and will refer to the portion of Lopez' deposition that
Defendants attached to their Reply as "Defendants' Lopez Depo."

Commissioner before Lyons, understands that, historically in the Land Office, exempt employees serve under one elected official and then leave office, and the new elected official has the opportunity to appoint new people into that position.  See Response ¶ 15, at 7 (setting forth this fact); Powell Depo. at 38:21-39:8; Defendants' Response, ¶ 15, at 4 (not disputing this fact).[5]

---

[5]The Defendants assert the additional fact:

> In hiring Walton into an "exempt" Secretary II position, the NMSLO did not require or take into consideration that Walton was registered to vote as a Republican.  Nor did the NMSLO take into consideration whether Walton supported the Republican Party, the election of Commissioner Lyons, or any other political activity or ideology.

MSJ (QI) ¶ 4, at 4.  The Defendants assert additional facts that are essentially identical to this factual assertion.  See MSJ (QI) ¶¶ 7, 10, at 4-5.  To support this fact, the Defendants direct the Court to Sandra Lopez' affidavit, where she stated:

> When the NMSLO hired Ms. Walton into the "exempt" Secretary II position, it was not a requirement that the person hired be registered to vote as a Republican, that the person support the Republican Party, or that the person have supported the election of Commissioner Lyons or any other political activity or ideology. To the best of my knowledge, Ms. Walton was not hired because she was registered to vote as a Republican, because she supported the Republican Party or because she supported the election of Commissioner Lyons or any other political activity of Commissioner Lyons.

Affidavit of Sandra Lopez ¶ 2, at 2, filed November 27, 2014 (Doc. 52-1)("First Lopez Aff."). Walton disputes this fact by arguing that Lyons directed Lopez "to fill out the appropriate documents to hire Walton into the exempt Secretary II position" and that "Lopez admitted that she does not know whether Mr. Lyons hired Walton because Walton is a Republican, and does not know whether Mr. Lyons hired Walton because Walton supported Mr. Lyons."  Plaintiff's Response to Defendants' Motion for Summary Judgment (Doc. 52)(Alleged Qualified Immunity) at 3-4, filed December 30, 2013 (Doc. 56)("Response (QI)").  Walton directs the Court to Lopez' deposition where she testified that her only participation in Walton's hiring consisted of filling out "the appropriate documents for the Department of Finance and Administration."  Plaintiff's Lopez Depo. at 44:13-45:13.  Walton also directs the Court to a portion of Lopez' deposition, where she testified that she does not know whether Lyons hired Walton because of her support for the Republican Party, because she was a Republican, or because she supported Walton.  See Plaintiff's Lopez Depo. at 46:6-46:13, 74:18-76:4.  The Defendants rely on Lopez' Affidavit to support their factual assertion, see MSJ (QI) ¶ 4, at 4, but

Walton's first job assignment at the Land Office involved working in the Commercial Resources Division as a special projects coordinator and lease analyst.  See Response ¶ 5, at 3 (setting forth this fact); Walton Aff. ¶ 7, at 2; Defendants' Response ¶ 5, at 1 (not disputing this fact).   On or about October 22, 2008, Walton accepted the position of director of the commercial leasing section of the Commercial Resources Division, and as director of the commercial leasing section, Walton supervised the lease analysts, including Bearden, who was an employee whom the first Powell administration had hired.  See Response ¶ 5, at 3 (setting forth this fact); Walton Aff. ¶ 7, at 2-3; Defendants' Response ¶ 5, at 1 (not disputing this fact).

In early 2009, Lyons instructed Sandra Lopez, the Land Office's Human Resources Manager, to transfer Walton from the exempt Secretary II position to the only vacant classified position in the Commercial Resources Division, which was an Economist A position.  See Response ¶ 6, at 3-4 (setting forth this fact); Walton Aff. ¶ 8, at 3; Defendants' Response ¶ 6, at 1-2 (not disputing this fact).  Lyons also instructed Lopez to reclassify that Economist A position to a General Manager I position.  See Response ¶ 6, at 3-4 (setting forth this fact); Walton Aff. ¶ 8, at 3; Defendants' Response ¶ 6, at 3-4 (not disputing this fact).  Walton did not have the credentials to fill the Economist A position; however, Walton was qualified to serve in a General Manager I position, and Walton told Lopez at this time that she was not qualified to serve in the Economist A position.  See Response ¶ 6, at 3-4 (setting forth this fact); Walton Aff. ¶ 8, at 3.[6]

After the Land Office transferred Walton to the Economist A position, Lopez refused to

---

Lopez has testified that she does not know whether the asserted facts are true, see Plaintiff's Lopez Depo. at 46:6-46:13, 74:18-76:4.  Because Lopez' Affidavit and deposition contradict, the Court finds that the factual assertion is disputed and will not consider it.

[6]The Defendants do not address this fact; as such, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

initiate the paperwork with the State Personnel Office to reclassify the Economist A position to a

General Manager I position; after Lopez repeatedly refused to initiate the paperwork for over a

year, Lyons directed Walton to bypass Lopez and work directly with the State Personnel office to

accomplish the reclassification, which Walton did.  See Response ¶ 7, at 4 (setting forth this

fact); Walton Aff. ¶ 9, at 3.[7]  Lopez later told Elaine Olah that she thought the reclassifying of

---

[7]The "Defendants dispute that Sandra Lopez refused to initiate the paperwork with the State Personnel Office. . . ."  Defendants' Response ¶ 7, at 2.  Defendants direct the Court to a lengthy portion of Lopez' deposition, which includes the following testimony:

> Q.     Going back to your affidavit, in paragraph 2 you said that you'd participated in, and are familiar with, the reclassification of the Economist A position into a General Manager I position.
>
> What was your participation in that reclassification?
>
> A.     I was asked by Commissioner Lyons to assist in the process of reclassifying the position.
>
> Q.     Anything else?
>
> A.     Just assisting in the process.
>
> Q.     Did you assist in the process?
>
> A.     Yes.
>
> Q.     Did you resist assisting in the process?
>
> A.     No.
>
> Q.     Did you object to accomplishing that reclassification?
>
> A.     Not that reclassification.

. . . .

> Q.     Okay.  And did you resist working with Peggy on the reclassification of her position?

Walton's Economist A position to a General Manager I position was improper.  See Evidence in Opposition to Defendants' Statement of Alleged Undisputed Material Facts ¶ 9, at 2 (Doc. 55-8)("Evidence in Opposition");[8] Deposition of Loretta Elaine Olah at 54:24-58:7 (taken October

_____

> A.    No.
>
> Q.    Not at all?
>
> A.    No.

Deposition of Sandra Lopez at 54:6-55:12 (taken December 4, 2013), filed January 17, 2014 (Doc. 59-3)("Defendants' Lopez Depo."). The rest of Lopez' testimony that the Defendants direct the Court to describes Lopez' correspondences with the State Personnel Office and resolution of issues in reclassifying the Economist A position to a General Manager I position. See Defendants' Lopez Depo. at 55:23-74:15. To support her factual assertion, Walton directs the Court to her affidavit, which states:

> After the State Land Office transferred me to the Economist A position, Sandra Lopez refused to initiate the paperwork with the State Personnel Office (SPO) to reclassify the Economist A position to a General Manager I position, the reclassification held by other State Land Office employees with my level of responsibility. Finally, after Ms. Lopez repeatedly refused to initiate the paperwork for over a year, Mr. Lyons directed me to bypass Ms. Lopez and to work directly with the SPO to accomplish the reclassification, and I did so.

Walton Aff. ¶ 9, at 3. Walton's asserted fact and affidavit are contrary to Lopez' testimony. At the summary judgment stage, because Walton has presented competent evidence in support of her factual assertion, the Court must consider it as true. See Estate of Anderson v. Denny's Inc., 987 F. Supp. 2d 1113, 1138-39 (D.N.M. 2013)(Browning J.)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.")). The Court will, therefore, consider Walton's factual assertion to be true in considering the MSJ.

    [8]Walton does not dispute the Defendants' factual assertions in her response, but rather addresses them in a document attached to her Response as an exhibit, which is titled "Evidence in Opposition to Defendants' Statement of Alleged Undisputed Material Facts." See Evidence in Opposition ¶¶ 1-41, at 1-9. The Court will refer to this document as "Evidence in Opposition" when addressing Walton's arguments disputing the Defendants' factual assertions.

2, 2013), filed November 6, 2013 (Doc. 38-1)("Olah Depo.").[9]

---

[9]The Defendants dispute this fact by stating the "Plaintiff cannot state that Ms. Olah spoke to Ms. Lopez regarding her opinions as to whether Plaintiff had been inappropriately placed in a General Manager I position, as both Ms. Olah and Ms. Lopez deny any such conversation ever took place."  See Reply in Response ¶ 9, at 2.  To support her factual assertion, Walton directs the Court to a portion of Olah's deposition.  See Evidence in Opposition ¶ 9, at 2. The relevant portion states:

> Q.      Did Sandra Lopez tell you that she thought that was improper?

> MR. HATCHER:      Object to form.

> BY MR. HARDWICK:

> Q.      For Ms. Walton to have received, then moved into the economist I position?

> A.      I believe at some point when we went through discussing the movement of how Ms. Walton came to be in the general manager position, she did say that she was required to fill -- to post and fill the position with Ms. Walton.

> Q.      Did she say --

> A.      But I did not know that early on.

> Q.      Did Ms. Lopez tell you she thought that was improper?

> A.      She did tell me she objected to it.

> . . . .

> Q.      . . . .

> Did Ms. Lopez tell you that she refused to process the paperwork to reclassify the economist position as a general manager I?

> A.      I don't -- I recall that she said she had a problem with it, and I don't -- I don't know that she said it exactly that way.

Olah Depo. at 56:25-58:7.  Viewing the evidence in a light most favorable to Walton, the Court finds that Olah's testimony supports her factual assertion.  Olah testified that Lopez told her that she objected to the reclassification and that she had a problem with it.  See

The reclassification was approved effective September 8, 2010, and Walton continued to serve as the director of the commercial leasing section of the Commercial Resources Division. See Response ¶ 7, at 4 (setting forth this fact); MSJ (QI) ¶ 6, at 4 (also setting forth this fact); Walton Aff. ¶ 9, at 3; Defendants' Response ¶ 7, at 2 (not disputing this fact).  According to the position assignment documentation form, which describes the General Manager I position, Walton's responsibilities included management of employees in the Land Office's Commercial Resources Division, including "decisions to correct/discipline staff if unwilling to perform their duties ethically, professionally, and in a non-hostile manner," and the most challenging aspect of the General Manager I position was the "correction of inappropriate staff behaviors."  MSJ (QI) ¶ 11, at 5.  See First Lopez Aff. ¶ 6, at 2-3.[10]  On Walton's manager evaluation form, which was completed on February 22, 2011, one area of evaluation is the management of the Land Office's Commercial Resources Division staff by, among other things, establishing standards of performance and preparing employee evaluations.  See MSJ (QI) ¶ 12, at 6; First Lopez Aff. ¶ 7, at 3.[11]

Lyons served as Land Commissioner for two terms, the second of which expired on December 31, 2010, and did not run for re-election.  See Response ¶ 8, at 4 (setting forth this fact); Walton Aff. ¶ 10, at 4; Defendants' Response ¶ 8, at 2 (not disputing this fact).  Powell, a Democrat who had served as Land Commissioner immediately before Lyons' first term, defeated

---

Olah Depo. at 56:25-58:7.  This testimony supports the factual assertion that Lopez told Olah that she thought the reclassification was improper; thus, the Court, viewing the evidence in favor of the non-movant, will consider Walton's factual assertion.

[10]Walton does not address this fact; thus, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

[11]Walton does not address this fact; thus, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

the Republican candidate for Land Commissioner, Matthew Rush, in the November 2, 2010, general election.  See Response ¶ 8, at 4 (setting forth this fact); Walton Aff. ¶ 10, at 4; Defendants' Response ¶ 8, at 2 (not disputing this fact).  The campaign for Land Commissioner was contentious, and, during the campaign, Powell repeatedly attacked Lyons' record, and accused Lyons of engaging in unethical conduct and mismanaging State trust lands.  See Response ¶ 8, at 4 (setting forth this fact); Walton Aff. ¶ 10, at 4; Defendants' Response ¶ 8, at 2 (not disputing this fact).  Lyons publicly stated that Rush would continue the same policies as Lyons if Rush were elected.  See Response ¶ 8, at 4 (setting forth this fact); Walton Aff. ¶ 10, at 4.[12]

During the summer and fall of 2010, Walton attended a number of Republican campaign events, including rallies for Susana Martinez -- a Republican running for Governor -- which Rush also attended.  See Response ¶ 9, at 4 (setting forth this fact); Walton Aff. ¶ 11, at 4; Defendants' Response ¶ 9, at 2 (not disputing this fact).  Walton also attended a campaign event for Rush at Rancho de Chimayo restaurant in Espanola.  See Response ¶ 9, at 4 (setting forth this fact); Walton Aff. ¶ 11, at 4; Defendants' Response ¶ 9, at 2 (not disputing this fact).  Walton traveled to the Rush campaign event with Lyons and other Land Office employees.  See Response ¶ 9, at 4-5 (setting forth this fact); Walton Aff. ¶ 11, at 4; Defendants' Response ¶ 9, at 2 (not disputing this fact).  Land Office employees, including Lopez, knew of Walton's support of Lyons and the Republican Party.  See Response ¶ 9, at 5 (setting forth this fact); Walton Aff. ¶ 11, at 4.[13]  On the wall in her office, Walton had a photograph of herself and Governor

_____

[12]The Defendants do not address this fact; as such, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

[13]The Defendants dispute the fact that the "Plaintiff's support of the Republican party

Martinez, and a photograph of Lyons with a personal note from Lyons to Walton, and during the

fall of 2010, Walton observed Lopez studying those photographs.  See Response ¶ 9, at 5 (setting

forth this fact); Walton Aff. ¶ 10, at 4.[14]

---

was known to employees in the SLO, including Sandra Lopez."  Defendants' Response, ¶ 9, at 2.
Specifically, the Defendants direct the Court to a portion of Lopez' deposition, which contains
the following relevant exchange: "Q. And your testimony here today is that before this lawsuit
you had no idea whether Ms. Walton was a Republican or not? A. That is correct."  Defendants'
Lopez Depo. at 78:8-78:11.  Walton refers the Court to her affidavit to support her factual
assertion.  The relevant portion states:

> I believe that it (sic) well known in the State Land Office that I was a supporter of
> Mr. Lyons and the Republican Party.  I had a photograph of myself and Susana
> Martinez standing together, and a photograph of Mr. Lyons with a personal note
> from Mr. Lyons to me, on the wall in my office . . . .  During the fall of 2011, I
> observed Sandra Lopez studying those photographs.

Walton Aff. ¶ 11, at 4.  The facts set forth in Walton's affidavit -- her belief that her support of
the Republican party was well known in the Land Office, and that Lopez studied Walton's
pictures of her with Lyons and Martinez -- establish the reasonable inference that Lopez and
other Land Office employees knew of Walton's support of the Republican Party.  See Walton
Aff. ¶ 11, at 4.  The Court must take Walton's evidence as true, see Anderson v. Liberty Lobby,
Inc., 477 U.S. at 255, even though the Defendants have produced contrary evidence, Reeves v.
Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

> Thus, although the court should review the record as a whole, it must disregard all
> evidence favorable to the moving party that the jury is not required to believe.
> That is, the court should give credence to the evidence favoring the nonmovant as
> well as that 'evidence supporting the moving party that is uncontradicted and
> unimpeached, at least to the extent that that evidence comes from disinterested
> witnesses.

Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. at 151 (quoting Charles Allen Wright &
Arthur R. Miller, Federal Practice and Procedure § 2529, at 299 (2d ed. 1995))(citations
omitted).  Even though the Defendants have produced some direct evidence to dispute Walton's
asserted fact, because of the reasonable inferences that Walton's evidence creates, the Court
takes Walton's asserted fact as true in considering the MSJ.  See PNH Corp. v. Hullquist Corp.
843 F.2d 586, 593 (1st Cir. 1988)(finding a genuine issue of material fact when non-movant
relied solely on circumstantial evidence to contradict movant's direct evidence in the form of
depositions).

[14]The Defendants do not address this fact; however, there is testimony from Lopez'

In the November, 2010, general election, Walton voted for Rush, yet, Powell ended up winning the election.  See Response ¶ 10, at 5 (setting forth this fact); Walton Aff. ¶ 12, at 4; Defendants' Response ¶ 10, at 2 (not disputing this fact).  The day after the election, Walton told Bearden that she had voted for Rush, and Bearden told Walton that she had voted for Powell. See Response ¶ 10, at 5 (setting forth this fact); Walton Aff. ¶ 12, at 4; Defendants' Response ¶ 10, at 2 (not disputing this fact).  On or about November 17, 2010, Mark Corley, an associate of KRQE investigative reporter Larry Barker, approached Walton at the back entrance to the Land Office building when Walton arrived at work.  See Response ¶ 11, at 5 (setting forth this fact); Walton Aff. ¶ 13, at 4-5; Defendants' Response ¶ 11, at 3 (not disputing this fact).  Corley informed Walton that Walton's personal human resources information had become known to him, and he interviewed Walton by asking her questions about the circumstances of her hiring, her transfer from the exempt Secretary II position to the classified Economist A position, and the reclassification of the Economist A position to the General Manager I position.  See Response ¶ 11, at 5 (setting forth this fact); Walton's Aff. ¶ 13, at 5; Defendants' Response ¶ 11, at 3 (not disputing this fact).  Walton believed, from the context of the interview, that KRQE intended to portray these events in a negative light.  See Response ¶ 11, at 5 (setting forth this fact); Walton Aff. ¶ 13, at 5; Defendants' Response ¶ 11, at 3 (not disputing this fact).  Walton also believed that the Human Resources Manager, Lopez, had collaborated with others to furnish Walton's

---

deposition that contradicts it.  Specifically, Lopez answered "No" to the following progression of questions: "Did you see the picture of Ms. Walton and Susan Martinez together on Ms. Walton's wall?"; "You never saw that?"; "You never stood there and looked at it?"  Defendants' Lopez Depo. at 77:25-78:6.  Yet because Walton has produced evidence in support of the fact and because Defendants have not provided a "concise statement" to dispute Walton's fact, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

personal employment information to KRQE.  See Response ¶ 11, at 5 (setting forth this fact);

Walton Aff. ¶ 13, at 5.[15]  Lopez did help provide Walton's employment information to KRQE by

assisting the Land Office in responding to an Inspection of Public Records Act Request from

KRQE television that asked for Walton's personnel file.  See Defendants' Response ¶ 11, at 3

(asserting this fact); Deposition of Sandra Lopez at 82:12-84:21 (taken December 4, 2013), filed

January 17, 2014 (Doc. 59-3)("Defendants' Lopez Depo.").[16]

---

[15]The Defendants dispute that "Sandra Lopez collaborated with others to furnish Plaintiff's personal employment information to KRQE."  Defendants' Response ¶ 11, at 3.  The Defendants argue that Lopez did not collaborate with others to provide Barker with Walton's information, but instead "merely assisted in the agency [the Land Office] response to an IPRA request from KRQE television regarding Plaintiff's personnel file."  Defendants' Response ¶ 11, at 3.  An IPRA request, or Inspection of Public Records Act Request, is a request under the Inspection of Public Records Act ("IPRA"), N.M. Stat. Ann. § 14-2-1, which gives a "person [] a right to inspect public records of this state [New Mexico]," N.M. Stat. Ann. § 14-2-5, for the purpose of providing "all persons . . . the greatest possible information regarding the affairs of government and the official acts of public officers and employees," N.M. Stat. Ann. 1978, § 14-2-5.  Defendants do not, however, specifically controvert Walton's asserted fact.  That Lopez assisted others in providing Walton's employment information to the KRQE under an IPRA request is consistent with Walton's asserted fact that Lopez collaborated with others to provide Walton's information to KRQE.  The Court, thus, deems the fact undisputed.

[16]Walton has not filed a surreply to dispute this factual assertion.  The Court may, however, rely on new summary judgment evidence presented by the moving party in their reply brief as long as the Court has not denied the non-movant an opportunity to file a surreply.  See, e.g. Pippin v. Burlington Res. Oil & Gas Co., 440 F.3d 1186, 1191-92 (10th Cir. 2006).  Nearly eight months have passed since Defendants filed their Reply; yet, Walton has not requested leave of court to file a surreply.  See Pippin v. Burlington Res. Oil & Gas Co., 440 F.3d at 1192 ("The district court correctly pointed out that approximately a month and a half passed between [the movant] filing its reply and the district court's decision.  [The non-movant] had plenty of opportunity to seek leave of the court to file a surreply but never attempted to do so.").  Furthermore, the Court's consideration of this additional evidence will not surprise or prejudice Walton because the testimony is from a deposition that Walton's attorney conducted.  See Defendants' Lopez Depo. at 1.  Therefore, the Court deems this factual assertion undisputed, because Walton has not sought leave to file a surreply to dispute this fact and the deposition is not a surprise.  The Court might not consider a new document or affidavit presented in a reply, but this deposition cite is not wholly prejudicial or a surprise, considering that the Court held a hearing, giving all parties a full say, and Walton did not seek to do anything about the additional deposition testimony.

On or about November 18, 2010, Walton telephoned Powell to inform him about the interview with Corley.  <u>See</u> Response ¶ 12, at 5 (setting forth this fact); Walton Aff. ¶ 14, at 5; Defendants' Response ¶ 12, at 3 (not disputing this fact).  Walton wanted Powell to know that KRQE was going to broadcast a negative story about Walton and the Land Office.  <u>See</u> Response ¶ 12, at 5 (setting forth this fact); Walton Aff. ¶ 14, at 5; Defendants' Response ¶ 12, at 3 (not disputing this fact).  On November 21 or 22, 2011, Powell, along with Harry Relkin, an attorney whom Powell hired to serve as general counsel to the Land Office, returned Walton's telephone call.  <u>See</u> Response ¶ 12, at 5 (setting forth this fact); Walton Aff. ¶ 14, at 5; Defendants' Response ¶ 12, at 3 (not disputing this fact).  During the telephone conversation, Walton informed Powell and Relkin about the circumstances of her hiring, her transfer to the Economist A position, Lyons' directions to Lopez to reclassify the Economist A position to the General Manager I position, and Lopez' refusal to follow Lyons' directions.  <u>See</u> Response ¶ 12, at 5-6 (setting forth this fact); Walton Aff. ¶ 14, at 5; Defendants' Response ¶ 12, at 3 (not disputing this fact).[17]

KRQE television broadcast the Barker investigative report on November 23, 2010, and the report was titled: "Cronies move up as officials move out."  Response ¶ 13, at 6 (setting forth this fact).  <u>See</u> Walton Aff. ¶ 15-16, at 5; Defendants' Response ¶ 13, at 3 (not disputing this fact).  Anchor reporter Dick Knipfing introduced the news segment by saying, among other things, that Walton was "distinctly unqualified" for her position and that her hiring was "rigged."

---

[17]The Defendants do not dispute this fact but state "Mr. Powell recalls little of the conversation except that it 'didn't really make sense' to him."  Defendants' Response ¶ 12, at 3.  That the conversation "didn't really make sense" to Powell is an additional fact that does not controvert Walton's asserted fact.  <u>See</u> D.N.M.LR-Civ. 56.1(b).  The Court, thus, deems the fact undisputed.

Response ¶ 13, at 6 (setting forth this fact). <u>See</u> Walton Aff. ¶ 16, at 6.[18]  Barker began his report with the statement: "Meet State Land Office employee Peggy Walton.  How she went from low-level political appointee to high-level division manager in two short years is a fascinating case study in abuse of power."   <u>See</u> Response ¶ 13, at 6 (setting forth this fact); Walton Aff. ¶ 16, at 6.[19]  Barker went on to report that the Lyons administration hired Walton as an exempt position and then moved into the classified service before the election -- but did so in a misleading and inaccurate manner; he also described the circumstances of Walton's hiring and the sequence of events that led to her being placed in the General Manager I position.  <u>See</u> Response ¶ 13, at 6 (setting forth this fact); Walton Aff. ¶ 16, at 6.[20]  State Personnel Office Director, Sandra Perez, who had approved the Economist A to General Manager I reclassification, was interviewed during the Barker report, but Perez deferred to Lyons for an explanation about the reclassification; the report ended with Knipfing stating: "Governor-elect Susana Martinez has promised to fire any political appointee who has been improperly shifted into a classified job . . . . New Land Commissioner Ray Powell will inherit Walton.  It is not clear whether her job is protected."  Response ¶ 13, at 6 (setting forth this fact).  <u>See</u> Walton Aff. ¶ 16, at 6.[21]

---

[18]The Defendants do not address this fact; thus, the Court deems it undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

[19]The Defendants do not address this fact; thus, the Court deems it undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

[20]The Defendants do not address this fact; thus, the Court deems it undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

[21]The Defendants do not address this fact; thus, the Court deems it undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

Powell watched the Barker investigative report online within a few days after KRQE broadcast the report.  <u>See</u> Response ¶ 14, at 6-7 (setting forth this fact); Powell Depo. at 55:6-55:15; Defendants' Response ¶ 14, at 3-4 (not disputing this fact).  Powell considers Barker to be the "gold standard" in investigative reporting; he believes that Barker's reports are "thorough and vetted."  Response ¶ 14, at 7.  <u>See</u> Powell Depo. at 49:24-50:6; <u>id.</u> at 57:7-57:13.[22]  At the time he had no reason to disbelieve what Barker said about Walton, and he understood that the gist "from the report" was that Lyons had hired Walton in an exempt position and then transferred her into a classified economist position.  <u>See</u> Response ¶ 14, at 7 (setting forth this fact); Powell Depo. at 58:1-58:12; <u>id.</u> at 60:6-60:12.[23]

Powell took office as Land Commissioner on January 1, 2011.  <u>See</u> Response ¶ 16, at 7 (setting forth this fact); Walton Aff. ¶ 17, at 6; Defendants' Response, ¶ 16, at 4 (not disputing this fact).  Powell brought in a number of exempt employees, who replaced the exempt employees from the Lyons administration who resigned effective January 1, 2011.  <u>See</u> Response ¶ 16, 7 (setting forth this fact); Walton Aff. ¶ 17, at 6-7; Defendants' Response, ¶ 16, at 4 (not disputing this fact).  These new Land Office employees included Robert Jenks, who served as Deputy Commissioner and reported to Powell; Relkin, who served as Chief Legal Counsel and reported to Jenks; Defendant Donald Britt, who served as Assistant Commissioner over the Commercial Resources Division and reported to Jenks; and Elaine Olah, who served as Assistant Commissioner over the Administrative Services Division and reported to Jenks.  <u>See</u> Response

_____

[22]The Defendants do not address this fact; thus, the Court deems it undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

[23]The Defendants do not address this fact; thus, the Court deems it undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

¶ 16, at 7 (setting forth this fact); Walton Aff. ¶ 17, at 6-7; Defendants' Response, ¶ 16, at 4 (not disputing this fact).

On January 3, 2011, which was Walton's first day in the office in 2011, Powell placed a note on the door to Walton's office that said: "This office is reserved for Donald Britt." Response ¶ 17, at 8 (setting forth this fact); Walton Aff. ¶ 18, at 7; Defendants' Response, ¶ 17, at 4 (not disputing this fact). Britt had worked in the first Powell administration, and Powell hired Britt to also serve in the Second Powell administration as an exempt employee. See Response ¶ 17, at 8 (setting forth this fact); Walton Aff. ¶ 18, at 7.[24] Powell was the person who placed the note on the door to Walton's office before staff arrived to work on January 3, 2011. See Response ¶ 17, at 8; Powell Depo. at 63:2-63:25.[25] Powell placed notes on office doors for every exempt employee, and he did not know, at that time, that the office he assigned to Britt was Walton's office. See Defendants' Response ¶ 17, at 4 (setting forth this fact); Powell Depo. at 63:2-64:11.[26]

On January 3 or 4, 2011, Powell met with the Commercial Resources Division staff,

---

[24]The Defendants do not address this fact, thus, the Court deems it undisputed. See D.N.M.LR-Civ. 56.1(b).

[25]The Defendants do not dispute this fact, but respond that "it is not material as Commissioner Powell placed a note on a door for every exempt employee, and did not know that the office he assigned to Donald Britt was Plaintiff's." Defendants' Response ¶ 17, at 4. This factual assertion does not "specifically controvert[]" Walton's factual assertion but rather adds an additional fact and disputes materiality. Yet, because this additional fact does not "specifically controvert[]" the fact and because materiality is more properly addressed in the analysis section, the Court deems the fact undisputed. See D.N.M.LR-Civ. 56.1(b). See also O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.).

[26]Walton did not file a surreply to dispute this fact, and the assertion is supported by evidence from a deposition that Walton's attorney conducted. See Powell Depo. at 1. The Court will, thus, deem it undisputed for the same reasons set out in note 13. See supra note 13.

along with Jenks and Britt.  See Response ¶ 18, at 8 (setting forth this fact); Walton Aff. ¶ 19, at 7; Defendants' Response ¶ 18, at 4 (not disputing this fact).   During the meeting, Powell expressed his opinion that the stewardship and leasing of State Trust Lands under the Lyons administration had not been handled properly, and he stated there would be federal investigations to find out who was involved; Powell stated that "men in suits with guns" were going to come to the office and implied that those "men in suits with guns" would arrest anyone involved in any wrongdoing.  See Response ¶ 18, at 8 (setting forth this fact); Walton Aff. ¶ 19, at 7; Defendants' Response ¶ 18, at 4 (not disputing this fact).  On January 24, 2011, Britt and Bearden accused Walton of illegally administering a land sale that had closed during Lyons' term in the latter part of December 2010.  See Response ¶ 19, at 8 (setting forth this fact); Walton Aff. ¶ 20, at 7.[27]

Because Powell had made threatening remarks during the January 4, 2011, meeting about alleged illegal conduct in the Lyons administration, and because Britt had been making comments to Walton about alleged illegal conduct in the Lyons administration, Walton asked her attorney, Linda Hemphill, to contact Powell regarding Walton's concerns that Walton was being mistreated because of her previous association with the Lyons administration.  See Response

---

[27]The Defendants attempt to dispute this fact; however, the Defendants do not refer the Court to any part of the record.  The local rules state:

> The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact.  All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  The Defendants do not "refer with particularity to [the] portions of the record upon which the [Defendants] rel[y]."   D.N.M.LR-Civ. 56.1(b).   The Defendants, therefore, have not "specifically controverted" this fact, and the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

¶ 19, at 8 (setting forth this fact); Walton Aff. ¶ 20, at 7-8.[28]  On January 27, 2011, Hemphill delivered a letter to Powell, which laid out Walton's affiliation with Lyons going back to Walton's employment at Miners' Colfax Medical Center, the circumstances of Walton's hiring and promotion during the Lyons administration, and Walton's belief that Lopez had inappropriately provided Walton's confidential personnel information to KRQE news.  See Response ¶ 20, at 8-9 (setting forth this fact); Walton Aff. ¶ 21, at 8; Defendants' Response ¶ 20, at 5 (not disputing this fact).[29]  Hemphill, on Walton's behalf, asked Powell to admonish his staff that harassment of Walton because of her association with Lyons would be illegal.  See Response ¶ 20, at 9 (setting forth this fact); Walton Aff. ¶ 21, at 8; Defendants' Response ¶ 20, at 5 (not disputing this fact).  Powell does not remember taking any action to address the concerns that Hemphill's letter raised, see Response ¶ 20, at 9 (setting forth this fact); Powell Depo. at 68:3-69:4; Defendants' Response ¶ 20, at 5 (not disputing this fact), although Powell's ordinary course of business would be to provide a copy of the letter to Lopez' supervisors, including Olah and Jenks, see Response ¶ 21, at 9 (setting forth this fact); Powell Depo. at 72:11-73:3.[30]

---

[28]The Defendants do not specifically dispute this fact, but rather state that the Defendants "cannot speak to Plaintiff's motivations in retaining an attorney to draft correspondence to Ray Powell. That letter speaks for itself."  Defendants' Response ¶ 19, at 4.  Because the Defendants do not specifically dispute this fact, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

[29]The Defendants dispute "the underlying premise that Ms. Lopez disclosed, improperly, any confidential information to KRQE."  Defendants' Response ¶ 21, at 5.  Walton's asserted fact, however, is that the letter stated: "Walton's belief that Sandra Lopez had inappropriately provided Walton's confidential personnel information to KRQE news" and not that Lopez did in fact improperly revealed confidential information.  Response ¶ 20, at 5.  The Defendants' have asserted an additional fact that does not "specifically controvert[]" the asserted fact; thus, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

[30]The Defendants dispute this fact by stating that the "Plaintiff's characterization of Powell's testimony regarding whether he would have provided the correspondence to Elaine Olah and Robert Jenks."  Defendants' Response ¶ 21, at 5.  Defendants and Walton direct the

_____

Court to a portion of Powell's deposition.  See Response ¶ 21, at 9; Defendants' Response ¶ 21, at 5; Powell Depo. 71:3-73:11.  The relevant testimony provides:

> Q.      Sandra Lopez was in human resources, wasn't she?
>
> A.      That's correct.  Um-hum.
>
> Q.      So is there any reason why you wouldn't have asked someone to investigate these allegations about Sandra Lopez?
>
> A.      I'm not sure that I didn't.  I just don't remember.
>
> Q.      Ordinarily, would you have, like you said, given this to the supervisory chain of command, which would have been Ms. Olah?
>
> A.      Either Ms. -- Bob Jenks or Ms. Olah would be a natural for that, under other circumstances.
>
> Q.      Do you receive letters like this very often?
>
> A.      No.  I think this is an unusual letter.
>
> Q.      All right.
>
> A.      Yeah
>
> Q.      So --
>
> A.      I don't remember.  Yeah.
>
> Q.      But your ordinary course of business would be to initiate an investigation in some fashion, wouldn't it?
>
> A.      It would be to follow up again, with our legal division, because it was from an attorney, and I may have passed it on to Mr. Jenks, as well.  I can't remember.
>
> Q.      Would you have passed it on to Ms. Lopez' supervisor?
>
> A.      That's a possibility.
>
> Q.      Would that be something you would think is appropriate?
>
> A.      I think I probably would have passed it on -- again, I just can't

At a February 8, 2011, Commercial Resources Division meeting, there were questions about two leases administered during the Lyons administration.  See Response ¶ 22, at 9 (setting forth this fact); Walton Aff. ¶ 22, at 8; Defendants' Response ¶ 22, at 5 (not disputing this fact).[31] Bearden pointed two fingers at two female Hispanic, Republican Land Office employees in an accusing manner and said, "you two girls worked in the front office" with Lyons, and implied that the two employees knew of improper handling of the leases.  Response ¶ 22, at 9 (setting forth this fact); Walton Aff. ¶ 22, at 8.[32]  Walton reported Bearden's conduct to Britt, because

---

remember that.

Powell Depo. at 71:17-72:24.  The Defendants dispute the "Plaintiff's characterization of Powell's testimony regarding whether he would have provided the correspondence to Elaine Olah and Robert Jenks."  Defendants' Response ¶ 21, at 5.  The Defendants argue that "Commissioner Powell explicitly testified that it was a 'possibility' that he passed the letter on to Ms. Lopez' supervisors, including Ms. Olah, but that he does not recall one way or the other." Defendants' Response ¶ 21, at 5.  Yet, as Powell's testimony shows, after Powell stated it was "a possibility that" he passed the letter onto Lopez' supervisors, he stated that he "probably would have passed it on."  Powell Depo. at 72:28-72:24.  Viewing the evidence in a light favorable to Walton and making all reasonable inferences in Walton's favor, the Court finds Powell's testimony supports Walton's factual assertion.  Because the Defendants have not "specifically controverted" Walton's asserted fact, the Court deems it undisputed.  D.N.M.LR-Civ. 56.1(b).

The Defendants also argue that "[n]o evidence shows Ms. Olah ever received the Hemphill letter."  Defendants' Response ¶ 21, at 5.  This is contrary to the evidence.  As shown above, Powell probably passed the letter onto Jenks or Olah.  Powell Depo. at 71:17-72:24. Furthermore, the Defendants' additional fact, that Olah did not receive the Hemphill letter, does not specifically controvert the asserted fact, which is that Powell probably passed the letter onto Olah and Jenks.  Cf. Defendants' Response ¶ 21, at 5.

[31]The Defendants state that they "have no evidence to dispute that a meeting took place on February 8, 2011, though discovery in this case is still ongoing."  Defendants' Response ¶ 22, at 5.  Discovery closed on January 31, 2014, see Scheduling Order at 1, filed July 12, 2013 (Doc. 16)("Scheduling Order"), and the Defendants have not supplemented their Reply since the close of discovery.  Because the Defendants do not specifically controvert this fact, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

[32]The Defendants do not specifically dispute this fact, but instead "dispute that this fact is material," for a number of reasons, including that

she felt that the conduct was inappropriate harassment.  See Response ¶ 22, at 9 (setting forth this fact); Walton Aff. ¶ 22, at 8.[33]

On or about February 9, 2011, Walton was told to attend the Assistant Commissioners' meeting.  See Response ¶ 22, at 9 (setting forth this fact); Walton Aff. ¶ 23, at 8; Defendants' Response ¶ 23, at 6 (not disputing this fact).  Before February 9, 2011, Powell, Britt, or Jenks never asked Walton to attend an Assistant Commissioners meeting.  See Response ¶ 23, at 9 (setting forth this fact); Walton Aff. ¶ 23, at 8.[34]  During the meeting, Walton reported about a request she had received for leasing acreage, and while she gave her report, Relkin rolled his eyes and exchanged glances with Powell.  See Response ¶ 22, at 9-10 (setting forth this fact); Walton Aff. ¶ 23, at 8-9.[35]  On February 16, 2011, Walton was called into a meeting with

---

Plaintiff cannot state that (a) anyone else within the SLO was aware that the two women that Ms. Bearden pointed at were Hispanic or Republican; (b) Ms. Bearden pointed at the women because they were Hispanic or Republican; (c) Ms. Bearden stated that the two women had done anything other than work in the front office with former Commissioner Lyons; and (d) cannot produce evidence that she reported this conduct to Mr. Britt.

Defendants' Response ¶ 22, at 5.  Because materiality is more properly considered in the analysis section, the Court deems the fact undisputed and will address materiality, if necessary, in the analysis section.  See D.N.M.LR-Civ. 56.1(b). See also O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1.

[33]The Defendants do not address this fact; thus, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[34]The Defendants do not address this fact; thus, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

[35]The Defendants dispute "that during the meeting Mr. Relkin 'rolled his eyes and exchanged glances' with Commissioner Powell when Plaintiff was giving her report." Defendants' Response ¶ 23, at 6.  The Defendants do not refer to any portion of the record to dispute this fact; thus, the Defendants have not specifically controverted the fact, and the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

Powell; Relkin, Jenks, Olah, Britt, Lopez, and Amy Atchley all attended the meeting.  See Response ¶ 24, at 10 (setting forth this fact); Walton Aff. ¶ 24, at 9.[36]  The meeting's purpose was to inform Walton that Atchley was being moved from the Legal Division back to the Commercial Resources Division, where Walton would supervise her.  See Response ¶ 24, at 10 (setting forth this fact); Walton Aff. ¶ 24, at 9; Defendants' Response ¶ 24, at 6 (not disputing this fact).  Walton was not given a reason for the transfer, and the transfer was a surprise to Walton; Atchley served during the Lyons administration and had been transferred from the Commercial Resources Division to the Legal Division, because she had been disruptive in the Commercial Resources Division.  See Response ¶ 24, at 10 (setting forth this fact); Walton Aff. ¶ 24, at 9.[37]  During the Lyons administration, Walton had written up Atchley for performance and misconduct on several occasions.  See Response ¶ 24, at 10 (setting forth this fact); Walton Aff. ¶ 24, at 9.[38]  During the Lyons administration, Atchley and a former Land Office employee spread a false rumor that Lyons and Walton were involved in a romantic relationship, and Walton reported to Lopez that Atchley had spread the false rumor.  See Response ¶ 24, at 10 (setting forth this fact); Walton Aff. ¶ 24, at 9.[39]  During the February 16, 2011, meeting, Lopez

---

[36]Defendants do not address this fact; thus, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

[37]The Defendants do not address this fact; thus, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

[38]The Defendants do not address this fact; thus, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

[39]The Defendants do not specifically dispute this fact, but instead state that they "have no information one way or another regarding a romance between Plaintiff and Mr. Lyons." Defendants' Response ¶ 24, at 6.  Because the Defendants do not specifically controvert the fact, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

and Jenks smirked at Walton throughout the meeting.  See Response ¶ 24, at 10 (setting forth this fact); Walton Aff. ¶ 24, at 9.[40]

On or about February 18, 2011, Walton went to lunch with Lyons and expressed her concerns to Lyons about the allegations that a land sale that Walton had administered was illegal; there were other Land Office employees in the same restaurant.  See Response ¶ 25, at 10 (setting forth this fact); Walton Aff. ¶ 25, at 9.[41]  Shortly after that lunch, Assistant Commissioner Ralph Gallegos informed Walton that Powell does not believe in going to lunch with his employees, which Walton believed to mean that Powell was aware that Walton had gone to lunch with Lyons.  See Response ¶ 25, at 10 (setting forth this fact); Walton Aff. ¶ 25, at 9-10.[42]

In January, February, and March, 2011, Britt made several comments to Walton, in which Britt referred to Lyons, including, among other things, several times saying "have you seen Pat?"

---

[40]The Defendants "deny that Ms. Lopez and Mr. Jenks 'smirked' at Plaintiff throughout the meeting."  Defendants' Response ¶ 24, at 6.  The Defendants do not refer the Court to any part of the record in disputing this fact; thus, the Court deems it undisputed. See D.N.M.LR-Civ. 56.1(b).

[41]The Defendants do not specifically deny this fact, but rather state that the "Defendants have no evidence with which to dispute that on February 18, 2011 Plaintiff went to lunch with Commissioner Lyons, that there were other Land Office employees in the same restaurant . . . though discovery in this case is ongoing."  Defendants' Response ¶ 25, at 6.  Discovery closed on January 31, 2014, see Scheduling Order at 1, and the Defendants have not supplemented their Reply since the close of discovery.  Because the Defendants have not specifically controverted these facts, the Court deems them undisputed.  See D.N.M.LR-Civ. 56.1(b).

[42]The Defendants do not specifically dispute this fact, but rather state they "have no evidence with which to dispute . . . that Assistant Commissioner Gallegos mentioned to Plaintiff that Commissioner Powell does not believe in going to lunch with his employees, though discovery in this case is ongoing."  Defendants' Response ¶ 25, at 6.  Discovery closed on January 31, 2014, see Scheduling Order at 1, and the Defendants have not supplemented their Reply since the close of discovery.  Because the Defendants have not specifically controverted these facts, the Court deems them undisputed.  See D.N.M.LR-Civ. 56.1(b).

or "how's your buddy Pat."  See Response ¶ 26, at 10 (setting forth this fact); Walton Aff. ¶ 26,

at 10.[43]  Related to those comments, on or about February 22, 2011, Britt told Walton "no one in

the Land Office respects you," and on or about February 24, 2011, Britt told Walton about a

meeting that Powell and others had with Barker, and taunted Walton by referring to Barker as

"your friend Larry."  Response ¶ 26, at 10-11 (setting forth this fact); Walton Aff. ¶ 26, at 10.[44]

In January, February, March, and April, 2011, Bearden became insubordinate and hostile

towards Walton.  See Response ¶ 27, at 11 (setting forth this fact); Walton Aff. ¶ 27, at 10.[45]

Britt moved Bearden's office next to his and began to direct Bearden's work, and although

Walton continued to supervise some aspects of Bearden's work, Britt became Bearden's primary

supervisor.  See Response ¶ 27, at 11 (setting forth this fact); Walton Aff. ¶ 27, at 10.[46]  Walton

remained Bearden's supervisor, and Bearden reported directly to Walton.  See MSJ ¶ 25, at 7

(setting forth this fact); Deposition of Peggy Walton at 79:16-80:12 (taken September 17, 2013),

---

[43]The "Defendants dispute that Mr. Britt made such comments to Plaintiff."  Defendants' Response ¶ 26, at 6.  The Defendants do not "refer with particularity to those portions of the record upon which the" Defendants rely, and, thus, do not "specifically controvert[]" this fact.  D.N.M.LR-Civ. 56.1(b).  The Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

[44]The "Defendants dispute that Britt made such comments to Plaintiff."  Defendants' Response ¶ 26, at 6.  The Defendants do not, however, "refer with particularity to those portions of the record upon which the" Defendants rely, and, thus, do not "specifically controvert[]" these facts.  See D.N.M.LR-Civ. 56.1(b).

[45]The "Defendants dispute that Ms. Bearden became increasingly insubordinate and hostile to Plaintiff."  Defendants' Response ¶ 27, at 7.  The Defendants do not, however, "refer with particularity to those portions of the record upon which the" Defendants rely, and, thus, do not "specifically controvert[]" these facts.  D.N.M.LR-Civ. 56.1(b).  The Court, thus, deems them undisputed.

[46]The Defendants do not address this fact, and, thus, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

filed November 6, 2013 (Doc. 38-3)("Walton Depo.").[47]

Walton observed that Bearden and Britt had a very close relationship, and often met behind closed doors.  See Response ¶ 27, at 11 (setting forth this fact); Walton Aff. ¶ 27, at 10.[48] During that same time frame, Bearden made derogatory comments of a sexual and racial nature, which Walton believed were inappropriate and violated Land Office policies.  See Response ¶ 27, at 11 (setting forth this fact); Walton Aff. ¶ 27, at 10.[49]

The only specific reference by Bearden regarding Walton's gender arose from a single circumstance where Bearden stated that she believed that a "man" was needed to deal with one specific client in one specific instance.  MSJ ¶ 20, at 6 (setting forth this fact); Walton Depo. at 87:12-88:23.[50]  No comments were ever made, however, by anyone in a position superior to

---

[47]Walton attempts to dispute this fact by stating: "Although Walton was Ms. Bearden's supervisor, Ms. Bearden in fact reported directly to Mr. Britt regarding various matters." Evidence in Opposition ¶ 25, at 4.  Walton refers the Court to a portion of her affidavit in which she states that, among other things: "Although I continued to supervise some aspects of Ms. Bearden's work, Mr. Britt directed me not to assign leases to Ms. Bearden, and it appeared to me that Mr. Britt had become her primary supervisor."  Walton Aff. ¶ 27, at 10.  The assertions that Britt directed portions of Bearden's work and that Britt appeared to be Bearden's primary supervisor provide additional facts, but do not specifically controvert that Bearden still reported directly to Walton.  D.N.M.LR-Civ. 56.1(b).  Accordingly, the Court deems the facts undisputed.

[48]The Defendants do not address this fact, and, thus, the Court deems it undisputed. See D.N.M.LR-Civ. 56.1(b).

[49]The Defendants attempt to dispute this assertion by stating that the "Defendants dispute that Ms. Bearden became increasingly insubordinate and hostile to Plaintiff."  Defendants' Response ¶ 27, at 7.  The Defendants do not, however, "refer with particularity to those portions of the record upon which the" Defendants rely, and, thus, do not "specifically controvert[]" these facts.  D.N.M.LR-Civ. 56.1(b). The Court deems them undisputed.  See D.N.M.LR-Civ. 56.1(b).

[50]Walton does not explicitly state that this fact is undisputed.  In her Response, Walton refers only to the facts that she disputes.  So, for facts she does not address, the Court deems undisputed, see D.N.M.LR-Civ. 56.1(b), and for the remainder of the Opinion will merely state that Walton does not dispute these facts rather than explaining that each unaddressed fact is

Walton, that a male was needed to fill her General Manager I position.  See MSJ ¶ 21, at 6 (setting forth this fact); Walton Depo. at 84:24-83:9; Evidence in Opposition ¶¶ 1-41, at 1-9 (not disputing this fact).  Additionally, Bearden's statements were made in Walton's presence, but were not directed at Walton.  See MSJ ¶ 22, at 6 (setting forth this fact); Walton Depo. at 94:11-101:4; Evidence in Opposition ¶¶ 1-41, at 1-9 (not disputing this fact).[51]

_____

deemed undisputed.

[51]The Defendants assert the additional fact that "Defendant Bearden never made any derogatory statements to Plaintiff about her protected class (Hispanic)."  MSJ ¶ 23, at 6.  Walton does not address this fact, but the portion of the record to which the Defendants direct the Court does not support the fact.  The Defendants refer the Court to Walton's deposition,  which contains the following relevant testimony:

> Q.     (BY MR. HATCHER) Did she [Bearden] ever make any statements to you that implied or expressly stated that she doesn't like Hispanics or Native Americans?

> A.     She referred to Hispanics as the derogatory term that you hear about Mexican nationals.

> Q.     What's that?

> A.     Mojars.

> Q.     She said that?

> A.     Yes.

. . . .

> Q.     (BY MR. HATCHER) What does that mean?

> A.     Mojar means -- it's a, well, slang term, I guess, would be what they call wetbacks.

> Q.     Okay. And she said that directly -- she ascribed that characterization to you?

> A.     Yes.

The Land Office had a non-harassment policy in effect from April, 2004, through March, 2013, which contained a provision that stated that "if any employee believed that she had been subjected to harassment on the basis of race, gender, or certain other classifications, she was required to inform her supervisor or some other designated NMSLO personnel."  MSJ (QI) ¶ 13, at 6.  See First Lopez Aff. ¶ 8, at 3.[52]  On numerous occasions in February, March, and April, 2011, Walton verbally reported her concerns about Bearden's conduct to Britt.  See Response ¶ 28, at 11 (setting forth this fact); Walton Aff. ¶ 28, at 10; Defendants' Response ¶ 28, at 7 (not disputing this fact).   On April 7 and 8, 2011, Walton sent Britt electronic mail transmissions in

_____

> Q.      And tell me exactly what she said.
>
> A.      I don't recall who she was referring to, but I do know that any time a Hispanic would inquire about a land sale or a lease that she felt protective about, she would -- I shouldn't say any time.  That specific time, she referred to them as a "mojar."
>
> Q.      So she was describing someone other than you as a "mojar," correct?
>
> A.      Right.

Walton Depo. at 94:11-95:7 (alteration added).  The Defendants' asserted fact -- the "Defendant Bearden never made any derogatory statements to Plaintiff about her protected class (Hispanic)" -- can either be interpreted as meaning Bearden never made a derogatory statement directed at Bearden concerning Hispanics or that Bearden never made a derogatory statement to Walton concerning Hispanics.  See MSJ ¶ 23, at 6.  Because the Defendants' previous factual statement is that Bearden's statements concerning race or national origin were not "directed at Bearden," MSJ ¶ 22, at 6, the Court interprets this factual statement as Bearden never made any derogatory statement to Walton that concerned Hispanics.  MSJ ¶ 23, at 6.  Because Walton's testimony, to which the Defendants directed the Court, contradicts the Defendants' asserted statement, the Court finds that the Defendants' asserted statement lacks support in the evidence and will not consider it.

[52]Walton does not address this fact; thus, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

which Walton raised some of her concerns about Bearden's misconduct.  See Response ¶ 28, at 11 (setting forth this fact); Walton Aff. ¶ 28, at 10.[53]  Britt did not respond to Walton's electronic mail transmissions, and, to Walton's knowledge, took no action against Bearden to address Walton's concerns.  See Response ¶ 28, at 11 (setting forth this fact); Walton Aff. ¶ 28, at 10.[54]

On April 14, 2011, Walton attended a meeting of the State Trust Lands Advisory Board, which assists the Land Commissioner in the formation of policies and programs for the trust. See Response ¶ 29, at 11 (setting forth this fact); Walton Aff. ¶ 29, at 10-11; Defendants' Response ¶ 29, at 7 (not disputing this fact).  The meeting started at 10:00 a.m., but Britt directed Walton to appear at 10:30 a.m.; when Walton arrived, the meeting was already underway, with the Board members, Powell, Britt, Olah, and other Land Office employees already seated.  See Response ¶ 29, at 11 (setting forth this fact); Walton Aff. ¶ 29, at 11.[55]  The only available seat,

---

[53]The Defendants "dispute that Plaintiff sent Mr. Britt emails detailing her concerns on April 7 and 8, 2011 as no such emails have been produced or are part of the record." Defendants' Response ¶ 28, at 7.  The Defendants do not "refer with particularity to those portions of the record upon which the" Defendants rely, and, thus, do not "specifically controvert[]" these facts.  D.N.M.LR-Civ. 56.1(b).  The Court deems them undisputed.  See D.N.M.LR-Civ. 56.1(b).

[54]Walton's asserted fact stated that "Mr. Britt did not respond to Walton's email, and, to Walton's knowledge took no action to address Walton's concerns."  Response ¶ 28, at 11.  The Defendants dispute that Walton even sent the electronic mail transmissions and "that Mr. Britt took no action to address Plaintiff's concerns because he was working with Plaintiff to address her managerial skills."  Defendants' Response ¶ 28, at 7.  The Defendants refer the Court to a portion of Britt's testimony in which he describes coaching and counseling Walton in her managerial skills.  See Deposition of Donald D. Britt at 74:7-77:17 (taken October 3, 2013), filed November 6, 2013 (Doc. 38-2)("Britt Depo.").  Viewing the evidence in a light favorable to Walton, the Court interprets her asserted fact as stating that Britt did not discipline or address Bearden in regards to Walton's Complaint, and not that Britt did not coach Walton in dealing with Bearden and other subordinates.  Because the Defendants do dispute the fact that Britt did not take any action, however, the Court has modified Walton's asserted fact to state that Britt did not take any action against Bearden.

[55]The Defendants dispute "that Plaintiff was advised to arrive late to the meeting."

where Walton sat, was directly across a conference room table from Powell.  See Response ¶ 29,

at 11 (setting forth this fact); Walton Aff. ¶ 29, at 11.  During the meeting, Powell addressed the

Board, and during his presentation, Powell referred to the Barker report and then followed up by

stating that he was concerned about employees in inappropriate roles, who were "protected"

employees; Powell then stated that the "protected" employees, "for some reason[,] didn't have to

meet the leadership criteria within the division, and somehow got directions from the front

office."  See Response ¶ 29, at 11 (setting forth this fact); Walton Aff. ¶ 30, at 11.[56]  Although

Powell did not mention Walton by name, Powell was glaring directly at Walton in a threatening

and serious manner when he made those remarks.  See Response ¶ 29, at 11 (setting forth this

fact); Walton Aff. ¶ 30, at 11.[57]  Powell was, however, referring to two other employees within

_____

Defendants' Response ¶ 29, at 7.  The Defendants do not "refer with particularity to those
portions of the record upon which the" Defendants rely, and, thus, do not "specifically
controvert[]" these facts.  D.N.M.LR-Civ. 56.1(b). The Court deems the facts undisputed.  See
D.N.M.LR-Civ. 56.1(b).

[56]The Defendants do not specifically dispute that Powell referenced the Barker report and
made remarks regarding protected employees.  See Defendants' Response ¶ 29, at 7-8.  Rather,
the Defendants dispute the context and implications of those facts.  Specifically, the Defendants
state that "[t]he 'protected' employees Mr. Powell referenced did not include Plaintiff,"
Defendants' Response ¶ 29, at 7-8, and the Defendants "dispute that Commissioner Powell
directed comments to Plaintiff about the Larry Barker report," Defendants' Response ¶ 30, at 8.
These additional facts do not dispute that Powell discussed the Barker report and that he
mentioned protected employees.  The Court, thus, deems the fact undisputed.

[57]The Defendants dispute "that Commissioner Powell directed comments to Plaintiff
about the Larry Barker report" and "that Commissioner Powell glared at Plaintiff in a
'threatening manner' during the time that he made the remarks."  Defendants' Response ¶ 30, at
8.  Concerning the Barker report, the Defendants refer the Court to the Land Office's summary
of the meeting, specifically a portion which states, "Following the audit, there have been a series
of interviews by investigative reporters like Larry Barker."  Summary of NM State Land Trust
Advisory Board Meeting Thursday, April 14, 2011, at 3 (Doc. 55-3)("State Land Trust
Meeting").  The entire section from the summary of the meeting reads as follows:

Commissioner Powell referred to the special audit issued to the Land Office, and

the Land Office and not Walton when he referred to "protected employees" at the meeting.  See

Defendants' Response ¶ 29, at 7-8 (setting forth this fact); Powell Depo. at 100:11-101-14.[58]

Throughout April, 2011, Bearden's conduct escalated, and she frequently made

comments, which Walton believed were sexually or racially inappropriate; the comments made

Walton uncomfortable, and she believed that the comments were improper and could subject the

Land Office to liability for creating a sexually or racially hostile work environment.  See

---

offered to provide a full copy to the Board if they have not read it.  The audit was
produced by State Auditor Hector Balderas after two years of work.
Commissioner Powell said he has never seen an audit of a government agency
that was so scathing.  It was turned over to the New Mexico Attorney General, the
US Attorney, and the District Attorney for possible future action.  The Special
audit has helped to form recent public perception of the Land Office that is
skewed due to the concerns brought up in the audit.  Following the audit, there
have been a series of interviews by investigative reporters like Larry Barker
which have been featured on television state wide.  Commissioner Powell's
commitment to the Advisory Board and to the employees is that we want to focus
on sunshine (transparency) and accountability, and highlight the good things that
we do.  We want to let the public know that this is a great place to work, a fun
place to work, and an important place to work.  Also, we will do everything in our
power to address the issues brought up in the audit, which is our legal obligation,
while we move forward in a very positive manner.

State Land Trust Meeting, at 3.  The Court finds nothing in this summary that specifically
controverts Walton's implication that the statements were directed at her.  At most, the Land
Office meeting summary indicates the reason why Powell brought up the Barker report during
the meeting, but it does not address whether the statements were directed at Walton.  See State
Land Trust Meeting at 3.

As for Powell glaring at Walton in a threatening and serious manner, the Defendants do
not "refer with particularity to [the] portions of the record upon which the [Defendants] rel[y]."
See D.N.M.LR-Civ. 56.1(b).  The Defendants have not "specifically controverted" this fact, and
the Court thus deems the facts undisputed.  D.N.M.LR-Civ. 56.1(b).

[58]Walton did not file a surreply to dispute this fact, and the assertion is supported by
evidence from a deposition that Walton's attorney conducted.  See Powell Depo. at 1.  Therefore,
the Court will deem it undisputed.

Response ¶ 31, at 8 (setting forth this fact); Walton Aff. ¶ 31, at 11-12.[59]  When Walton verbally

addressed Bearden's behavior to Bearden as these incidents would occur, Bearden became more

contentious and accusatory, and Bearden repeatedly justified her behavior and comments to

Walton by saying, "I have worked with this administration before," referring to her employment

in the first Powell administration.  See Response ¶ 31, at 12 (setting forth this fact); Walton Aff.

¶ 31, at 12.[60]

By memoranda to Britt dated April 29 and April 30, 2011, Walton described Bearden's

inappropriate conduct, which Walton believed constituted illegal sexual, racial, and religious

harassment.  See Response ¶ 32, at 12 (setting forth this fact); Walton Aff. ¶ 32, at 12; Walton

Depo. at 77:10-78:15; Britt Depo. at 76:25-77:17; Defendants' Response ¶ 32, at 8 (not disputing

---

[59]The Defendants' attempt to dispute this fact:

> Plaintiff's contention that Ms. Bearden's conduct escalated, and contend that
> Plaintiff now raises, for the first time, the specter of Ms. Bearden's conduct
> creating a sexually or racially hostile work environment.  No such claims are of
> record in this case. Plaintiff previously alleged that Ms. Bearden's conduct served
> to discriminate against Plaintiff on the basis of race or sex, claims which Plaintiff
> is now voluntarily dismissing.

Defendants' Response ¶ 31, at 8.  This argument is a legal one, not a factual dispute;
accordingly, the Court will not address it in the factual section but will, if necessary, address it in
the analysis section.  See O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M.
2012)(Browning, J.)(citing Ruiz v. City of Brush, No. CIV 05-897 EWN/CBS, 2006 WL
1816454, at *4 (D. Colo. June 30, 2006)("[T]he 'sole purpose' of the required statements of and
responses to undisputed material facts is 'to establish facts and determine which of them are in
dispute[;] [l]egal argument should be reserved for separate portions of the brief.'")).
The Defendants further argue that "[d]iscovery in this case is ongoing"; however,
discovery closed on January 31, 2014, see Scheduling Order at 1, and the Defendants have not
supplemented their Reply since the close of discovery. Because the Defendants do not refer the
Court to any part of the record in disputing this fact, the Court deems the fact undisputed. See
D.N.M.LR-Civ. 56.1(b).

[60]The Defendants do not address this fact; accordingly, the Court deems it undisputed.
See D.N.M.LR-Civ. 56.1(b).

this fact); MSJ ¶ 27 (also setting forth this fact).  Walton delivered those memoranda to Britt on

May 6, 2011.  See Response ¶ 32, at 12 (setting forth this fact); Walton Aff. ¶ 32, at 12;

Defendants' Response ¶ 32, at 8 (not disputing this fact).[61]  Walton reported her concerns to

Britt, because the Land Office's harassment policy provides that a report of harassment can be

made to an employee's supervisor.  See Response ¶ 32, at 12 (setting forth this fact); Walton Aff.

¶ 32, at 12.[62]  After receiving the memoranda from Walton, Britt passed them onto Lopez.  See

Evidence in Opposition ¶ 29 at 5 (setting for this fact); Powell Depo. at 84:10-87:8.[63]  Lopez

chose, however, not to investigate the allegations against Bearden in spite of the Land Office's

Policy, which requires an investigation whenever a complaint of discriminatory conduct is

alleged.  See Evidence in Opposition ¶ 29, at 5 (asserting this fact); Plaintiff's Lopez Depo. at

121:22-123:10; id. at 125:13-126:9; id. at 127:24-133:13.[64]  Following Walton's reports to Britt,

Bearden continued to make inappropriate comments of a sexual and racial nature.  See Response

---

[61]The Defendants assert that, "[i]n response [to the April 29, 2011, memorandum], Defendant Britt continued working with Plaintiff to address the best way to manage conflict with her subordinates in a meaningful way."  MSJ ¶ 28, at 7.  Walton disputes the fact that "Mr. Britt did not work with Walton to address the issue of Ms. Bearden's discriminatory conduct in the workplace."  Evidence in Opposition ¶ 28, at 4.  Walton cites to a portion of her affidavit in which she states that "Mr. Britt's statement in his deposition . . . that Mr. Britt 'continued working with Plaintiff to address the best way to manage conflict with her subordinates in a meaningful way' is false."  Walton Aff. ¶ 32, at 12.  "Where one party asserts that something happened and the other asserts that it did not happen, it is accurate to say that there is a dispute."  O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1064 n.9 (July 21, 2012 D.N.M.)(Browning, J.).  The Court thus finds that this fact is disputed and will not consider it.

[62]The Defendants do not address this fact; accordingly, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

[63]The Defendants do not address this fact; accordingly, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

[64]The Defendants do not address this fact; accordingly, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

¶ 32, at 12 (setting forth this fact); Walton Aff. ¶ 32, at 12.[65]  Other than these memoranda, which Walton delivered to Britt, Walton never prepared a formal written statement or report concerning Bearden's behavior, never reported Bearden in any way up the chain of command to Powell, and never reported Bearden to Lopez.  See MSJ ¶ 28, at 7 (setting forth this fact); Walton Depo. at 102:10-103:5.[66]

From February, 2011, through the end of her employment, Walton attended weekly leadership meetings that Powell and Jenks headed; various other Land Office management employees also attended the meetings.  See Response ¶ 33, at 13 (setting forth this fact); Walton Aff. ¶ 33, at 12-13; Defendants' Response ¶ 33, at 9 (not disputing this fact).  Many times when Walton gave her reports, expressed her opinion, or participated in the discussion, Powell and Jenks were aloof, would cut Walton off or make facial gestures, and Powell frequently

---

[65]The Defendants do not address this fact; accordingly, the Court deems it undisputed. See D.N.M.LR-Civ. 56.1(b).

[66]Walton attempts to dispute this fact by stating that "Mr. Britt was Walton's direct supervisor, and had an obligation to take Walton's complaints to the SLO Human Resources Office, which was supervised by Sandra Lopez" and that "Mr. Britt testified that he reported Walton's complaints to Ms. Lopez.  Ms. Lopez, however, chose not to investigate."  Evidence in Opposition ¶ 30, at 5 (citations omitted).  These statements do not specifically controvert Defendants' asserted fact, which is that Walton never reported Bearden to Lopez or Powell, and not that Lopez was never informed of Walton's complaint.  Walton does not specifically controvert this fact, and the Court finds it undisputed.
Defendants assert the additional fact that Walton "never filed an internal or EEOC complaint against Ms. Bearden."  MSJ ¶ 29, at 7.  The Defendants direct the Court to a portion of Walton's deposition to support this fact.  See Walton Depo. at 102:10-103:5.  In this portion of Walton's deposition, there is no mention of not filing an EEOC complaint, but, rather, Walton testified that she did not report Bearden to Powell or Lopez.  See Walton Depo. at 102:10-103:5.  Walton disputes this fact by directing the Court to a portion of her affidavit in which she states that she "filed a charge of discrimination with the New Mexico Human Rights Bureau, which then dual filed the charge with the EEOC under the work-sharing agreement between the Human Rights Bureau and the EEOC."  Walton Aff. ¶ 36, at 14.  Because the Defendants have not produced evidence to support the asserted fact, and because Walton has produced evidence that specifically controverts it, the Court finds the fact disputed and will not consider it.

intimidated and threatened Walton in those meetings by making comments, including, "if you don't like it here we will be glad to help you find a place of your liking."  Response ¶ 33, at 13 (setting forth this fact).  See Walton Aff. ¶ 33, at 13.[67]

In June 2011, the General Appropriations Act of 2011 ("Appropriations Act") the legislatively mandated Reduction in Force ("RIF"), which reduced the Land Office fiscal year 2012 budget, which began January 1, 2011, by $609,000.00 and the number of full-time equivalent ("FTE") positions within the agency from 153 to 151.  See MSJ ¶ 1, at 2 (setting forth this fact); MSJ (QI) ¶ 14, at 6 (also setting forth this fact); Defendants' Lopez Depo. at 70:3-71:23.[68]  Lyons proposed the budget and FTE reduction to the State Legislature in September,

---

[67]The "Defendants dispute that when Plaintiff would give her reports, express her opinions, or participate in the discussion that Commissioner Powell and Mr. Jenks were 'aloof,['] would cut Plaintiff off or 'make facial gestures' or were 'intimidating and threatening' to Plaintiff."  Defendants' Response ¶ 33, at 9.  The Defendants do not refer the Court to any part of the record in disputing this fact; accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

[68]Walton disputes this fact "to the extent Defendants contend that the specific RIF plan was legislatively mandated."  Evidence in Opposition ¶ 1, at 1.  The Defendants reply that the "Plaintiff does not dispute that the June 11 RIF was legislatively mandated.  Rather, she disputes that the specific plan was legislatively mandated."  Reply in Response to Plaintiff's Evidence in Opposition to Defendants' Statement of Alleged Undisputed Material Facts ¶ 1, at 1 (Doc. 59-2)("Reply in Response").  In support of and in opposition to the asserted fact, both parties direct the Court to Olah's deposition.  See MSJ ¶ 1, at 2; Evidence in Opposition ¶ 1, at 1.  The portions of Olah's testimony that the Defendants cite in support of the fact includes the following testimony; the Defendants begin their cited portion with Olah's Answer, the Court will reproduce the Question that prompted that Answer:

> Q.   All right.  And you have said "after the General Appropriations Act was acted upon by the Senate Finance Committee and it became evident that the agency's FTE would be reduced by two positions"
> I'm going to stop there.
> I have a question.  How did it become evident at that point that the FTE would be reduced by two positions?
>
> A.   Our FTE count as of January 1st, 2011, in fiscal year 2011, was

_____

153 FTE.  The General Appropriations Act of 2011 had the FTE count at 151.

Olah Depo. at 70:12-70:22.  The Defendants also direct the Court to the following testimony:

> Q.      Okay. Then you -- but it was -- okay, let me just start over.
> Continuing with that sentence you said "it became evident that the agency's FTE
> would be reduced by two positions and the overall agency budget reduced by
> $609,000."
> So the House Bill 2 had a budget for the State Land Office that was $609,000 less
> than for fiscal year '11?

> A.      Correct.

> Q.      And it also eliminated two full-time equivalents?

> A.      Yes.

Olah Depo. at 71:11-71:23.  Walton responded by directing the Court to the following testimony:

> Q.      Tell me how it was that you determined that should the positions
> not be restored you should eliminate one vacant and one filled position?

> A.      If we eliminated only vacant positions, that had not been included
> in the projection that already showed us at a $95,000 deficit, we would have
> incurred no savings.  So that would not have helped to reduce that deficit.

> So what I was looking for was a mechanism to address both the need to eliminate
> two FTE and bring that deficit down to a manageable level.  So in my mind I
> thought it's got to be at least one vacant position and one filled position.

> Q.      Or instead of one filled position, the GM I or lawyer position that
> was actively under recruitment would accomplish the same thing; right?

> A.      That could have done it.

Olah Depo. at 76:24-77:15.  Walton further referred the Court to portions of Olah's testimony in
which she discussed alternatives to eliminating Walton's position and the reasons she eliminated
Walton's General Manager I position rather than a vacant position.  See Olah Depo. at 140:1-
142:3.

Olah testified that the Appropriations Act eliminated two FTE positions.  See Olah Depo.
at 71:11-71:23.  Walton does not dispute this fact.  See Evidence in Opposition ¶ 1, at 1.  In the
Court's view, the fact that the Appropriations Act reduced two FTE positions supports
Defendants' asserted fact that the RIF was legislatively mandated.  Moreover, Walton's cited
testimony shows merely the manner in which Olah enacted the RIF and decided which two FTE

2010, before the November general election where Powell was elected.  See MSJ ¶ 4, at 3 (setting forth this fact); MSJ (QI) ¶ 16, at 6 (also setting forth this fact); Olah Depo. at 28:4-28:7; Affidavit of L. Elaine Olah ¶ 2, at 1-2, filed November 27, 2013 (Doc. 52-2)("Olah Aff."); Evidence in Opposition ¶¶ 1-41, at 1-9 (not disputing this fact).  After the Powell administration took office on January 1, 2011, Olah and others made significant efforts to save the agency from the budget cut and FTE reductions.  See MSJ ¶ 5, at 3 (setting forth this fact); Olah Depo. at 28:19-32:11; Evidence in Opposition ¶¶ 1-41, at 1-9 (not disputing this fact).  Despite the Powell administration's efforts to save the agency from any RIF, the Legislature and Governor, through the Appropriations Act, nonetheless imposed both the budget cuts and the RIF Lyons proposed. See MSJ ¶ 6, at 3 (setting forth this fact); MSJ (QI) ¶ 17, at 7 (also setting forth this fact); Olah Depo. at 32:1-32:11; Olah Aff. ¶ 3, at 2; Evidence in Opposition ¶¶ 1-41, at 1-9 (not disputing this fact).

    Starting in February of 2011, Olah designed the RIF.  See MSJ ¶ 7, at 3 (setting forth this fact); MSJ (QI) (also setting forth this fact) ¶ 15, at 6; Olah Depo. at 72:21-73:23; Olah Aff. ¶¶ 3-4, at 2; Evidence in Opposition ¶¶ 1-41, at 1-9 (not disputing this fact).  Olah, in designing the RIF, determined that it would be best for one vacant and one filled position to be eliminated, to simultaneously reduce the FTE positions and reduce the budget, as the Appropriations Act required; she ultimately, based on a review of the Land Office's organizational structure and mission, proposed the elimination of a General Manager I position.  See MSJ ¶ 8, at 3 (setting

---

positions would be eliminated, and not that Olah rather than the legislature created the RIF.  See Olah Depo. at 76:24-77:15 & 140:1-142:3.  Walton, therefore, has not specifically controverted the fact and the Court deems it undisputed.

forth this fact); MSJ ¶ 18-19, at 7; Olah Depo. at 70:3-70:11, 76:6-77:11; Olah Aff. ¶¶ 4-5, at 2.[69]

In making the determination to eliminate the General Manager I position, Olah had to look to the

structure and goals of the Land Office in determining where best to eliminate a filled FTE

position.  See MSJ ¶ 9, at 4 (setting forth this fact); Olah Depo. at 80:8-82:6.[70]  Olah made the

_____

[69]The Defendants' asserted fact states that "[s]he ultimately, based on a review of the entire agency, proposed the elimination of a General Manager I position."  MSJ ¶ 8, at 3.  Walton disputed this fact by stating that "[t]he referenced deposition testimony of Elaine Olah does not support the contention that Ms. Olah's design of the RIF was based upon a 'review of the entire agency.'"  Evidence in Opposition ¶ 8, at 2.  Walton further argues that "Ms. Olah was unable to describe exactly what she reviewed," and that "Ms. Olah admitted that the SLP did not explore other alternatives to terminating Walton's employment."  Evidence in Opposition ¶ 8, at 2.  The Court notes that a lack of documentation and failure to explore other alternatives are additional facts that do not specifically dispute the asserted fact.  Additionally, Walton's assertion that "Ms. Olah was unable to describe exactly what she reviewed," Evidence in Opposition ¶ 8, at 2, lacks support in the portion of the record to which Walton directs the Court.  In the portion of Olah's deposition, to which Walton cites, Olah testified about the lack of documentation supporting her analysis, see Olah Depo. at 130:25-132:24, and not that she "was unable to describe exactly what she reviewed," Evidence in Opposition ¶ 8, at 2.  Walton has not specifically controverted this fact.
        The Court also finds, however, that the originally asserted fact lacks support in the evidence.  The Defendants in their Reply direct the Court to Olah's deposition; the most relevant portion, which the Defendants quote in their Reply, see Reply in Response ¶ 8, at 1, is reproduced below:

        Q.    Between February 18, 2011, and March 30, 2011, what analysis did you do that led you to propose eliminating the general manager I position?

        A.    I looked at the organizational structures, all of the organizational charts for all of the divisions.  I looked at how positions were aligned within those divisions, and I was looking for anything that struck me as not fitting the mission of the agency or the division.

Olah Depo. at 123:18-124:1.  This testimony does not support the factual statement that Olah based her decision on a review of the "entire agency," MSJ ¶ 8, at 3, but more accurately supports that Olah based her decision on a review of the Land Office's "organizational structures" and "mission," see Olah Depo. at 123:21-124:1.  The Court has revised the factual assertion to reflect the evidence.  Because Walton's remaining arguments merely present additional evidence and do not specifically controvert the fact, the Court deems it undisputed.

        [70]Walton disputes this fact by arguing:

determination to eliminate the General Manager I position in the Commercial Resources Division before March 30, 2011. See MSJ ¶ 10, at 4 (setting forth this fact); Olah Depo. at 82:7-82:25.[71]  In making this determination, Olah looked to the agency's organizational structure and

---

> Given Ms. Olah's vague testimony as to what she looked at in developing the proposal, the lack of documentation concerning Ms. Olah's alleged review, and Ms. Olah's conversations with Sandra Lopez, the Director of Human Resources who felt that Walton had been inappropriately placed in the General Manager I position, a reasonable inference can be drawn that Ms. Olah did not 'look to the structure and goals of the entire agency in determining where best to eliminate a filled FTE position' but determined to terminate Ms. Walton's employment through a RIF because of Ms. Walton's political affiliation.

Evidence in Opposition ¶ 9, at 2 (citations omitted).  This argument does not "specifically controvert[]" Defendants' asserted fact, but rather introduces additional evidence, and as such, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

[71]Walton disputes this fact by stating: "Ms. Olah did not make the determination to eliminate the General Manager I position held by Walton.  That determination was made by the Defendant Ray Powell."  Evidence in Opposition ¶ 10, at 2-3.  Walton refers the Court to a portion of Powell's deposition, which supports Defendants' asserted fact rather than disputes it.  The relevant portion of Powell's deposition is reproduced below:

> Q.    You don't recall if it was a day versus a month that -- before June 10 that you learned there was a proposal to eliminate Ms. Walton's position?
>
> A.    Again, my presumption, the competence of our staff, it was earlier rather than later.  As soon as they made the decision, I'm sure they brought it to my attention and we talked about it and I concurred with it, and that's where this letter came from.
>
> Q.    So your recollection is that Ms. Olah and Mr. Jenks brought to you a recommendation to eliminate Ms. Walton's position through this reduction-in-force?
>
> A.    Correct.

Powell Depo. at 132:14-132:25.  Powell admits that his staff made the decision and brought to him the recommendation to eliminate Walton.  See Powell Depo. at 132:14-132:25.  This testimony is consistent with the asserted fact that Olah -- Powell's staff -- made the determination to eliminate Walton's General Manager I position.  The Court finds the fact

- 41 -

its strategic plan for the coming years.  See MSJ ¶ 11, at 4 (setting forth this fact); Olah Depo. at

123:18-124:11.[72]   Olah's decision recognized the Commercial Resources Division had two

General Manager I positions, creating a redundancy; one position had numerous subordinates,

the other had no subordinates, so Olah suggested that the two positions be combined so that

management could be consolidated in a single General Manager I position.  See MSJ ¶ 12, at 4

(setting forth this fact); MSJ (QI) ¶ 18, at 7; Olah Depo. at 137:7-139:11; Olah Aff. ¶ 4, at 2.[73]

_____

undisputed because Walton did not specifically controvert it.

[72]Walton argues that this fact is disputed using an identical argument as she did to
Paragraph 9 of the MSJ, see Evidence in Opposition ¶¶ 9, 11, at 2-3, the Court thus deems this
fact undisputed because Walton does not specifically controvert the fact but asserts additional
evidence.  See supra note 65.

[73]The Defendants' asserted fact states that "Ms. Olah's decision recognized that the
Commercial Resources Division structure was out of sync with the rest of the agency in that
there were two General Manager I positions, a redundancy."  MSJ ¶ 12, at 4.  In support of this
fact, the Defendants cite to a portion of Olah's deposition in which she testifies:

> What I considered was the fact that the commercial resources division was clearly
> out of sync with the rest of the agency.  There was a general manager who had all
> of the staff reporting to her, and a general manager who had very little staff and
> very little activity, as far as we could see.

Olah Depo. at 137:10-137:15.  Walton disputes this fact by arguing that the assertion "'the
Commercial Resources Division structure was out of sync with the rest of the agency' is
factually inaccurate."  Evidence in Opposition ¶ 12, at 3.  Walton directs the Court to a portion of
her affidavit where she states:

> Elaine Olah's Affidavit testimony 'the Commercial Resources Division structure
> was out of sync with the rest of the agency' is factually inaccurate.  Other
> Divisions, for example the Mineral Resources Division, had a similar structure.
> The fact that several subordinates reported to me and none reported to Brian
> Bingham, the other General Manager I, is due to the fact that the renewable
> energy leasing section was a new section, and consequently there was not as much
> work in that section.

Walton Aff. ¶ 36, at 13-14.  The Defendants reply that the "Plaintiff does not dispute that the
structure of the Commercial Resources Division structure (sic) was out of sync in that there were

Of the two General Manager I positions in consideration for elimination, Walton's position was

chosen, because she had less seniority with the agency than the individual serving in the other

General Manager I position, per SPO Regulation that "the order of layoff due to reduction in

force shall be by service date which is determined based upon the agency hire date."  MSJ ¶ 13,

at 4 (setting forth this fact).  See Olah Depo. at 124:25-125:12; Letter from Chris Melendrez,

Associate Counsel, New Mexico State Land Office, to Gina Anaya, Civil Rights Specialist,

Department of Workforce Solutions -- Labor Relations Bureau (dated May 14, 2012), filed

November 6, 2013 (Doc. 38-4).[74]   At the time the RIF was designed, Olah had no knowledge of

the Barker report.  See MSJ ¶ 37, at 9 (setting forth this fact); Olah Depo. at 40:1-40-16.[75]

_____

two General Manger (sic) I positions, a redundancy, and that one of the positions had numerous
subordinates while the other had no subordinates."  Reply in Response ¶ 12, at 3.  The Court
disagrees with Defendants.  Walton is not disputing that there were two General Manager I
positions, but rather that this redundancy was "out of sync with the rest of the agency."
Evidence in Opposition ¶ 12, at 3.  Walton's assertions -- that two General Manager I positions
within one division was consistent with Land Office's structure because another division within
the Land Office also had two General Manager I positions and that one manager oversaw a
number of employees, while the other did not, was because the other manager's section was new
-- specifically controvert the Defendants' asserted fact that the Commercial Resources Division
was "out of sync" with the rest of the Land Office.  See Evidence in Opposition ¶ 12, at 3.  As
such, the fact is disputed.  Thus, the Court will not consider the Defendants' factual assertion in
determining the MSJ.

[74]Walton disputes this fact by stating that "there is ample evidence that the decision to
eliminate Walton's position was a pretext for retaliation."  Evidence in Opposition ¶ 13, at 4.
Whether Walton's termination was a pretext for retaliation is a legal argument, not a factual
dispute; as such, the Court will not address it in the factual section, but will, if necessary, address
it in the analysis section.  See also O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M.
2012)(Browning, J.)(citing Ruiz v. City of Brush, No. CIV 05-897 EWN/CBS, at *4 (D. Colo.
June 30, 2006)).

[75]Walton disputes this fact by stating:

[A] reasonable inference to be drawn from the facts set forth in Walton's affidavit
is that Ms. Olah did have knowledge of the circumstances of Walton's hiring, and
her political association with the Lyons' administration, and that the Land Office

_____

target Walton in the RIF for that reason, with the knowledge, consent, and participation of Powell and others.

Evidence in Opposition ¶ 37, at 7 (internal citation removed).  Walton refers the Court to her affidavit to dispute this fact.  See Evidence in Opposition ¶ 37, at 7; Walton Aff. ¶¶ 1-38, at 1-15.  Nothing in her affidavit specifically controverts this fact; rather, it provides additional facts, from which Walton wishes the Court to draw an inference.  Because these additional facts do not specifically controvert Defendants' asserted fact, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

The Defendants assert the additional fact that "[a]t the time Ms. Olah designed the RIF she had no knowledge of the history of Plaintiff's employment within the SLO, nor was she aware that Plaintiff had initially been hired into an exempt position by the Lyons' administration and later transferred to a classified position."  MSJ ¶ 38, at 9.  See MSJ (QI) ¶ 21, at 7.  The Defendants support this fact by directing the Court to Olah's deposition.  See MSJ ¶ 38, at 9; Olah Depo. 52:2-55:5.  Walton disputes this fact by asserting that "[t]he cited deposition testimony does not support the alleged material fact," and that "Ms. Olah admitted in her deposition that Sandra Lopez, the SLO's Human Resources officer, told Ms. Olah that Ms. Lopez had objected to transferring Walton to the classified Economist A position, and that she 'had a problem' with reclassifying the position to the General Manager A position."  Evidence in Opposition ¶ 38, at 7.  The Defendants reply by reproducing the following testimony from Olah's deposition:

Q.      . . .
You know that Ms. Walton was hired into a governor exempt secretary II position by Patrick Lyons?

A.      I know that now.

Q.      When did you first find that out?

A.      As I said, when we were preparing for this case.

Q.      So are you telling me that during the time you were preparing the RIF plan you did not know that Ms. Walton had been hired into an exempt position initially?

A.      I don't think I realized that until later.   So at the time we were doing the RIF plan I was just looking at it structurally.

Q.      Okay.  Just to make it clear --

A.      Okay.

Q.      -- your testimony today is that at the time you were working on the

- 44 -

Additionally, Olah was not aware that Walton had reported to Britt that Bearden had engaged in alleged racially and sexually inappropriate behavior until after Walton's position was eliminated and the RIF fulfilled.  See MSJ ¶ 39, at 9 (setting forth this fact); MSJ (QI) ¶ 23, at 8; Olah

RIF plan you did not know Ms. Walton had been hired by Patrick Lyons into an exempt position?

A.      I don't recall.  If I knew then, it -- I don't know.  I mean, it just didn't come to mind, wasn't what I was thinking about.  So I don't know when I first knew that she had been hired by the Lyons administration in an exempt job.

Q.      Could have been before you developed the RIF plan?

A.      What I knew at the time that I developed the RIF plan was that she was a general manager and she was in that position.

Q.      Well, I know you knew that, but could you have known also that she had been initially hired into an exempt plan -- exempt position in the Lyons administration?

A.      At that time?

Q.      Yes.

MR. HATCHER.      Object to form.
You can answer

A.      I really don't think I did.

Olah Depo. at 52:17-54:3.  Walton also directs the Court to a section of Olah's testimony where she testifies that Lopez told her "at some point" that Lopez objected to transferring Walton into an Economist A position.  Evidence in Opposition ¶ 38, at 7; Olah Depo. at 57:6-57:21.  Olah does not state, however, when Lopez told her that she thought the transfer was improper, so that portion of her deposition does not specifically controvert the asserted fact.  Yet, the Court agrees with Walton that Olah's testimony does not support the Defendants' asserted fact.  Olah testified that she learned of Walton's transfer while preparing for the deposition, see Olah Depo. at 55:24-56:5, but Olah also testified that she does not recall if she knew about Walton's transfer when she was working on the RIF, see Olah Depo. at 56:6-56.  Viewing the evidence in a light most favorable to Walton -- the non-movant -- the Court finds that there is a material dispute.  Olah has testified both that she first learned of Walton's transfer while preparing for her deposition and that she does not know whether she knew of Walton's transfer while creating the RIF.  The Court deems the fact disputed and will not consider it.

Depo. at 67:5-67:18; Britt Depo. at 104:3-104:19; Olah Aff. ¶ 7, at 3.[76]  There was nothing in Walton's personnel file that indicated that she was registered to vote as a Republican, that she supported the Republican Party, that she supported Lyons when he was election, that she engaged in any political activity, or that she held any political ideology.  See MSJ (QI) ¶ 8, at 5; First Lopez Aff. ¶ 4, at 2.[77]  In formulating the RIF, Olah did not know Walton was registered as a Republican, and Olah did not consider whether Walton supported the Republican Party, whether Walton supported Lyons during his election, whether Walton supported the Democratic Party, whether Walton supported the election of Powell, whether Walton engaged in any political activity, or whether Walton held any political ideologies.  See MSJ (QI) ¶¶ 20, 21, at 7-8 (setting

---

[76]Walton disputes this fact by arguing:

> [U]nder SLO's policy Mr. Britt was required to initiate a complaint investigation by forwarding Walton's complaint to the SLO's Human Resources office, which Ms. Olah supervised.  Mr. Britt testified that he did deliver Walton's written memos which detailed Ms. Bearden's conduct to Ms. Lopez.  A reasonable inference to be drawn from those facts is that Ms. Olah was aware of Walton's complaint, but, chose not to investigate because the SLO intended to eliminate Walton's employment.

Evidence in Opposition ¶ 39, at 8 (citations omitted)(emphasis omitted).  Walton directs the Court to a portion of Lopez' deposition in which Lopez testified that the Land Office's official policy was for official complaints to be given to the Deputy Commissioner.  See Plaintiff's Lopez Depo. at 130:9-133:13.  At that time, Jenks, not Olah, was the Deputy Commissioner, see Response ¶ 16, at 7; Walton Aff. ¶ 16, at 6, thus, this testimony does not create the inference that Olah knew of Walton's complaints to Britt.  Walton additionally argues that Britt delivered Walton's memoranda to Lopez.  See Evidence in Opposition ¶ 39, at 8.  Walton does not argue that Britt delivered the memoranda to Olah, therefore; this additional evidence also does not specifically controvert the Defendants' asserted fact.  The Court thus deems the Defendants' factual assertion undisputed.

[77]Walton does not address this fact; thus, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

forth this fact); Olah Aff. ¶ 6, at 3.[78]   Olah was unaware of any complaints Walton may have

made concerning her working conditions at the Land Office or concerning the manner in which

the agency operated.  See MSJ (QI) ¶ 24, at 8; Olah Aff. ¶ 7, at 3.[79]

It was not Olah's intention to eliminate Walton's position or to terminate her

employment; charged with eliminating two FTE positions, Olah was required to evaluate the

Land Office's organizational structure and to create a fully functioning organization.  See MSJ ¶

40, at 10 (setting forth this fact); Olah Depo. at 132:5-132:15; id. at 135:3-135:11.[80]   Olah did

---

[78]Walton disputes this fact in the Response (QI) by referring the Court to the Response.
See Response (QI) at 4 ("For the reasons stated in Walton's Response to the Defendants' Motion
for Summary Judgment filed on December 19, 2013 (Doc. 55), which Walton incorporates by
reference pursuant to D.N.M.LR-Civ.7.1(a), Walton disputes alleged undisputed facts numbered
14, 18, 20, 21, 22, 23, and 24").  In the Response, however, Walton does not address this fact,
nor does she address any similar fact.  See Evidence in Opposition ¶¶ 1-41, at 1-9.  Because
Walton does not specifically address this fact or refer the Court to a portion of the record on
which Walton relies, the Court deems the Defendants' factual assertion undisputed.  See
D.N.M.LR-Civ. 56.1(b).

[79]Walton disputes this fact in the Response (QI) by referring the Court to the Response.
See Response (QI) at 4.  In the Response, however, Walton does not address this fact, nor does
she address any similar fact.  See Evidence in Opposition ¶¶ 1-41, at 1-9.  Because Walton does
not specifically address this fact or refer the Court to a portion of the record on which Walton
relies, the Court deems the Defendants' factual assertion undisputed.  See D.N.M.LR-Civ.
56.1(b).

[80]Walton disputes this fact by arguing:

Ms. Olah admitted that she did not consider other alternatives to eliminating
Walton's position.  There were, however, alternatives available.  Moreover, the
SLO did not follow the State Personnel Board Rule 1.7.10.9(C)(5) which required
the SLO to offer to Walton, the employee affected by the RIF, a position in the
agency for which she was qualified, even though at the time of the RIF there were
at least two open positions for which Walton was qualified, which the SLO later
filled with others.

Evidence in Opposition ¶ 40, at 8-9 (citations omitted).  Walton further argues that "[t]hose facts,
together with the additional facts set forth in Walton's Affidavit, support an inference that the
RIF plan was a pretext to eliminate Walton's position because of her political association with

not, however, document any of her analysis and process in making the determination to eliminate

Walton's position.  See Evidence in Opposition ¶ 9, at 2; Olah Depo. at 130:25-132:24.[81]

Olah first presented her RIF design for approval in a meeting held on April 6, 2011, with

Powell, Jenks, Relkin, a personnel representative, and outside counsel.  See MSJ ¶ 14, at 5

(setting forth this fact); Olah Depo. 147:2-147:11 & 176:24-177:4; Evidence in Opposition ¶¶ 1-

41, at 1-9 (not disputing this fact).  Olah did not consult with Powell regarding her

recommendations until after the RIF plan had been fully developed.  See MSJ ¶ 32, at 8 (setting

forth this fact); Olah Depo. at 127:19-128:17.[82]  At the April 6 meeting, Powell approved the

plan to eliminate Walton's General Manager I position.  See MSJ ¶ 14, at 5 (setting forth this

fact); Olah Depo. at 176:24-177:4; Powell Depo. at 131:22-133:8; Evidence in Opposition ¶¶

the Lyons administration."  Evidence in Opposition ¶ 40, at 9 (citations omitted).  That Olah
could have considered alternatives to eliminating Walton's position and that the Land Office did
not offer Walton another position for which she was qualified are additional facts that do not
specifically controvert Defendants' asserted fact.  See D.N.M.LR-Civ. 56.1(b).  The Court thus
deems the fact undisputed.  Additionally, the argument that the RIF was a pretext to eliminating
Walton's position is a legal argument that is more properly addressed in the analysis section.
See also O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning,
J.)(citing Ruiz v. City of Brush, No. CIV 05-897 EWN/CBS, at *4 (D. Colo. June 30, 2006)).

[81]The Defendants do not address this fact; thus, the Court deems it undisputed.  See
D.N.M.LR-Civ. 56.1(b).

[82]Walton disputes this fact, arguing that a "reasonable inference to be drawn from the
relationships between the parties is that Ms. Olah informed Powell of the RIF plan as it was
being developed."  Evidence in Opposition ¶ 32, at 6 (citations omitted).  Walton directs the
Court to portions of Walton's affidavit in which she describes the positions of Jenks, Relkin,
Britt, Olah, and Powell; that Powell placed a note on Walton's office stating that it was reserved
for Brit; that Powell expressed an opinion that the Lyons administration had not properly handled
the stewardship and leasing of State Trust Lands; that Britt and Bearden accused Walton of
illegally administering a land sale during the Lyons administration; and that Bearden had
informed Britt and Relkin of this land sale two months before Powell was elected.  See Evidence
in Opposition ¶ 32, at 6.  See also Walton Aff. ¶¶ 17-29, at 6-8.  These additional facts do not
specifically controvert the fact asserted by Defendants, and, thus, the Court deems the fact
undisputed.  See D.N.M.LR-Civ. 56.1(b).

1-41, at 1-9 (not disputing this fact).  Britt did not know that Walton's position was going to be eliminated until after the final determination had been made and approved by Powell, Jenks, and Relkin; Britt did not have any input or involvement with the RIF plan.  See MSJ ¶ 30, at 8 (setting forth this fact); Olah Depo. at 142:4-144:14; Britt Depo. at 97:12-97:19; Evidence in Opposition ¶¶ 1-41, at 1-9 (not disputing this fact).  When Olah and Jenks informed Britt that the Commercial Resources Division would be losing Walton's position, Olah was not aware that Walton had made a written complaint to Britt regarding Bearden.  See MSJ ¶ 31, at 8 (setting forth this fact); Olah Depo. at 144:4-144:14.[83]  Walton's General Manager I position was eliminated as a result of the RIF; the RIF's criterion to eliminate two FTE positions was executed.  See MSJ ¶ 41, at 10 (setting forth this fact); Olah Depo. at 173:11-177:4.[84]  Olah did

---

[83]Walton disputes this fact by arguing that "Ms. Olah supervised the SLO's Human Resources Office, and the manager of that office, Sandra Lopez.  Therefore there is an inference that Ms. Olah became aware of Ms. Walton's complaints about Ms. Bearden, in the ordinary course of business of the SLO."  See Evidence in Opposition ¶ 31, at 5.  Walton refers the Court to a portion of Lopez' deposition in which, in response to the question, "What is -- was the policy of the State Land Office at that time with respect to process once human resources receives a written complaint alleging that kind of inappropriate behavior?" Lopez responded, "meet with the supervisor, and also the supervisor provides a copy to the deputy commissioner, and depending on the allegations that are made, an investigation may take place."  Defendants' Lopez Depo. at 125:13-125:22.  At the time, Jenks was the Deputy Commissioner of the Land Office, not Olah, see Response ¶ 16, at 7; Walton Aff. ¶ 17, at 38, so the deposition testimony cited by Walton may create an inference that Jenks was aware of Walton's complaints against Bearden but it does not provide any evidence that creates the inference that Olah was aware.  Walton, thus, has not specifically controverted this fact, and the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

[84]Walton disputes this fact by arguing that the "Commercial Resources Division now has more managerial positions than when Walton was employed there.  The RIF criteria of eliminating two FTE positions easily could have been met by eliminating two of the approximately twelve vacant positions which existed."  Evidence in Opposition ¶ 41, at 9 (citations omitted).  These additional facts -- that there were additional positions available and that the RIF could have been carried out by eliminating two vacant positions -- do not specifically controvert Defendants' asserted fact that Walton's General Manager I position was eliminated as a result of the RIF and that the RIF's criteria of eliminating two FTE was carried

not consider any alternatives to enacting the RIF, see Evidence in Opposition ¶ 40, at 8, Olah

Depo. at 124:12-125:16; id. at 166:16-167:20, although, there were alternatives available that did

not require eliminating Walton's position.   See Evidence in Opposition ¶ 40 at 8 (setting forth

this fact); Olah Depo. at 76:24-77:15; Powell Depo. at 144:14-145:5; id. at 146:10-147:5; Reply

in Response ¶ 40, at 7 (not disputing this fact).   Additionally, the Commercial Resources

Division of the Land Office now has more managerial positions than when Walton was

employed there.   See Evidence in Opposition ¶ 41, at 9 (setting forth this fact); Walton Aff. ¶ 36,

at 14.[85]

On June 10, 2011, Powell submitted the RIF plan to the State Personnel Office and

received approval from the State Personnel Office on that same date.   See Response ¶ 34, at 13

(setting forth this fact); Powell Depo. at 140:1-140:18; Defendants' Response ¶ 34, at 9 (not

disputing this fact).   The State Personnel Office approved the RIF, and it was made effective

June 30, 2011.   See MSJ ¶ 15, at 5 (setting forth this fact); Walton Depo. at 135:24-137:21;

Evidence in Opposition ¶¶ 1-41, at 1-9 (not disputing this fact).   On June 10, 2011, Walton was

called into a meeting with Olah, Britt, and Lopez, and informed that her employment was being

terminated effective June 30, 2011, because of a RIF and that Walton would be on paid

administrative leave immediately through June 30, 2011; Walton was directed to pack her

personal belongings, turn in her keys, and leave the building immediately; before June 10, 2011,

no one informed Walton that her position could possibly be eliminated through a RIF.   See

Response ¶ 35, at 13 (setting forth this case); Walton Aff. ¶ 34, at 13; Defendants' Response

---

out.   See D.N.M.LR-Civ. 56.1(b).   The Court deems the facts undisputed.

[85] The Defendants do not address this fact; thus, the Court deems it undisputed.   See D.N.M.LR-Civ. 56.1(b).

¶ 35, at 9 (not disputing this fact).  By an electronic mail transmission dated June 10, 2011, at 1:09 p.m., Powell informed the entire staff of the Land Office, statewide, that Walton's employment had been terminated; the electronic mail transmission embarrassed and humiliated Walton.  See Response ¶ 36, at 13 (setting forth this case); Walton Aff. ¶ 35, at 13; Defendants' Response ¶ 35, at 9 (not disputing this fact).  In Walton's almost thirty years working in State government, she had never seen such an announcement of the termination of an employee's employment.  See Response ¶ 36, at 13 (setting forth this case); Walton Aff. ¶ 35, at 13; Defendants' Response ¶ 35, at 9 (not disputing this fact).  State Personnel Board Rule 1.7.10.9(C)(5), N.M. Admin. Code § 1.7.10.9, requires the Land Office to offer an employee affected by a RIF, such as Walton, a position in the agency that she is qualified for.  See Evidence in Opposition ¶ 40, at 8; Plaintiff's Lopez Depo. at 133:16-142:15.  At the time of the RIF there were at least two openings that Walton was qualified for and that the Land Office later filled with other people, however, Walton was not offered either of these positions in violation of State Personnel Board Rule 1.7.10.9(C)(5).  See Evidence in Opposition ¶ 40, at 8-9; Walton's Aff. ¶ 37, at 14.[86]

---

[86]The Defendants dispute this fact by stating the "Defendants did follow State Personal Board Rule 1.7.10.9(C)(5).  The SLO was not filling any positions in the agency for which Plaintiff was qualified during the period in which Plaintiff would have had the right of first refusal."  Reply in Response ¶ 40, at 7.  Defendants direct the Court to Lopez' affidavit to dispute Walton's factual assertion.  See Second Affidavit of Sandra Lopez ¶¶ 5-8, at 2-4, filed January 17, 2014 (Doc. 59-4)("Second Lopez Aff.").  In her affidavit, Lopez testified:

> [T]he SLO's recruitment of a person to fill the Line Manager II position was initiated on July 12, 2011. Therefore, while the position was vacant as of June 10, 2011 (the date that SPO approved the RIF and that Ms. Walton was informed of the RIF), the position was not being filled between the time the SPO approved the RIF and July 1, 2011, the date that the RIF went into effect.

. . .

## PROCEDURAL BACKGROUND

On April 2, 2013, Walton filed her first amended Complaint in state court against the Land Office, Powell, Britt, and Bearden, alleging sexual and racial discrimination in violation of the NMHRA, N.M. Stat. Ann. § 28-1-7(A); unlawful retaliation under the NMRHA, N.M. Stat.

---

> [T]he SLO initiated a reclassification of the vacant Management Analyst - O position on June 8, 2011.  That position was being reclassified as an Urban and Regional Planner - A position.  The SLO did not initiate recruitment of a person to fill the reclassified position until after the reclassification was approved by the SPO. . . . on June 24, 2011. . . . [R]ecruitment of a person to fill the reclassified Urban & Regional Planner - A position was vacant as of June 1, 2011.  Therefore, while the Management Analyst - O position was vacant as of June 10, 2011 (the date that SPO approved the RIF and that Ms. Walton was informed of the RIF), the position was not being filled between the time that SPO approved the RIF and July 1, 2011, the date that the RIF went into effect.
>
> More generally, between the time that SPO approved the RIF and the date that the RIF went into effect, the SLO was not filling any positions for which Ms. Walton met the established requirements, at the same or lower midpoint than the midpoint of the General Manager I position held by Ms. Walton.  As a result, the SLO did not initiate a right of first refusal as to any such position between the time that SPO approved the RIF and the date that the RIF went into effect.

Lopez Aff. ¶¶ 5-6, at 2-3.  To support her factual assertion, Walton directs the Court to a portion of her affidavit in which she states:

> At the time of the RIF, there were two open position classifications for which I was qualified in the State Land Office.  Those positions were a Line Manager II position in Central Records, and one of two Management Analyst positions in Commercial Resources. . . [T]he SLO did not provide me a right of first refusal for those positions.

Walton Aff. ¶ 37, at 14.  Walton's affidavit contradicts Lopez' affidavit.  Compare Walton Aff. ¶ 37, at 14, with Lopez Aff. ¶¶ 5-6, at 2-3.  Because the Court must view factual assertions in a light favorable to the non-movant, and because credible evidence supports Walton's factual assertion, the Court will consider Walton's factual assertion true in considering the MSJ.  See Estate of Anderson v. Denny's Inc., 987 F. Supp. 2d 1113, 1138-39 (D.N.M. 2013)(Browning J.)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

Ann. § 28-1-7(I); violation of the WPA, N.M. Stat. Ann. § 10-16C-1; and violation of her rights under the First and Fourteenth Amendments to the United States Constitution, including her rights to engage in political association[87] without reprisal by state officials and right to speak on matters of public concern.   See First Amended Complaint to Recover Damages for Discrimination and Retaliation and for Violations of Constitutional Rights ¶¶ 22-39, at 5-8, filed April 11, 2013 (Doc. 1-1).  The Defendants removed the case to federal court on April 11, 2013. See Notice of Removal ¶¶ 1-7, at 1-2, filed April 11, 2013 (Doc. 1).  Walton amended her first amended complaint on August 1, 2013, adding additional claims for discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 20002-3(a).   See Second Amended Complaint to Recover Damages for Discrimination and Retaliation and for Violations of Constitutional Rights ¶¶ 28-33, at 6-7, filed August 1, 2013 (Doc. 20)("Complaint").

On November 6, 2013, the Defendants moved for summary judgment on all of Walton's claims.   See MSJ at 10-25.   On November 27, 2013, the Defendants moved for summary judgment on Walton's political affiliation and speech claims on the basis of qualified immunity. See MSJ (QI) at 8-20.  Walton responded to the MSJ on December 19, 2013, and dropped her NMHRA and Title VII discrimination claims, her constitutional claims against Britt and Bearden, as well as her First Amendment speech claims.   See Response at 1 n.1.

The Court will address the procedural background in three parts.  First the Court will discuss the procedural background for the MSJ.  The Court will next discuss the procedural background for the MSJ (QI).  The Court will last look at the hearing the Court held on April 9

---

[87]Walton and the Defendants use the terms "political affiliation" and "political association" interchangeably, as do some courts.

and 10, 2014.

1.      **The MSJ, Response, and Reply.**

In the MSJ, the Defendants argue that Walton has not produced sufficient evidence to establish a claim for retaliation under the NMHRA or Title VII of the Civil Rights Act of 1964. See MSJ at 15.  The Defendants note that Walton's retaliation claims must be examined under the burden-shifting analysis in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)("McDonnell Douglas").  See MSJ at 15.  The Defendants argue that, to establish a prima facie case of retaliation under Title VII, Walton must demonstrate that "(1) she engaged in protected opposition to discrimination, (2) she was subject to an action that a reasonable employee would have found to be materially adverse, and (3) a causal connection exists between the protected activity and the materially adverse action."  MSJ at 15-16 (citing Webb v. Padilla, No. 08-0411 MV/LAM, 2009 WL 3379034 (D.N.M. Sep. 30, 2009)(Vazquez, C.J.)).  The Defendants assert that under the NMHRA, to establish a prima facie case, Walton must show that "she was discharged because she performed an act that public policy authorizes or encourages."  MSJ at 16 (citing Chavez v. Manville Prod. Corp., 108 N.M. 643, 647, 777 P.2d 371, 375 (1989)).  The Defendants maintain that if Walton can establish a prima facie case, then under the McDonnell Douglas analysis, the Defendants are still entitled to summary judgment if they can demonstrate that there was a nondiscriminatory reason for the RIF of Walton's General Manager I position.  See MSJ at 16 (citing Moongate Water Co. v. State, 120 N.M. 399, 902 P.2d 554 (Ct. App. 1995)).

The Defendants concede that "the RIF was an adverse employment action," but they argue that Walton cannot establish a prima facie case, because she cannot meet the other two elements.  MSJ at 16.  The Defendants argue that Walton did not engage in protected opposition

to discrimination, because Walton's "protected opposition . . . must be to an 'unlawful employment practice [under] [Title VII]," and Bearden's complained of behavior does not rise to a level that violates Title VII.  MSJ at 16-17 (quoting <u>Peterson v. Utah Dep't of Corr.</u>, 301 F.3d 1182, 1188 (10th Cir. 2002)(alterations in the MSJ but not in original)("<u>Peterson</u>")).   The first element requires Walton to "have a reasonable, good faith belief that she was opposing discrimination," and a "good faith belief involves both subjective and objective elements."  MSJ at 17 (citing <u>Crumpacker v. Kan. Dep't of Human Res.</u>, 338 F.3d 1163, 1171 (10th Cir. 2003)). This element means Walton must show that she "was targeted because of her gender, national origin or some other protected class," MSJ at 17 (citing <u>Sandoval v. City of Boulder, Colo.</u>, 388 F.3d 1312, 1327 (10th Cir. 2004)), which Walton cannot do because of a lack of evidence, <u>see</u> MSJ at 17.  The Defendants also argue that Walton cannot establish the third element -- a causal connection.  MSJ at 17.  The Defendants argue that Walton "'must show that the individual who took adverse action against [her] knew of the employee's protected activity.'"  MSJ at 18 (quoting <u>Williams v. Rice</u>, 983 F.2d 177, 181 (10th Cir. 1993))(alterations in the MSJ but not in original).   Olah identified Walton's position for the RIF before March 30, 2011, but Walton did not formally report Bearden's conduct to Britt until April 29, 2011.   <u>See</u> MSJ at 17. Furthermore, there is no evidence that Olah had any knowledge of Bearden's alleged discriminatory conduct.  <u>See</u> MSJ at 18. Therefore, the Defendants argue, because "there is no evidence Elaine Olah had knowledge of any protected activity on the part of Ms. Walton, there can be no causal connection between any protected activity and Plaintiff's adverse action."  MSJ at 18.

As to Walton's WPA claim, the Defendants make similar arguments.  <u>See</u> MSJ at 18-19. The Defendants argue that, in "understanding the [WPA], it is important to look to the federal

Whistleblower Protection Act, 5 U.S.C. § 2302 . . . and decisions interpreting it, . . . because the federal and New Mexico acts are materially similar." MSJ at 18. The Defendants maintain that under the federal Whistleblower Protection Act, "[d]isclosures which do not demonstrate clear violations of law, gross mismanagement and abuse of authority, or other wrongful conduct, are not protected as whistleblowing." MSJ at 19 (citing Cavanaugh v. Merit Sys. Prot. Bd., 176 F. App'x 133, 135 (D.C. Cir. 2006)). The Defendants argue that Walton has not established a protected disclosure, because "[h]er complaints about Ms. Bearden's inappropriate remarks, sabotaging of work, etc. simply do not rise to the level of 'unlawful or improper acts' necessary to come with the [WPA's] protection." MSJ at 19. The Defendants further argue that Walton's "WPA claim fails because she cannot establish the causal connection element of a prima facie case." MSJ at 20 (emphasis omitted). A "successful WPA claim requires [Walton] to establish that the adverse employment action was taken by the SLO because of the alleged protected disclosure." MSJ at 19 (citing Desantis v. Napolitano, 716 F. Supp. 2d 1100, 1107 (D.N.M. 2010)(Browning, J.)). Because "[t]here is no evidence that Ms. Olah, who designed the RIF, had any knowledge of the alleged protected disclosures of [Walton]," Walton has failed to show that she was terminated because of her protected disclosures. MSJ at 20.

Regarding Walton's political affiliation claim, the Defendants argue that "there is no evidence that Ms. Olah, again the only person responsible for the design of the RIF of [Walton's] position, intended to discriminate on the basis of political affiliation"; there is no "genuine dispute that political affiliation and/or beliefs were a 'substantial or motivating factor' in the RIF." MSJ at 22. The Defendants argue that Walton "has no evidence she was discriminated against because she was Republican," but instead Walton "only alleges she was mistreated because of her association with a prior administration." MSJ at 22-23. The Defendants refer the

Court to Jantzen v. Hawkins, 188 F.3d 1247 (10th Cir. 1999)("Jantzen").  According to the

Defendants, in Jantzen, a county sheriff warned his subordinates during a meeting that anyone

who ran against him in an election, openly opposed him, or was disloyal to him, would be fired,

and when the plaintiff announced he would run against the sheriff in the election, he was

immediately fired.  See MSJ at 23.  The court granted summary judgment to the defendant

sheriff based on those facts, because the plaintiff had failed to put forth any evidence that "he

was terminated for 'supporting or affiliating with a particular political party.'"  MSJ at 23

(quoting Jantzen, 188 F.3d at 1252).  The Defendants also direct the Court to Nelms v. Modisett,

153 F.3d 815 (7th Cir. 1998)("Nelms").  See MSJ at 23.  In Nelms, an investigator in the Indiana

Attorney General's Office, who worked under a Republican administration, had his position

restricted and eliminated under a Democrat administration, and when the investigator inquired

about the termination, he was told "you understand the political realities."  MSJ at 23 (quoting

Nelms, 153 F.3d at 817).  There, the United States Court of Appeals for the Seventh Circuit, in

affirming the district court's grant of summary judgment for the defendant, held that there was

no evidence that "the protected political association was a substantial factor in the decision to

terminate him," and that a "'disgruntled employee fired for legitimate reasons would not be able

to satisfy the burden merely by showing that he carried the political card of the opposition party

or that he favored the defendant's opponent in the election."  MSJ at 123-24 (quoting Nelms, 153

F.3d at 818).  The Defendants argue that Walton's claim of discrimination based on political

affiliation is directed at Britt, Powell, and Bearden; however, there "is no evidence any of these

individuals had any involvement with the RIF, which was within the sole determination of Ms.

Olah."  MSJ at 24.  The Defendants further argue that Walton's "claims are based only upon

untethered speculation," and that her "allegations and testimony . . . fall short of any objective or

direct evidence her position was targeted for the RIF on the basis of her Republican affiliation." MSJ at 24.  The Defendants argue in the alternative, that, "even assuming Plaintiff establishes a prima facie case, the Defendants clearly demonstrate a legitimate, non-political reason for the elimination of Ms. Walton's position."  MSJ at 24.  The Defendants again refer the Court to Nelms, which involved an organizational restructuring, and an employer having to choose between the plaintiff and an employee, who had been with the employer ten years longer than the plaintiff, to show that Walton "cannot rebut Defendants' assertion that the RIF was a legitimate, non-political reason for the elimination of Plaintiff's job," because "[v]irtually the same principal facts exist in the present case" as Nelms, where the court "found no evidence rebutting defendant's assertion that the re-organization was a legitimate reason to terminate the plaintiff." MSJ at 24-25.

In response to the MSJ, Walton first argues that she has produced sufficient evidence to establish a prima facie case of retaliation.  See Response at 17.  Walton argues that it is undisputed that she "engaged in a protected activity when she submitted written complaints about Ms. Bearden's conduct to her supervisor, Mr. Britt, on April 7 and 8, and on May 5, 2011," and that it is undisputed that the Land Office "took an adverse employment action shortly after Walton engaged in that protected conduct."  Response at 17-18.  Walton argues that the "proximity of the protected activity and the submission of the RIF plan to the State Personnel Office alone is sufficient to establish a prima facie case of retaliatory motive."  Response at 18. Walton further argues that there is sufficient evidence to show that the RIF criteria was manipulated to terminate her position and that the RIF was "generally pretextual," including "that the SLO did not consider any options to Walton's termination, that other options were available, that other divisions in the SLO had an organizational structure similar to the structure

of the Commercial Resources Division, and that the SLO failed to offer Walton a right of first refusal for other positions in the SLO."  Response at 18.  Walton notes that Olah has denied "knowledge of Walton's complaints," but "a reasonable inference" can be drawn from the facts that Britt delivered copies of Walton's complaints to Lopez, that Olah supervises Lopez, and that the Land Office policy requires human resources "to investigate and keep copies of the complaints," to conclude that Olah knew of Walton's complaints and "is now not being truthful." Response at 18.  Regardless, Walton argues that Olah's testimony is not conclusive, by referring the Court to Anthony v. Sundlun, 952 F.2d 603, 606 (1st Cir. 1991), for the assertion that an "actors' self-serving statement about his state of mind is not conclusive."  Response at 18. Walton argues that, even if Powell, and not Olah, was the "ultimate decision maker" and he did not know about Walton's protected activity, there is still "evidence from which the trier of fact could conclude that the SLO is liable for retaliation under the subordinate bias theory of liability. . . ."  Response at 18 (citing EEOC v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 485 (10th Cir. 2006)).  Walton argues that there is sufficient evidence to infer that Powell's staff informed him of Walton's complaints of Bearden's conduct before Powell submitted the RIF to the State Personnel Office for approval.  See Response at 19.  Walton specifically refers to the facts that Lopez, Olah, and others met with Powell to discuss the RIF before June 10, 2011; that Lopez believed Lyons had improperly moved Walton to a classified position; and that Britt testified that he delivered copies of Walton's complaints about Bearden to Lopez, who was obligated to investigate the complaints.  See Response at 19.  Walton further argues that there is evidence that the RIF was pretextual, and that "Powell was motivated to favor" Bearden because Bearden worked for the first Powell administration and Bearden sent an electronic mail transmission to Powell and his staff Land Office containing "information about a pending land

sale" more than two months before the November 2, 2010, general election.  Response at 19.

As for the WPA claim, Walton argues that "there is ample evidence that" she "communicated to her supervisor, Mr. Britt, in accordance with SLO policy," Bearden's conduct, "which Walton believed in good faith constituted improper and unlawful discrimination." Response at 20.  Walton argues that her reporting of Bearden was protected activity, because "Bearden's conduct was, at a minimum, improper" and that "Bearden's conduct violated SLO's policy against sexual, racial, and religious harassment."  Response at 20.  According to Walton, "[w]hether Ms. Bearden's conduct rose to the level of actionable harassment under either Title VII or the NMHRA is irrelevant," because the WPA prohibits retaliation "against a public employee who reports conduct 'that the public employee believes in good faith constitutes an unlawful or improper act.'"  Response at 20 (quoting N.M. Stat. Ann. § 10-16C-3).  To show that Olah knew of Walton's complaints, Walton asserts the same facts she uses to support her retaliation claim: that Britt forwarded Walton's complaints to Lopez, whom Olah supervised. See Response at 20.

As for her political affiliation claim, Walton argues that there is a "genuine dispute of fact . . . whether Walton's political affiliation with the Republican party and with Mr. Lyons were substantial or motivating factors in the adverse employment action."  Response at 21 (internal quotation marks omitted).  Walton argues that, when "Powell submitted the RIF plan to the . . . State Personnel Office for approval, Powell was aware that Walton was politically affiliated with both the Republican party and Mr. Lyons, who was Powell's political adversary."  Response at 21.  To show Powell's knowledge of her political affiliations, Walton points to the facts that Powell watched the Barker report; Powell considers Barker to be the gold standard of reporting; Powell found no reason to disbelieve Barker's report; and Powell received a letter from

Hemphill, describing Walton's affiliation with Lyons and cautioning that any retaliation against her because of her political affiliation would be illegal.  See Response at 22.  Powell argues that the April 14, 2011 meeting with the State Trust Lands Advisory Board, where Powell discussed the Barker report and made the statement about protected employees from the Lyons' administration, shows that "Powell approved the RIF plan in retaliation for Walton's political affiliation."  Response at 22.  Walton addresses the Defendants' argument that Nelms "is instructive," by arguing that, in Nelms, there was no evidence "that the persons who terminated the plaintiff's employment were motivated by the plaintiff's Republican party membership," but, "[b]y contrast, in this case the jury can reasonably infer . . . that Powell, the official who ultimately approved the RIF plan" and submitted it to the State Personnel Board for approval, "was motivated by Walton's political affiliation."  Response at 22-23.  Specifically, Walton refers the Court to the April 14, 2011, meeting; to Britt making numerous comments to Walton about her association to Lyons; and to Powell and to his staff demonstrating their "distrust of Walton in the context of transactions completed in the Lyons administration" by making comments and facial gestures.  Response at 23.  Walton also argues that "the jury can reasonably infer that Ms. Olah designed the RIF to eliminate Walton's position at the behest of Powell or with Powell's endorsement, because of Walton's political affiliation."  Response at 23.  Walton directs the Court to the facts that Olah was "a member of Powell's hand-picked team" and was hired as an exempt employee to "oversee Administrative Services, including the Human Resources Manager, Sandra Lopez"; that Lopez informed Olah that she objected to Lyons' direction to transfer Walton to a classified position; that Lopez, Olah, and others "met with Powell to inform" him about the development of the RIF plan; and that "there were alternatives to meeting the budgetary and FTE requirements" from the Appropriations Act that did not

require eliminating Walton's position.  Response at 24.  Walton argues that "the jury is not obligated to accept Ms. Olah's denial" that she did not know of Walton's political affiliation before developing the RIF plan and that Powell did not direct the development of the RIF plan to target Walton.  Response at 24.

In their Reply, the Defendants repeat their arguments from the MSJ that Walton did "not engage in protected opposition to Title VII discrimination, nor did she make any protected disclosure," because the activities of which Walton complained did not "rise to a level of discrimination required by Title VII," noting that Walton "voluntarily dismissed her claims for discrimination."  The Defendants' Reply in Support of Motion for Summary Judgment on Plaintiff's Second Amended Complaint to Recover Damages for Discrimination and Retaliation and for Violations of Constitutional Rights at 4-5, filed January 17, 2014 (Doc. 59)("Reply").  The Defendants argue that the "fact [Walton] claims that she was targeted because of her gender, national origin or some other protected class are being voluntarily dismissed is indicative of the fact that [Walton] recognizes that she did not engage in any protected activity."  Reply at 5.  The Defendants repeat their arguments from the MSJ that Walton cannot establish a causal connection, because her electronic mail transmissions and memoranda to Britt, detailing her complaints, were sent after the decision to terminate her position was made.  Reply at 5-6.  The Defendants argue that the Court must disregard Walton's allegations concerning the April 7 or 8, 2011, electronic mail transmissions, because Walton "has failed to provide evidence of written complaints made" in those electronic mail transmissions by citing to Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885 (9th Cir. 2003), for the proposition that "Courts may only consider that evidence properly before them and admissible at trial."  Reply at 4 n.1 (citing 336 F.3d at 889).  The Defendants address Walton's argument that Olah must have known of

Walton's complaints and was motivated to prepare a retaliatory RIF, by arguing that the decision to terminate Walton's position was made before Walton's electronic mail transmissions and memoranda to Britt. Reply at 6. In addressing the subordinate bias theory, the Defendants argue that "the Court must first find that Ms. Olah was aware of the complaints made by Plaintiff to Mr. Britt" in the April 29, 2011, memoranda so "that her bias could thus be attributed to Commissioner Powell"; yet, Olah had made the decision to terminate Walton's position before the memoranda were delivered. Reply at 7.

The Defendants next argue that, even if the Court determines that Walton established a prima facie case for retaliation, the "Defendants have presented evidence of a legitimate, non-retaliatory business reason for its decision to eliminate Plaintiff's position." Reply at 7. Regarding Walton's assertion that there were other alternatives available to Olah that did not terminate Walton's position, the Defendants argue that "a fact finder should not second guess an employer's decision absent objective evidence of discriminatory motive." Reply at 7 (citing Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1169 (10th Cir. 1998); Considine v. Newspaper Agency Corp., 43 F.3d 1349, 1363 (10th Cir. 1994)). The Defendants contend that "[a]s such, the Court should disregard all evidence of Plaintiff purporting to demonstrate the 'alternatives' Ms. Olah supposedly had available aside from eliminating Plaintiff's General Manager I position." Reply at 7. The Defendants argue that, because they have offered a legitimate, nondiscriminatory reason for the decision, "summary judgment is warranted unless [Walton] can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." Reply at 7 (citing Asbury v. Geren, 582 F. Supp. 2d 1323, 1334 (D.N.M. 2008)(Black, J.)). The Defendants' argue that the evidence presented by Walton is "legally insufficient" to support a claim that the RIF plan was pretextual. Reply at 8. The Defendants argue that Walton "asserts

but fails to present evidence that": (i) Olah did not consider alternatives to Walton's termination, (ii) alternatives were available, (iii) other divisions in the Land Office had similar organizational structures as the Commercial Resources Division, and (iv) the Land Office did not offer Walton a right of first refusal for another position in the Land Office, as State Personnel Board Rule 1.7.10.9., N.M. Admin. Code § 1.7.10.9, requires.  Reply at 8.  They contend that, because it is not their "burden to establish that the decision to eliminate [Walton's] position was a good one, or a right one[,] all the [Defendants] need to do is state a reason other than retaliation for their action."  Reply at 9 (citing Sanchez v. Mora San Miguel Elec. Coop. Inc., No. 98-2061, 1999 WL 176151, at *5 (10th Cir. 1999)(unpublished)).  The Defendants argue that "whether other divisions in the SLO had an organizational structure similar to the organizational structure of the Commercial Resources Division is irrelevant" to the issue of pretext, because, while "the Mineral Resources Division . . . may have had a similar structure, it was dissimilar in a number of key ways."  Reply at 9.  Additionally, the Defendants argue that they "did not fail to offer [Walton] a right of first refusal for other positions," because "there were no other positions being filled from June 10, 2011 through July 1, 2011, the time frame covered by" State Personnel Board Rule 1.7.10.9., N.M. Admin. Code § 1.7.10.9.  Reply at 9.

As for Walton's WPA claim, the Defendants repeat arguments from the MSJ that Walton cannot show that she disclosed protected information, that there was a pretext, or that there was a causal connection "between any protected disclosure and her adverse employment action." Reply at 10.  The Defendants argue that the McDonnell Douglas burden-shifting standard should be used, because the WPA provides defendants with an affirmative defense to prove "'a reduction in workforce or other legitimate business unrelated to conduct prohibited pursuant to the Whistleblower Protection Act and that retaliatory action was not a motivating factor.'"

Reply at 11 (quoting N.M. Stat. Ann. § 10-16C-4(B)).  The Defendants contend that Walton "cannot show the requisite protected activity required by the WPA," because Walton's complaints to Britt regarding Bearden's conduct "are unprotected disclosures because she was reporting claimed misconduct which was a matter within her regular job duties."  Reply at 11. The Defendants maintain that the General Manager I position was tasked with correcting and disciplining staff members for inappropriate behavior, and by "reporting Ms. Bearden's conduct up the chain of command to her immediate supervisor, Mr. Britt, Ms. Walton was doing nothing more than reporting misconduct of a subordinate as part of her assigned job responsibilities." Reply at 11.  The Defendants argue that the communications are "undertaken as part of [an employee's] normal duties and through normal channels are not protected disclosures" under the Federal Whistleblower Protection Act.  Reply at 11 (citing Kahn v. Dep't of Justice, 618 F.3d 1306, 1312-13 (Fed. Cir. 2010); Huffman v. Office of Pers. Mgmt., 263 F.3d 1341, 1352 (Fed. Cir. 2001), superseded by statute, Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112-199, § 101(b)(2)(C), as recognized in 504 F. App'x 894, 896 (Fed. Cir. 2013)(unpublished)).  Additionally, the Defendants argue that, even "assuming Plaintiff's claims can be interpreted to identify protected disclosures under the WPA, complaints that Mr. Britt or others did nothing to follow up, investigate or resolve Plaintiff's complaints in the workplace do not rise to the level of protected disclosures."  Reply at 12 (citing Willis v. Dep't of Agric., 141 F.3d 1139, 1143 (Fed. Cir. 1998)("[C]riticism directed to the wrongdoers themselves is not normally viewable as whistleblowing.")).

The Defendants argue that Walton's complaints about Bearden "do not constitute 'unlawful or improper acts'" as the WPA defines the phrase because Walton's complaints "cannot rise to the level of a violation of federal or state law."  Reply at 12 (citing Oncale v.

Sundowner Offshore Servs., 523 U.S. 75, 80 (1998)).  The Defendants further argue that Walton has not produced any evidence of pretext or a causal connection, which are "closely related" concepts.  Reply at 12-13.  The Defendants argue that Walton has not produced evidence of pretext, "other than statements in her Affidavit which are conclusory, based on speculation, and are unreasonable inferences of agreed upon fact."  Reply at 13.  The Defendants argue that Walton's argument that the adverse employment action came within close proximity of Walton notifying Britt of her complaints "wholly ignores the unrefuted evidence that Ms. Olah, the only practical decision maker with respect to the RIF, made her determination to eliminate Plaintiff's General Manager I position by March 30, 2011, and that her recommendation was approved by Commissioner Powell on April 6, 2011."  Reply at 13.  The Defendants argue that Walton has produced no evidence that Olah held a discriminatory animus against her when Olah made the RIF recommendation.  See Reply at 13.

Regarding Walton's political affiliation claim, the Defendants concede that Walton's "General Manager I position . . . did not require political allegiance," but argue that Walton has not established that her political affiliation was a substantial or motivating factor in the termination of her position.  Reply at 14.  The Defendants argue that it "is not sufficient for Plaintiff to establish that she was a Republican, or that she attended Republican events, or that she was hired by a Republican commissioner into an exempt position."  Reply 14 (citing Nelms, 153 F.3d at 815).  The Defendants additionally argue that Powell's testimony that he watched the Barker report and had no reason to disbelieve it "does not mean a prima facie political association claim is made," but instead shows only "that Commissioner Powell knew Plaintiff was a Republican accused by the media of obtaining her exempt job during the Lyons administration through special favor."  Reply at 15.  Addressing the April 14, 2011, meeting,

where Powell made remarks concerning protected employees, the Defendants argue that Powell's "deposition testimony demonstrates he meant individuals other than Plaintiff" and that "there is no suggestion by Commissioner Powell that such 'protected employees' would be targeted for a discriminatory RIF or any such other illegal treatment."  Reply at 15.  The Defendants further argue that Walton "mischaracterizes [the] meeting by linking references of the Larry Barker report, to use of the term 'protected employees' in the Lyons administration." Reply at 17.  The Defendants contend that at the meeting, Powell was offering a "brief overview of the first four months of office and proceeded to address a special audit issued to the SLO," when Powell stated that the "special audit has helped to form recent public perception of the Land Office that is skewed due to the concerns brought up in the audit" and that, following the audit, "'there have been a series of interviews by investigative reporters like Larry Barker which have been featured on television statewide.'"  Reply at 16-17 (quoting State Land Trust Meeting at 3).  Powell, later in the meeting, unrelated to the Barker report, stated "that he was 'concerned about employees in inappropriate roles, protected employees.'"  Reply at 17 (internal quotation marks omitted).  The Defendants argue that there "is no clear evidence Commissioner Powell was referring to the Larry Barker story" that concerned Walton, because there was, in fact, "more than one story about the SLO reported by Mr. Barker."  Reply at 17 (citing Powell Depo. at 49:11-51:6).  The Defendants argue that Powell's comments at the meeting were not directed at Walton and that there is not "any reasonable inference" that they were, absent "pure speculation."  Reply at 17.  Furthermore, the Defendants argue that Powell "only approved a RIF design undertaken by Ms. Olah, who" did not know of Walton's political affiliation or the Barker report.  Reply at 15.  The Defendants attempt to distinguish Dickeson v. Quarberg, 844 F.2d 1435 (10th Cir. 1988)("Dickeson"), which Walton brings up in her Response to the MSJ (QI),

Response (QI) at 9, by arguing that the "present case is clearly distinguishable from Dickeson."

MSJ at 15-16.  The Defendants contend that in Dickeson the defendant-sheriff told one of the

plaintiffs that there were "black marks against him" because of his association with the ex-

sheriff; the defendant-sheriff stated at a meeting that employees, who campaigned for the ex-

sheriff, "need not bother re-applying for their jobs"; the defendant-sheriff told one of the

plaintiffs that he did not want a friend of the ex-sheriff in his position; and the defendant-sheriff

told one of the plaintiffs that he was "not going to keep her on because of her failure to campaign

and vote for him."  MSJ at 15-16.  The Defendants maintain the only evidence Walton "offers in

support of her" political affiliation claim is that Powell was "aware of her political affiliation,"

because of the Barker report and Hemphill letter, and that Powell "displayed his political bias

against Walton at the April 14, 2011 meeting of the State Trust Lands Advisory Board."  Reply

at 16.

       **2.**      **The MSJ (QI), Response (QI), and Reply (QI).**

In the MSJ (QI), the Defendants argue that they are entitled to Qualified Immunity with

regards to

> Walton's claim that the elimination of her position in a reduction in force violated
> the First Amendment right of political association because she did not have a
> clearly established right not to be subject to a reduction in force on account of
> being hired as an "exempt" employee during the Lyons administration.

MSJ (QI) at 11.  The Defendants argue that a "First Amendment protected political association

claim or belief generally consists of support for a particular political party, candidate for election,

or political ideology."  MSJ (QI) at 12 (citing Gann v. Cline, 519 F.3d 1090, 1092-93 (10th Cir.

2008)("Gann")).  The Defendants argue that Walton has not alleged "that her position was

designated for elimination in the reduction in force plan because she was registered to vote as a

Republican, supported the Republican Party, or supported Commissioner Lyons' election or any other political activity or ideology."  MSJ (QI) at 12.  The Defendants assert that Walton has not alleged that her position was eliminated because of a lack of support for "the Democratic Party, Commissioner Powell's election, or any other political activity or ideology."  MSJ (QI) at 12. Instead, the Defendants argue that Walton's claim is that "her position was eliminated because she had been hired as an 'exempt' employee when Lyons was the Commissioner of Public Lands and later re-classified, ultimately, into a General Manager I, classified position" with no indication of allegations that a retaliation was based on anything other than a "loose association with Commissioner Powell's predecessor."  MSJ (QI) at 12.

The Defendants argue that an "affiliation with individuals or administrations without a claim" that the affiliation "is based on political beliefs is not protected."  MSJ (QI) at 13 (citing Jantzen, 188 F.3d at 1247).  The Defendants note that the "Plaintiff claims that her hire as an 'exempt' employee and subsequent reclassification is a form of political association," and that it was made "clear to Defendants that Plaintiff was, in fact, a hire based on political beliefs."  MSJ (QI) at 13.  The Defendants contend that hiring a person "into an 'exempt' position is not necessarily a form of political affiliation or political belief," but instead it "simply means the employee was hired outside the requirements of the State Personnel Act," N.M. Stat. Ann. § 10-19-4(D).  MSJ (QI) at 13 (citing N.M. Stat. Ann. § 10-19-4).  The Defendants argue that, when hiring Walton, the Land Office did not take into consideration that Walton was registered to vote as a Republican, that she supported the Republican Party, the election of Lyons, or any other political activity.  See MSJ (QI) at 13.  The Defendants argue that Olah did not know that Walton was registered as a Republican, and that Olah did not consider whether Walton supported the Republican or Democrat Party, the Lyons or Powell elections, or any other political effort.  MSJ

(QI) at 13-14.  The Defendants argue that Walton's "First Amendment right not to be subject to a reduction in force because of her original hire as an 'exempt' employee was not clearly established."  MSJ (QI) at 14.  Additionally, the Defendants contend that there is no evidence that Britt or Bearden participated in the RIF process, and that there is no evidence that Powell retaliated on the basis of political association, "when approving the termination of Plaintiff's position."  MSJ (QI) at 14.

In response, Walton argues that "there are genuine issues of material facts as to whether the RIF was a pretext for retaliation for Walton's political association with the out-going Lyons administration and with the Republican party" by referring the Court to her Response to the MSJ. Response (QI) at 8.  Concerning the second prong for qualified immunity, Walton argues that her right "was clearly established at the time of the conduct in question," because "it has long been established that 'the First Amendment Protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance.'"  Response (QI) at 8 (quoting Mason v. Okla. Tpk. Auth., 115 F.3d 1442, 1451 (10th Cir. 1997), overruled on other grounds by TW Telecom Holdings Inc. v. Caroline Internet Ltd., 661 F.3d 495 (10th Cir. 2011)).  Walton argues that the "Supreme Court [of the United States] has articulated that right in a variety of circumstances."   Response (QI) at 8 (citing Elrod v. Burns, 427 U.S. 347, 359 (1976); Branti v. Finkel, 445 U.S. 507, 514-15 (1980)("Branti"); Rutan v. Republican Party of Ill., 497 U.S. 62, 72 (1990)).  Walton also argues that the Tenth Circuit "has recognized a public employee's First Amendment right to be free from discrimination and retaliation because of political affiliation (or non-affiliation) in a wide variety of circumstances." Response (QI) (citing Dickeson, 844 F.2d at 1441; Laidley v. McClain, 914 F.2d 1386, 1395 (10th Cir. 1990), superseded by rule on other grounds as recognized in Ferguson v. Brian

Webster P.A., 493 F. App'x 982 (10th Cir.)(unpublished); Mason v. Okla. Tpk. Auth., 115 F.3d at 1451; Bass v. Richards, 308 F.3d 1081, 1090-91 (10th Cir. 2002); Gann, 519 F.3d at 1095-96).

Walton argues that the facts in Dickeson "were very similar to the facts in this case." Response (QI) at 9.   Walton states that in Dickeson, a sheriff terminated the plaintiffs' employment because of their association with the former sheriff, and the United States Court of Appeals for the Tenth Circuit held that the termination of the plaintiffs' employment, because of their association with the former sheriff, "would have violated their First Amendment right of political association."  Response (QI) at 10 (citing Dickeson, 844 F.2d at 1436).  Walton argues that "Dickeson clearly informed Powell that [he] could not terminate Walton's employment because of Walton's association with Powell's political adversary, the former Commissioner of Public Lands, Patrick Lyons."  Response (QI) at 10.  Walton argues that Gann "demonstrates that the contours of a public employee's First Amendment right to be free of political patronage were clearly established in 2008" -- two years before "Powell engaged in the patronage termination of Walton."  Response (QI) at 10.  According to Walton, in Gann, a county commissioner fired a county requisitions manager, who alleged that she was fired and replaced because she did not support the county commissioner's election campaign, while her replacement did.  See Response (QI) at 10 (citing Gann, 519 F.3d at 1095).  The Tenth Circuit held that the plaintiffs' right was clearly established at that time, because the defendant was on reasonable notice that his conduct was unlawful even though the facts in the case did not precisely match controlling precedent. See Response (QI) at 10 (citing Gann, at 1096).  Walton argues that "Powell was on reasonable notice that" terminating Walton's position because of her "association with Powell's Republican predecessor . . . was unconstitutional."  Response (QI) at 11.  Walton further argues that "Powell admitted in this [(sic)] deposition that he was aware that the termination of a public employee

because of the public employee's political affiliation was improper."  Response (QI) at 11 n.3 (citing Powell Depo. at 36:25-38:6).

Walton argues that "Powell has misleadingly attempted to recast Walton's § 1983 claim" by stating that "'she did not have a clearly established right not to be subject to a reduction in force on account of being hired as an 'exempt' employee during the Lyons administration.'" Response (QI) at 11 (quoting MSJ (QI) at 11).  Walton argues that the "Defendants' convoluted statement completely misconstrues Walton's claim," because it "was the termination of Walton's employment because of Walton's affiliation with Powell's political adversary, Patrick Lyons, and Walton's affiliation with the Republican party, that violated" her "First Amendment right to be free of political patronage."  Response (QI) at 12.  Walton argues that Powell's knowledge that Lyons, "[Powell's] political adversary, hired Walton, a Republican, as an exempt employee, and then moved [her] into a classified position shortly before the November 2010 election, is evidence that Powell knew of Walton's political affiliation."  Response (QI) at 12.  Walton argues that the Defendants' "attempt to show that Walton's claim is somehow distinguishable from controlling precedent . . . completely misstates and misconstrues Walton's claim." Response (QI) at 12.  Walton argues that other statements in the MSJ (QI) are "misleading," including the statement: "[h]ere, Walton does not allege that her position was designed for elimination in the reduction in force plan because she was registered to vote as a Republican, supported the Republican Party, or supported Commissioner Lyons' election or any other political party or ideology."  Response (QI) at 12 (quoting MSJ (QI) at 8-9).  Walton directs the Court to her Complaint, where she alleges that "Powell . . . unlawfully retaliated against Walton in violation of . . . her right to engage in political association free of reprisal by State officials . . . .  Specifically, and without limitation, Powell retaliated against Walton for Walton's political

affiliation with the Lyons' administration." Response (QI) at 12 (quoting Complaint ¶ 42 at 8-9).
Walton also points to her Response to the MSJ, where she alleges that she "more fully described
her allegations" that her "'political affiliation with the Republican party and with Mr. Lyons
were substantial or motivating factors in'" the termination of her position. Response (QI) at 13
(quoting Response at 21). Walton addresses the Defendants' assertion that "'affiliation with
individuals and administrations generally is not protected,'" Response (QI) at 13 (quoting MSJ
(QI) at 13), by arguing that, in Dickeson, the plaintiffs alleged only that their employment was
terminated because they had been hired by the previous sheriff and not because they were active
in a political campaign, because they voted for a certain candidate, or because they were
members of a specific political party, Response (QI) at 13 (citing Dickeson, 844 F.2d at 1445).
There, according to Walton, the Tenth Circuit reversed the district court's dismissal of the
plaintiffs' claims by holding that the "'plaintiffs should be allowed to attempt to prove that they
were discharged because of their party affiliation and/or association with ex-Sheriff Harvey.'"
Response (QI) at 13 (quoting Dickeson, 844 F.2d at 1445). Walton further uses Dickeson to
argue that the Defendants' claim that a loose affiliation is insufficient to establish a First
amendment claim "is without any support, and is meaningless under the facts in this case."
Response (QI) at 13.

Walton contends that the Defendants "mis-cited" Jantzen for the proposition that an
affiliation with an individual or administration without a claim that the affiliation is based on
political beliefs is not protected, because the Tenth Circuit in Jantzen, never made "such a
pronouncement." Response (QI) at 14 (citing Jantzen, 188 F.3d at 1247). Additionally, Walton
argues that Jantzen does not support the Defendants' assertion of qualified immunity, because
the Tenth Circuit in Jantzen recognized that it was clearly established at that time that it is

unconstitutional to terminate an employee for "'affiliating with and/or believing in a particular candidate.'"  Response (QI) at 15 (quoting <u>Jantzen</u>, 188 F.3d at 1259).

In reply, the Defendants argue that Walton does not allege in her Complaint that she was retaliated against "for her support of the Republican Party, the fact she was a registered Republican, any support for the election of Commissioner Lyons, or any other political ideology," nor that Powell knew of these facts "at the time of the RIF."   Reply Brief of Defendants Ray Powell, Donald Britt and Delma Bearden in Support of Motion for Summary Judgment on Count VI of the Second Amended Complaint on Grounds of Qualified Immunity at 3-4, filed January 24, 2014 (Doc. 64)("Reply (QI)").  The Defendants argue that the "sole basis for Plaintiff's political association claim is that she was retaliated against because of her 'political association with the Lyons' Administration."  Reply (QI) at 4 (quoting Complaint ¶ 18, at 4).  The Defendants argue that the Complaint is "structured such that any retaliation for Plaintiff's alleged political association is apparently based on the fact she was hired as an exempt employee and reclassified as a classified employee during the Lyons Administration."  Reply (QI) at 4.  The Defendants assert that Walton has recast her claim in the Response (QI) to argue that her claim is based on her "'political affiliation with both the Republican Party, and with Powell's political adversary, Patrick Lyons.'"   Reply (QI) at 4 (quoting Response (QI) at 12). The Defendants concede that, "[d]ue to the manner in which she has recast her claim, Defendant, Powell does not dispute the fact that, at the time of the RIF . . . it was clearly established that if a public employer used political association as a substantial or motivating factor behind an adverse employment action," such action would violate the employee's First Amendment rights.  Reply (QI) at 4.  The Defendants argue that the Court must still determine whether a prima facie case exists before evaluating qualified immunity, and the Defendants refer the Court to their Reply to

the MSJ to argue that Walton has failed to make a prima facie case or has, in the alternative, failed to establish sufficient evidence to show pretext.  Reply (QI) at 4-5.

The Defendants argue that as "plead [(sic)], however, Plaintiff's Complaint may be insufficient as a matter of law, but it nonetheless supports a finding of qualified immunity for Mr. Powell," because it "was not clearly established that affiliation with another administration, standing alone, and without allegations that Plaintiff was retaliated against for supporting a candidacy or her political beliefs, supported a political affiliation claim."  Reply (QI) at 5.  The Defendants again refer to Court to Nelms for the proposition that "simply carrying the political card of the opposition party, alone, does not satisfy the significant burden of raising a claim for retaliation based on political association."  Reply (QI).  The Defendants assert that Walton has alleged only that she was a Republican, that she worked as both an exempt and classified employee with the Lyons Administration, and that, based on those two facts alone, "there is no clearly established law which would have informed Commissioner Powell," at the time he approved the RIF, "that he was violating Plaintiff's First Amendment Rights of political association."  Reply (QI) at 5.

### 3.    Hearings on April 9 and 10, 2014.

The Court held hearings on April 9 and 10, 2014.  At the April 9, 2014, hearing, the Court heard arguments on the NMHRA and Title VII retaliation claims, and on the political affiliation claim, see Transcript of Hearing at 46:15-102:6 (taken the morning of April 9, 2014)(Hatcher, Hardwick, Court)("April 9 Morning Tr."); Transcript of Hearing at 1:2-24:7 (taken the afternoon of April 9, 2014)(Hatcher, Hardwick, Court)("April 9 Afternoon Tr."), and at the April 10, 2014, hearing, the Court heard arguments on the WPA claim and the qualified immunity defense, see Transcript of Hearing at 1:11-22:25, 35:16-51:10 (taken April 10,

2014)(Hatcher, Hardwick, Court)("April 10 Tr.").[88]

At the April 9, 2014, hearing, the Defendants argued that retaliation claims under the NMHRA and Title VII are evaluated in essentially the same manner, and that each is subject to the <u>McDonnell Douglas</u> burden-shifting analysis.[89]  <u>See</u> April 9 Morning Tr. at 57:10-57:22 (Hatcher).  The Defendants argued that Walton did not engage in protected opposition to discriminatory activity, because Bearden's behavior was "at best . . . colorful talk" and at worst "inappropriate trash talk," and that Bearden's statements were not directed at Walton personally. April 9 Morning Tr. at 58:6-59:7 (Hatcher).  The Defendants argued that, under <u>Peterson v. Utah Department of Corrections</u>, 301 F.3d at 1182, Walton must have complained of an actual Title VII violation, <u>see</u> April 9 Morning Tr. at 60:24-61:5 (Hatcher, Court).  When the Court noted that <u>Peterson</u> was not a retaliation case, the Defendants maintained that the standard from <u>Peterson</u> should still apply in the retaliation context.  <u>See</u> April 9 Morning Tr. at 61:6-62:7 (Hatcher, Court).  The Court directed the Defendants to <u>Kelley v. City of Albuquerque</u>, 542 F.3d 802 (10th Cir. 2008), for the proposition that merely complaining to human resources about conduct that does not violate Title VII would be protected conduct, but the Defendants maintained that Walton had to report actual discriminatory behavior to engage in protected activity, <u>see</u> April 9 Morning Tr. at 61:10-61:20 (Hatcher, Court); <u>id.</u> at 63:11-63:15 (Hatcher, Court).

The Defendants also argued that there was no causal connection between Walton's

---

[88]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

[89]The Court will discuss the parties' arguments in the order that they addressed them in the MSJ and not necessarily the order in which they were argued at the hearings.

termination and any protected conduct, because Olah designed the RIF and Powell approved it before Walton reported Bearden's conduct to Britt.  See April 9 Morning Tr. at 64:2-64:21 (Hatcher).  The Defendants additionally argued that there is no evidence that the RIF was pretextual, and that the Court "should not second-guess a proffered business or nondiscriminatory decision made by" an employer, because there is no "nonspeculative evidence of discrimination" in the record.  April 9 Morning Tr. at 68:15-68:23 (Hatcher).  In addressing Walton's argument that other divisions within the Land Office had two General Manager I positions, the Defendants noted that the other division -- the Oil and Gas Division -- is much larger than the Commercial Resources division, where Walton worked.  See April 9 Morning Tr. at 69:20-70:19 (Hatcher, Court)("[T]he oil and gas division generates revenues of 500 million dollars a year.  The commercial resources 6 million.").  The Defendants addressed Walton's argument that the Land Office did not provide her a right of first refusal by arguing that Lopez, who allegedly violated Walton's right of first refusal, did not "have anything to do with the RIF" and that, at that time, there were not any open positions that were hiring.  April 9 Morning Tr. at 71:11-71:25 (Hatcher).  The Defendants also addressed the cat's paw theory by arguing that there is nothing to support it other than the fact that Olah was Lopez' supervisor on an organizational chart.  See April 9 Morning Tr. at 72:9-72:24 (Hatcher, Court).  The Defendants argued that, even if Lopez had a discriminatory intent against Walton, there must be something other "than just organizational structure to create a reasonable inference" that Olah was influenced by Lopez, because there "is no evidence of Lopez feeding any information" to Olah.  April 9 Morning Tr. at 88:22-89:19 (Hatcher, Court); id. at 96:4-96:7 (Hatcher, Court).

Walton responded to the Defendants' argument that protected activity requires an actual violation by arguing that "it's just plain wrong," because opposition "activity is protected even

when it is based on a mistaken good faith belief that Title VII has been violated."  April 9

Morning Tr. at 79:19-80:11 (Hardwick).  Walton additionally argued that "a lot of" Bearden's

conduct "would constitute actionable harassment."   April 9 Morning Tr. at 82:3-82:12

(Hardwick).  In addressing the causal connection requirement, Walton argued that, because

Walton verbally reported Bearden to Britt before April, 2011, and because Land Office policy

required Britt to take the complaints to Lopez, whom Olah supervised, a jury could reasonably

infer that Olah knew of the complaints.  See April 9 Morning Tr. at 82:12-83:3 (Hardwick).

Walton argued that "there is ample evidence . . . from which the jury could conclude that the RIF

was a pretext."  April 9 Morning Tr. at 85:10-85:13 (Hardwick).  Specifically, Walton argued

that, in Olah's deposition, "she admitted that she did not explore other" alternatives in carrying

out the RIF and that there "were other options available," which could lead a jury to conclude

that Olah's reasons for terminating her position were pretextual.  April 9 Morning Tr. at 85:21-

86:9 (Hardwick).  Walton argued that there were "three or four other alternatives available" to

the Land Office that did not involve terminating Walton's position, and, in addition, that the

Land Office could have transferred her to one of the vacant positions within the Land Office.

April 9 Morning Tr. at 85:10-85:18 (Hardwick).

Concerning the WPA claim, the Defendants argued that a WPA claim requires disclosure

of protected information, which the WPA defines as "the disclosure of an unlawful or improper

act," and that the WPA requires disclosure of something more than "a workplace personality

dispute or complaints about workplace subordinates," and "bad behavior."  April 10 Tr. at 2:12-

3:15 (Hatcher).  The Defendants repeated arguments from their Reply that the WPA does not

protect reporting complaints if the reporting is part of an employee's job duties, and that

Walton's job duties required her to "work with subordinates" and to "try to remedy inappropriate

behavior."   April 10 Tr. at 5:7-5:22 (Hatcher).   The Defendants also argued that there is a problem with "any causal connection between the reporting of" Bearden and "the RIF itself," because only Britt and Lopez knew of Walton's complaints, and "there is absolutely nothing in the record . . . to suggest that" Olah or Powell had any knowledge of Walton's complaints.  April 10 Tr. at 6:12-6:24 (Hatcher).   The Defendants again argued that Walton's electronic mail transmissions and memoranda to Britt were all delivered after the decision to terminate Walton's position had been made.  See April 10 Tr. at 6:24-7:14 (Hatcher).

Walton responded by arguing that the Defendants moved for Summary Judgment on the WPA claim solely "on the grounds that Ms. Walton did not make a protected communication," and not "on the grounds that there was a valid business justification," that "there was no causal connection," or that "reporting was within her official duties."   April 10 Tr. at 10:13-10:22 (Hardwick).   Walton addressed the argument that reporting Bearden's conduct was within her official duties by arguing that the Defendants' argument "suffers from a fatal flaw, as the" United States Court of Appeals for the Federal Circuit "recently acknowledged its narrow interpretation of the" Federal Whistleblower Protection Act, 5 U.S.C. § 2302 -- that it does not apply to reporting within an employee's official duties -- has recently "been definitively overruled by Congress."   April 10 Tr. at 10:23-12:19 (Hardwick).   Walton additionally argued that the WPA protects reporting a "violation of a state administrative rule," and that the Land Office has "a sexual harassment and discrimination policy," which Bearden's "racially insensitive comments violate[d]."   April 10 Tr. at 13:5-13:20 (Hardwick).   Walton further argued that "there has been no showing that Ms. Walton didn't in good faith believe that Ms. Bearden was making comments that violated the State Land Office's harassment and discrimination policy."   April 10 Tr. at 13:21-12:24 (Hardwick).   As for causation, Walton argued that "there is

evidence upon which the jury could reasonably infer that Ms. Lopez communicated with Ms. Olah about [Walton's] complaint." April 10 Tr. at 14:6-14:13 (Hardwick). Specifically, Walton argued that she verbally complained to Britt in February and March, 2011, which was before Powell approved the RIF. See April 10 Tr. at 14:10-15:1 (Hardwick). When asked by the Court whether the McDonnell Douglas analysis should be applied to the WPA, Walton stated that she did not agree or disagree that the analysis should be used, and stated that the WPA is silent regarding whether "courts should or shouldn't use the McDonnell Douglas framework." April 10 Tr. at 16:1-17:18 (Hardwick, Court).

Concerning the political affiliation claim, the Defendants argued that a political affiliation claim requires more than "mere knowledge of political affiliation." April 9 Afternoon Tr. at 2:25-3:8 (Hatcher). The Defendants addressed Powell's statements at the April 14, 2011, meeting, by arguing that Powell was referring to employees who "bypassed the chain of command in the [Lyons] administration[,] [a]nd were able to get things done without going through the normal chain of command." April 9 Afternoon Tr. at 3:20-4:16 (Hatcher). The Defendants argued that, when asked whether he was referring to Walton at the meeting, Powell answered that he was not. April 9 Afternoon Tr. at 4:20-4:23 (Hatcher). The Defendants contended that Powell had knowledge of Walton's political history with Lyons, but that "there is nothing attributable to Mr. Powell that would show any type of intent to retaliate against Ms. Walton based on . . . her political association." April 9 Afternoon Tr. at 6:8-6:19 (Hatcher). The Defendants addressed Dickeson by arguing that, in that case, the defendant-sheriff publicly stated that anyone who supported his challenger would be fired, which involved direct comments and direct statements, "showing an intent to retaliate based" on the plaintiffs political affiliation. April 9 Afternoon Tr. at 7:5-7:25 (Hatcher). The Defendants argued that the present case is more

in line with <u>Nelms</u>, because Powell was aware only of Walton's political affiliation, which is insufficient to support a political affiliation retaliation claim.  April 9 Afternoon Tr. at 8:1-9:12 (Hatcher).   The Defendants agreed with the Court that circumstantial evidence could be sufficient to survive summary judgment, but argued that mere knowledge of a political affiliation should not survive summary judgment.   <u>See</u> April 9 Afternoon Tr. at 10:4-12:20 (Hatcher, Court).   Addressing the Barker report, the Defendants contend that it is insignificant that Powell testified that he thought Barker was the gold standard of investigative reporting and that he had no reason to disbelieve the story when he watched it, because at the time he watched the report in November, 2010, he would not have had any reason to disbelieve the report.   <u>See</u> April 9 Afternoon Tr. at 18:24-19:12 (Hatcher).   The Defendants argued that there is no evidence to show that Powell, Lopez, or any other Land Office employee believed Walton was unqualified for her General Manager I position after they started working with her.   <u>See</u> April 9 Afternoon Tr. at 18:24-19:12 (Hatcher).

Walton responded by arguing that there "is much more" than mere knowledge of Walton's political affiliation, which makes the case different than <u>Nelms</u>.  April 9 Afternoon Tr. at 14:3-14:12 (Hardwick).   Walton argued that Powell believing the Barker report; Powell placing a note on her office door, stating that it was reserved for Britt; Powell and Relkin making faces and rolling their eyes when she made presentations; and the April 14, 2011, meeting all provide evidence of retaliation based on her political affiliation.  April 9 Afternoon Tr. at 14:13-15:10 (Hardwick).  Walton addressed Powell's testimony that he was not referring to Walton during the April 14, 2011, meeting, by arguing that the "jury doesn't have to believe" Powell and it is "reasonable to infer" that Powell was talking about Walton, because during the Lyons administration, "Walton got her direction directly from Mr. Lyons to process her own personnel

action through the state personnel office, bypassing Sandra Lopez."  April 9 Afternoon Tr. at 15:3-15:21 (Hardwick).

Concerning qualified immunity, the Defendants argued that Powell denies that he knew that Walton was a Republican at the time he approved the RIF, and the Defendants argued that there "is nothing" in the record that shows that Powell knew Walton was a Republican.  See April 10 Tr. at 36:15-36:19 (Hatcher).  The Defendants further argued that there is no evidence to show that Powell knew that Walton was a political hire, that she supported the Republican Party, or that she campaigned for Lyons.  See April 10 Tr. at 36:19-37:17 (Hatcher).  The Defendants argued that there is no clearly established law that being hired as an exempt employee "equates" to being "a political hire."  April 10 Tr. at 37:21-38:9 (Hatcher).  When asked whether it would be adequate for Walton to contend that she was terminated because she was closely aligned with Lyons, the Defendants argued that there would be no First Amendment claim, because her "politics" were not being used to retaliate against her.  April 10 Tr. at 39:12-40:7 (Hatcher, Court).  The Defendants argued that "political association by the interpretation in the case law means discrimination on the basis of political association with some allegiance to political ideas."  April 10 Tr. at 47:9-47:22 (Hatcher).  The Defendants contended that, if "mere association as defined by the plaintiff, such as just being a Republican in a prior administration," led to a political affiliation claim, it would open "the floodgates to litigation, because anyone who was on the opposite political party once a new administration came in and was let go, would have a lawsuit."  April 10 Tr. at 48:8-48:15 (Hatcher).

Walton responded by arguing that "an association is sufficient" to bring a First Amendment claim and that Powell was not required to know "what Ms. Walton's politics" were, but instead only that she was "politically associated with the Lyons administration."  April 10 Tr.

at 41:11-41:24 (Hardwick).  Walton argued that Powell was aware of her political association

with the Lyons administration, because of the Barker report, the Hemphill letter, and the picture

she had in her office of Lyons.  <u>See</u> April 10 Tr. at 41:12-42:15 (Hardwick, Court).  Walton

contended that, if "Powell made the decision to RIF her," and "her association with

Commissioner Lyons was a substantial or motivating factor" in that decision, then Walton's

"First Amendment association rights" would be violated.  April 10 Tr. at 43:8-43:13 (Hardwick).

Walton directed the Court to a number of cases that she cited in her Response (QI) to show that it

is "very clear under Tenth Circuit precedent that Ms. Walton has a clearly established right to be

associated with Commissioner Lyons."  April 10 Tr. at 43:14-45:8 (Hardwick).  Walton directed

the Court to the Defendants' Reply (QI) to argue that the Defendants "concede that at the time of

the RIF . . . it was clearly established that if a public employer used political association as a

substantial or motivating factor" for an "adverse employment action" then "such action would"

violate "the employee['s] First Amendment rights," which Walton argues is "exactly the claim

that was pled in this case in paragraph 42 of the Complaint."   April 10 Tr. at 46:2-46:23

(Hardwick).

## <u>LAW REGARDING SUMMARY JUDGMENT</u>

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "'The movant bears

the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving

party's case.'"  <u>Herrera v. Santa Fe Pub. Schs.</u>, 956 F. Supp. 2d 1191, 1221 (D.N.M.

2013)(Browning, J.)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th

Cir. 1991)).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "If the *moving* party will

bear the burden of persuasion at trial, that party must support its motion with credible evidence --

using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if

not controverted at trial." Celotex Corp v. Catrett, 477 U.S. at 331 (Brennan, J.,

dissenting)(emphasis in original).[90]  Once the movant meets this burden, rule 56 requires the

nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See

Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986).

The party opposing a motion for summary judgment must "set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238,

1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir.

1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific

facts showing that there is a genuine issue for trial as to those dispositive matters for which it

carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A

party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).  It

is not enough for the party opposing a properly supported motion for summary judgment to "rest

---

[90]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme
Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely
understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R.
Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued
a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment
burden of proof operates; they disagreed as to how the standard was applied to the facts of the
case.").

on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at

256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v.

United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, once a properly supported

summary judgment motion is made, the opposing party may not rest on the allegations contained

in his complaint, but must respond with specific facts showing the existence of a genuine factual

issue to be tried." (citation omitted)(internal quotation marks omitted)).  Nor can a party "avoid

summary judgment by repeating conclusory opinions, allegations unsupported by specific facts,

or speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D.

Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199

(10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a

party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape

summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co.

v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir.

1988)).

        To deny a motion for summary judgment, genuine factual issues must exist that "can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either

party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will

not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v.

Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the

fact finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc.,

477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448

(1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If

the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court explained:

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 547, 586-587 (1986)(footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir.2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312. "The Tenth Circuit, in Rhoads v. Miller, [352 F.

App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[91]] explained that the blatant

---

[91]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive

contradictions of the record must be supported by more than other witnesses' testimony[.]"

Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation

omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

---

value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, Underwood v. Bd. of Cnty. Comm'rs, 415 F. App'x 100, 104 (10th Cir. 2011)(unpublished), and Trujillo v. Huerfano Cnty. Bd. of Cnty. Comm'rs, 349 F. App'x 355, 359-60 (10th Cir. 2009)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion.

question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury.  584 F.3d at 1326-27 (Holmes, J. concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . .

42 U.S.C. § 1983.   Section 1983 creates only the right of action; it does not create any substantive rights -- substantive rights must come from the Constitution or federal statute.  See Spielman v. Hildebrand, 873 F.2d 1377, 1386 (10th Cir. 1989)("Section 1983 does not provide a remedy if federal law does not create enforceable rights.").  Rather, 42 U.S.C. § 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights.  To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law.  See West v. Aikins, 487 U.S. 42, 48 (1988).  Broken down differently, a plaintiff

> must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. Mar. 30, 2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). Neither the civil-rights statutes nor the Fourteenth Amendment, however, are a license to the federal judiciary to displace state law through the creation of a body of general federal tort law. See Paul v. Davis, 424 U.S. 693, 701 (1976)(Fourteenth Amendment); Griffin v. Breckenridge, 403 U.S. 88, 101-102 (1971)(civil-rights statute).

The Supreme Court has made clear that there is no respondeat superior liability under § 1983. See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)("Because vicarious liability is inapplicable to Bivens [v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1999),] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casaus, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dept. of Soc. Servs. of the City of New York, 436 U.S. 658, 689 (1978)).  The entity can be held liable only for its own unconstitutional or illegal policies, and not for the tortious acts of their employees.  Garcia v. Casaus, 2011 WL 7444745, at *25.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. 818). When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must demonstrate on the facts alleged that: (i) the defendants' actions violated his or her constitutional or statutory rights; and (ii) the right was clearly established at the time of the alleged unlawful activity. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

In evaluating whether the right was clearly established, the court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes

would understand that what he did violated that right.  See Casey v. W. Las Vegas Indep. Sch.
Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  In determining whether the plaintiff has met his or
her burden, the court construes the facts in the light most favorable to the plaintiff as the non-
moving party.  See Scott v. Harris, 550 U.S. 372, 378 (2007).  A clearly established right is
generally defined as a right so thoroughly developed and consistently recognized under the law
of the jurisdiction as to be "indisputable" and "unquestioned."  Zweibon v. Mitchell, 720 F.2d
162, 172-73 (D.C. Cir. 1983).  "Ordinarily, in order for the law to be clearly established, there
must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of
authority from other courts must have found the law to be as the plaintiff maintains."  Currier v.
Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed
that it is generally not necessary to find a controlling decision declaring the "very action in
question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining
whether the right was 'clearly established,' the court assesses the objective legal reasonableness
of the action at the time of the alleged violation and asks whether 'the contours of the right
[were] sufficiently clear that a reasonable official would understand that what he is doing
violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir.
2001)(quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

The Tenth Circuit held in Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), that, although
"a case on point isn't required if the impropriety of the defendant's conduct is clear from existing
case law," the law is not clearly established where "a distinction might make a constitutional
difference."  663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search
of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have
some general privacy interest in our home," but "whether it was beyond debate in 2005 that the

officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier

Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined,

applied a sliding scale to determine when the law is clearly established.  See Casey v. City of

Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct

in light of prevailing constitutional principles, the less specificity is required from prior case law

to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . ,

[the Tenth Circuit] does not require a second decision with greater specificity to clearly establish

the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of

the law are not inherently incapable of giving fair and clear warning . . . ."  Hope v. Pelzer, 536

U.S. 730, 741 (2002).

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a

qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts

"should be permitted to exercise their sound discretion in deciding which of the two prongs of

the qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand."  555 U.S. at 236.  The Supreme Court also noted in Pearson v. Callahan

that, while no longer mandatory, the protocol outlined in Saucier v. Katz would often be

beneficial.  See 555 U.S. at 241.  Once the plaintiff has established the inference that the

defendants' conduct violated a clearly established constitutional right, a qualified immunity

defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir.

1993).

## LAW REGARDING POLITICAL AFFILIATION CLAIMS

"The First Amendment protects public employees from discrimination based upon their

political beliefs, affiliation, or non-affiliation unless their work requires political allegiance."

Mason v. Okla. Tpk. Auth., 115 F.3d 1442, 1451 (10th Cir. 1997)(citing Rutan v. Republican Party of Ill., 497 U.S. 62, 68-69 (1990)("First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate.")).  For First Amendment purposes, "there [is] no meaningful distinction . . . between nonpartisan political alignment and membership in a political party."  Bass v. Richards, 308 F.3d at 1091 (citing Green v. Henley, 924 F.2d 185, 187 (10th Cir. 1991)).

In cases of retaliation or discrimination based on political affiliation, courts apply the test developed in Elrod v. Burns, 427 U.S. 347, (1976)("Elrod"), and Branti, 445 U.S. at 507.  See Jantzen, 188 F.3d at 1251.  The Elrod/Branti framework provides a two-part inquiry.  See Trujillo v. Huerfano Cnty. Bd. of Cnty. Comm'rs, 349 F. App'x at 359-60.  "To survive summary judgment, an employee needs to show a genuine dispute of fact that (1) political affiliation and/or beliefs were 'substantial' or 'motivating' factors in his demotion, and (2) his position did not require political allegiance."[92]  Poindexter v. Bd. of Cnty. Comm'rs, 548 F.3d 916, 919 (10th Cir. 2008)(internal quotation marks omitted).  Once a plaintiff proves that her political affiliation was a substantial or motivating factor behind her termination, the burden of persuasion shifts to the defendants to prove, as an affirmative defense, that the discharge would have occurred regardless of any discriminatory political motivation.  Gann, 519 F.3d at 1092-93 (citing Mason, 115 F.3d at 1452).  A plaintiff may, however, negate the defendants' proffered

---

[92]The Defendants concede that the second element is not at issue, because "the General Manager I position held by Plaintiff did not require political allegiance."  MSJ at 14.  The Court will, thus, address only the first element, whether Walton's political affiliation was a substantial or motivating factor in her termination.  See Poindexter v. Bd. of Cnty. Comm'rs, 548 F.3d at 919.  There may be circumstances where, shortly before the politician leaves office, he or she moves people from an exempt to a classified position and those people would not be protected under the First Amendment, but Powell does not address that argument here.

reasoning for the termination, by providing evidence that the defendants' nondiscriminatory reason is pretextual.  Laidley v. McClain, 914 F.2d at 1393; Garvey v. Montgomery, 128 F. App'x 453, 457 (6th Cir. 2007)(unpublished)(noting that the burden-shifting analysis for political affiliation claims is similar to the McDonnell Douglas burden-shifting analysis for Title VII retaliation claims); Ortiz v. San Miguel Cnty., 955 F. Supp. 1338, 1344 (D.N.M. 1996)(Black, J.).

### 1.    Supreme Court Cases Involving Political Affiliation Retaliation

The Supreme Court has addressed a public employee's right to be free from retaliation based on political affiliation in three cases.  The Supreme Court first articulated this right in 1976 in Elrod. 427 U.S. at 350.  When the new sheriff took office, he replaced all non-civil-service employees from different political parties with employees from his own political party.  See Elrod, 427 U.S. at 351.  The Supreme Court, in an opinion that Justice Brennan wrote, noted that this type of political patronage had "existed at the federal level at least since the Presidency of Thomas Jefferson," but expressed its concern about the impact that political patronage had on public employees' political beliefs and associations, which "constitute the core of those activities protected by the First Amendment."  427 U.S. at 353, 356.  Recognizing that political patronage infringed on "'the right to association with the political party of one's choice,'" which "'is an integral part of . . . basic constitutional freedom,'" 427 U.S. at 357 (quoting Kusper v. Pontikes, 414 U.S. 51, 57 (1973)), the Supreme Court held that this form of patronage, which punishes a person for their political beliefs, violated the First Amendment's protections, see Elrod, 427 U.S. at 359-60.[93]

---

[93]The Supreme Court also struck a balance to ensure that elected officials could enact their policies and ideas, by holding that the right to be free from political patronage did not

The Supreme Court again addressed the right in 1980 in Branti.  See 445 U.S. at 507.  In Branti, a new county public defender began terminating employees from his office as soon as he was appointed, of which the vast majority were members of his opposing political party.  See 445 U.S. at 509.  The Supreme Court, in an opinion by the Justice Powell, rejected the petitioner's argument that Elrod protects employees only from being terminated because of the "employee's failure to capitulate to political coercion," by holding that it is sufficient to find a violation based solely on the fact that employees were terminated because they were affiliated with or sponsored a specific political party.  445 U.S. at 517.

In Rutan v. Republican Party of Illinois, the Governor of Illinois placed a freeze on hiring, transferring, promoting, or any similar actions by state agencies without the Governor's express permission.  497 U.S. at 65-66.  The petitioners alleged that the Governor, a Republican, was granting exceptions to the freeze only to employees who supported the Republican Party. See 497 U.S. at 66-67.  The Supreme Court, in an opinion written by Justice Brennan, held that the rights articulated in Elrod and Branti extended beyond protection from dismissal but encompassed protection from any adverse employment action -- denial of promotions, transfers, or recalls after layoffs -- on the basis of political affiliation.  See 497 U.S. at 75.

## 2.      Tenth Circuit Cases Involving Political Affiliation Retaliation

The Tenth Circuit has also addressed in a number of cases the right to be free from adverse employment action because of political affiliation.  In Dickeson, a new sheriff was elected, and shortly after the election, he discharged the head jailer and administrative assistant, both of whom the ex-sheriff appointed.  See 844 F.2d at 1437.  The Tenth Circuit, in a 1988 opinion, that Chief Judge Holloway wrote, joined by Judge Anderson and the Honorable Wesley

extend to employees in policy-making positions.  See Elrod, 427 U.S. at 372-73.

E. Brown, United States District Judge for the District of Kansas, sitting by designation, held that there was a "genuine issue of material fact as to whether" the defendant "actually discharged plaintiffs due to their association with the former sheriff."   Dickeson, 844 F.2d at 1445. Specifically, the Tenth Circuit looked at evidence that the sheriff told one of the plaintiffs that "blackmarks against him were" because of "his association" with the former sheriff; that, during a meeting, the defendant "essentially stated that those who had not campaigned for him need not bother re-applying for their jobs"; and the defendant told one of the plaintiffs that he wanted someone who was not a friend of the ex-sheriff and that he "was not going to keep her on because of her failure to campaign and vote for him."  844 F.2d at 1445 n.9.

In Laidley v. McClain, the defendant was elected district attorney, and shortly after taking office, he told the plaintiffs, who were hired by the previous district attorney, "that he did not intend to retain them as employees."  914 F.2d at 1388.  Before the election, the defendant told the plaintiffs that their jobs would be secure even if they supported the incumbent district attorney during the Democratic primary.  See 914 F.2d at 1393.  During the primary campaign, which "was a bitter campaign marked by personal accusations from both sides concerning a lack of integrity," one of the plaintiffs publicly supported the incumbent district attorney by wearing t-shirts, participating in parades, stuffing envelopes, making phone calls, and putting out yard-signs.  914 F.2d at 1393.  After the defendant defeated the incumbent district attorney in the election and took office, the Department of Human Services ("DHS") requested that the defendant cut the budget in the plaintiff's division.  See 914 F.2d at 1393.  The defendant argued that there were "legitimate budgetary reasons" for terminating the plaintiff's position, but the Tenth Circuit, in a 1990 opinion written by Judge Wesley E. Brown, sitting by designation, which Judges McKay and Anderson joined, noted that the DHS "did not decide which particular

positions would be funded or how the" plaintiff's division "would be organized or staffed" -- only the defendant "had the authority to make those decisions."  914 F.2d at 1393.  The Tenth Circuit held that the defendant's proffered reason for terminating the plaintiff's position may have been pretextual for several reasons.  See 914 F.2d at 1393-94.  First, the DHS suggested the defendant appoint an attorney to a part-time position to save costs, but he rejected the idea.  See 914 F.2d at 1393.  Second, the defendant told the plaintiff that the DHS eliminated her position, when in fact the defendant made that decision.  See 914 F.2d at 1393.  Third, the defendant terminated the plaintiff's position as soon as he took office, but the "then-existing budget contract with" the DHS did not expire until six months later; the defendant replaced the plaintiff's position with two other positions, which actually cost more than her one position.  See 914 F.2d at 1393.  Finally, the defendant refused the plaintiff's request to be placed into a vacant secretarial slot, for which she was qualified, but instead placed one of his supporters into the position.  See 914 F.2d at 1393.

In Mason v. Oklahoma Turnpike Authority, the Managing Director of the Oklahoma Turnpike Authority hired the plaintiff, but the new Managing Director dismissed the plaintiff and replaced the plaintiff with a political supporter of the defendants.  See 115 F.3d at 1447.  The Tenth Circuit held that there was sufficient evidence to support a finding of retaliation based on political affiliation, because a member of the Turnpike Authority had insisted that the plaintiff find an open position to hire the political supporter and even threatened the plaintiff that, if he did not find an open position, the supporter could have his job.  See 115 F.3d at 1451.  The Tenth Circuit, in a 1997 opinion that Judge Anderson wrote, which Judges Baldock and Ebel joined, addressed the defendants' argument that they produced evidence that the plaintiff's termination was "part of a legitimate reorganization," by stating that either the jury did not believe the

defendant's testimony or that, "even if the jury did believe there was a legitimate motive behind Mason's discharge, it still may have concluded that other illegitimate factors also motivated the decision." Mason v. Okla. Tpk. Auth., 115 F.3d at 1452.

In Jantzen, a county sheriff held a meeting in which he told his employees that anyone who ran against him in the next election, openly opposed his reelection, or was disloyal to him, would be fired. See 188 F.3d at 1250. One of the deputies announced at the meeting that he would run against the sheriff and was immediately fired. See 188 F.3d at 1250. Two other deputies and a jailer began to support the fired deputy's campaign by making telephone calls, putting up signs, contributing money, and knocking on doors. See 188 F.3d at 1250. When the incumbent sheriff won the reelection, he fired the other two deputies and the jailer. See 188 F.3d at 1250. The Tenth Circuit, in a 1999 opinion that Judge Ebel wrote, which Judges McWilliams and Murphy joined, held that the deputy, who ran against the incumbent sheriff, did not have his First Amendment rights violated, because the "right to political affiliation does not encompass the mere right to affiliate with oneself." 188 F.3d at 1251-52. The Tenth Circuit held, however, that, based on the incumbent sheriff's statements demanding loyalty, there was a genuine issue of fact whether the remaining plaintiffs were fired because of their political affiliation with the other deputy. See 188 F.3d at 1252-53.

In Bass v. Richards, a reserve sheriff deputy had his commission revoked, because he privately supported a candidate in the sheriff election that opposed the incumbent sheriff. See 308 F.3d at 1084-85. The defendants admitted that the deputy's commission was revoked because of his private support for the other candidate, and the Tenth Circuit, in a 2002 opinion that Judge Murphy wrote, which Judges Henry and Anderson joined, affirmed the district court's denial of summary judgment, based on qualified immunity, stating "[A] reasonable official

would understand that [the plaintiff's] commission could not be removed because of his political alignment and beliefs."  308 F.3d at 1091.

In <u>Gann</u>, the Oklahoma County Commissioner hired the plaintiff but when a new County Commissioner was elected, he attempted to fire the plaintiff twice and eventually refused to rehire her during a rehiring process despite telling employees that they would receive priority in the rehiring process.  <u>See</u> 519 F.3d at 1090.  The plaintiff did not oppose the defendant in the County Commissioner election, but instead remained apolitical and did not support either candidate.  <u>See</u> 519 F.3d at 1090.  The defendant argued that he was entitled to qualified immunity, because the law was not clearly established at the time that political non-affiliation was a protected right and that Tenth Circuit cases had recognized only a political affiliation right in conjunction with actively campaigning or supporting a political candidate.  <u>See</u> 519 F.3d at 1095.  The Tenth Circuit, in a 2008 opinion that Judge Kelly wrote, which Judges Ebel and McConnell joined, rejected this argument by holding that it was clearly established at the time that the First Amendment protects both political affiliation and non-affiliation.  <u>See</u> 519 F.3d at 1095.

## <u>ANALYSIS</u>

The Court will grant the MSJ in part and deny it in part.  The Court will grant the MSJ as it pertains to Walton's retaliation claims under the NMHRA and Title VII, because Walton has failed to produce evidence to establish a causal connection between a protected activity and an adverse employment action.  The Court will also grant the MSJ as it pertains to Walton's WPA claim, because she has failed to produce evidence showing that she was terminated because of a protected disclosure.  The Court will deny the MSJ as it pertains to Walton's political affiliation claim, because Walton has produced sufficient evidence for a reasonable jury to conclude that

she was terminated in retaliation for her political affiliation with the Lyons administration. Additionally, the Court will deny the MSJ (QI), because Walton has produced sufficient evidence for a jury to conclude that her constitutional rights under the First and Fourteenth Amendments were violated and because the right of an employee to be free from retaliation based on her political affiliation with a prior administration was clearly established at the time Walton's position was terminated.

## I.     <u>POWELL IS NOT ENTITLED TO QUALIFIED IMMUNITY</u>.

Walton brought a § 1983 claim against Powell, alleging that Powell violated her First and Fourteenth Amendment rights by retaliating against her for her political affiliation with the Lyons administration.  The Defendants moved for summary judgment, asserting that Powell is entitled to qualified immunity, because Walton has not produced sufficient evidence to establish a constitutional violation, and because the law concerning any potential violation was not clearly established.  <u>See</u> MSJ (QI) at ¶ 11-14.  "Although these issues come before the Court on summary judgment, the Court reviews the defense of qualified immunity 'somewhat differently' than other summary judgment rulings."  <u>Chavez v. Cnty. of Bernalillo</u>, No. CIV 13-0309 JB/LFG, 2014 WL 936426, at *35 (D.N.M. Jan. 31, 2014)(Browning, J.)(quoting <u>Scull v. New Mexico</u>, 236 F.3d 588, 595 (10th Cir. 2000)).  Walton must satisfy a two-part test for her claims to survive summary judgment: first, she must show that the Defendants' conduct violated a constitutional or statutory right; and second, she must demonstrate that the constitutional or statutory right was clearly established at the time.  <u>See</u> <u>Scull v. New Mexico</u>, 236 F.3d at 595. "'Only if the plaintiff establishes both elements of the test does the defendant bear the traditional burden of showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'"  <u>Chavez v. Cnty. of Bernalillo</u>, 2014 WL 936426, at *35

(quoting Scull v. New Mexico, 236 F.3d at 595 (citations omitted)(internal quotation marks omitted)).

Before considering whether Powell is entitled to qualified immunity, the Court must first determine what claim Walton is asserting. In the MSJ (QI), the Defendants argue that Walton asserts the claim that she suffered retaliation, because she was "hired as an 'exempt' employee when Lyons was the Commissioner of Public Lands and later re-classified, ultimately, into a General Manager I, classified position," and because she had a "loose association with Commissioner Powell's predecessor." MSJ (QI) at 12. The Defendants argue that retaliation for those reasons cannot be the basis for a constitutional violation. See MSJ (QI) at 13. Walton responds by arguing that the Defendants "completely misstate[] and misconstrue[]" her claim. Response (QI) at 12. Walton specifically directs the Court to paragraph 42 of the Complaint, where Walton alleges:

> Powell . . . , acting under color of state law, unlawfully retaliated against Walton in violation of the First and Fourteenth Amendments to the United States Constitution for Walton's exercise of her rights under the First Amendment to the United States Constitution, including her right to engage in political association free of reprisal by State officials . . . . Specifically, and without limitation, Powell . . . retaliated against Walton for Walton's political affiliation with the Lyons' administration . . . . Such retaliation included, the illegal harassment by Bearden of Walton and the pretextual termination of Walton's employment.

Complaint ¶ 42, at 8-9. Walton also directs the Court to the Response, where she "more fully described her allegations of political retaliation," by stating that her "'political affiliation with the Republican party and with Mr. Lyons were substantial or motivating factors'" in the Defendants' decision to terminate her position. Response (QI) at 12-13 (quoting Response at 21 (internal quotation marks omitted)).

In the Complaint, Walton does not allege that she suffered retaliation merely because of her affiliation with Lyons -- or, as the Defendants put it, "a loose association with Commissioner Powell's predecessor."  Compare Complaint ¶ 42, at 8-9 ("Walton's political affiliation with the Lyons' administration"), with MSJ (QI) at 12 ("she alleges a loose association with Commissioner Powell's predecessor").   Rather, Walton alleges that she suffered retaliation because of her "political affiliation with the Lyons' administration."  Complaint ¶ 42, at 8-9.  Walton's affiliation with Lyons, as alleged, was of a political nature, not merely a cordial or loose affiliation.   See Complaint ¶ 42, at 8-9 ("*political affiliation* with the Lyons' administration")(emphasis added).   Additionally, Walton does not allege that she suffered retaliation solely based on her political affiliation with Lyons, but, rather, she was a target because of her "political affiliation with the *Lyons' administration*."  Complaint ¶ 42, at 8-9 (emphasis added).   The Court, thus, agrees with Walton that the Defendants misconstrue Walton's claim in the MSJ (QI), because Walton has not alleged that she suffered retaliation because she was transferred from an exempt position to a classified one, or because she has a loose association with Lyons.  Compare Complaint ¶ 42, at 8-9, with MSJ (QI) at 12.

Although Walton stated in the Response that she suffered retaliation because of her affiliation with the Republican Party, see Response at 21, Walton has made no such allegation in the Complaint, see Complaint ¶¶ 41-45, at 8-9.   Walton alleges that Lyons and she are Republicans, and that Powell is a Democrat, see Complaint ¶¶ 9-11, at 2, but nowhere in the Complaint does Walton allege that her termination was because she was a Republican or because she supported the Republican Party, see Complaint ¶¶ 41-45, at 8-9.  Walton has not amended the Complaint to allege that she suffered retaliation because of her affiliation with the Republican Party, nor has she moved for the Court's leave to amend the Complaint.  Based,

therefore, on Walton's allegations in the Complaint, the Court construes Walton's claim as asserting that Powell retaliated against her because of her political affiliation with the Lyons administration, but not necessarily because of her affiliation with the Republican Party.[94] Accordingly, the Court must determine whether Walton has produced sufficient evidence for a reasonable jury to conclude that her right to political affiliation with a prior administration has been violated and whether that right was clearly established at the time of her termination.

> ### A.   WALTON HAS PRODUCED SUFFICIENT EVIDENCE TO ESTABLISH A VIOLATION OF HER FIRST AND FOURTEENTH AMENDMENT RIGHTS.

Walton has produced sufficient evidence to establish a violation of her First Amendment right to be free from retaliation based on her political affiliation with the Lyons administration. The Defendants do not argue that Powell was not acting under the color of state law, see generally MSJ at 1-25; MSJ (QI) at 1-21, but instead, the Defendants argue that Walton has not produced sufficient evidence to establish a constitutional violation, see MSJ (QI) at 11-14. The Defendants also argue in the alternative that, if Walton has produced sufficient evidence of a constitutional violation, Powell is still entitled to summary judgment, because they have produced sufficient evidence of a legitimate, nondiscriminatory reason for the RIF. See Reply (QI) at 4-5.

As an initial issue, the Court must first determine whether an employee has a First Amendment right not to be subject to adverse action because of her affiliation with a prior administration. The Defendants argue that the First Amendment does not protect mere affiliation

---

[94]The Court will note, however, that a supporter of Lyons -- who was a Republican -- would likely support similar ideologies similar to that of Lyons. While the Court will not consider Walton's contention that she suffered retaliation because of her support of the Republican Party, because she did not state that allegation in the Complaint, the Court will take into consideration that Lyons was a Republican politician.

with a prior administration, but, instead, a political affiliation claim requires affiliation with a political party or idea.  Walton responds that the First Amendment, as Tenth Circuit precedent shows, protects affiliation with a prior administration.

The right to political affiliation is not limited to actively campaigning or supporting a candidate during an election.  While many political affiliation cases involve an election, see, e.g., Laidley v. McClain, 914 F.2d at 1388, courts do not find a violation based on the right to campaign or vote, but rather on the right to affiliate with a particular party, politician, or political idea, see, e.g., Elrod, 427 U.S. at 359 (support of political party); Gann, 519 F.3d at 1095 (support of political idea); Laidley v. McClain, 914 F.2d at 1394 (support of politician).  While courts look to employee's campaign or election activities to find evidence of retaliation based on political affiliation, they maintain that it is the retaliation because of the affiliation, and not because of campaigning or electioneering, that creates the violation.  See, e.g., Dickeson, 844 F.2d at 1445.  See also Mason v. Okla. Tpk. Auth., 115 F.3d at 1451 (holding that there was sufficient evidence of political affiliation violation when no election or campaign occurred).  For instance, in Elrod, the terminated employees did not campaign or actively support the outgoing sheriff in the election, but instead were affiliated with the prior sheriff and a different political party than the new sheriff.  See 427 U.S. at 350-51.  Additionally, in Dickeson, the Tenth Circuit held that the plaintiffs may have been discharged "due to their association with the former sheriff" in violation of their First Amendment rights, and as evidence supporting this conclusion, Chief Judge Holloway noted that the defendant, among other things, told one of the plaintiffs that he was going to fire her because she failed to campaign and vote for him.  844 F.2d at 1445 n.9.

Additionally, the right to political affiliation does not extend solely to the right to affiliate with a specific political party or ideology, but also includes the right to affiliate with a particular political figure.  In Dickeson, the Tenth Circuit held that the plaintiffs could succeed on their claims if they showed that their discharge was "because of their party affiliation" or because of their "association with [the] ex-Sheriff."  844 F.2d at 1445.  Moreover, in Laidley v. McClain, the plaintiffs were affiliated with the same political party as the defendant, but supported a different candidate during the Democratic primary election.  See 914 F.2d at 1393 ("[T]he plaintiff's political support of [the defendant's] opponent may have been a factor in her termination.").  The right to political affiliation extends, thus, to both affiliation with a party and association with a political figure.  See Dickeson, 844 F.2d at 1445; Laidley v. McClain, 914 F.2d at 1393.

This retaliation is analogous to the political patronage that occurred in Elrod: a new politician was elected and then terminated certain employees because they were aligned with the prior administration at a political level.  See 427 U.S. at 350-51.  While a cordial affiliation or friendship with a political figure may not be protected, a political affiliation will be.  The opinion of Honorable Judge Bruce D. Black, United States District Court Judge for the District of New Mexico, in Ortiz v. San Miguel County, 955 F. Supp. at 1338, is instructive on this issue.[95]  There, the plaintiff alleged that he was fired because of both his friendship and political affiliation with a political candidate.  See 955 F. Supp. at 1341-42.  Judge Black found that mere

---

[95]The Court may not rely on this case in determining whether the law was clearly established, because it is not a Supreme Court or Tenth Circuit case, see Currier v. Doran, 242 F.3d at 923 ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point"), and is only the opinion of one district judge, but the Court may consider it for its persuasive value as to whether Walton suffered a constitutional violation.  Further, it may not be a major factor in establishing the law outside of the parties in that case, but it is helpful in determining what the established law is.

friendship was insufficient to establish a constitutionally protected right, but that the plaintiff's claim that he was also politically affiliated with the candidate was sufficient.  See 955 F. Supp. 1341-43.   In this case, Walton has alleged that her political affiliation with the Lyons administration, not merely her friendship, led to her termination, and as such, she has sufficiently alleged a constitutionally violation.  Accordingly, if Walton's political affiliation with Lyons -- a publicly elected political figure and Powell's predecessor -- or the Lyons administration -- a political body -- was a substantial or motivating factor in Powell's decision to terminate her position, then Walton would have suffered a constitutional violation.

Viewing the evidence in a light most favorable to Walton, see Scott v. Harris, 550 U.S. at 378, the Court finds that Walton has produced sufficient evidence to establish a constitutional violation.   During the campaign for the November, 2010, election, Powell attacked Lyons' record, accusing him of engaging in unethical conduct and mismanaging state trust land.  See Laidley v. McClain, 914 F.2d at 1393 (stating that an election campaign, which was bitter and filled with attacks against the other candidate, contributed to the creation of an inference that the plaintiff's political affiliation with the prior administration played a role in her termination).  It was generally known in the Land Office that Walton supported Lyons and the Republican Party. Walton's telephone call to Powell before the Barker report aired, the Barker report, and the Hemphill letter all informed Powell of Walton's political affiliation with the Lyons administration.  The Barker report referred to Walton as Lyons' political crony, and Powell testified that he had no reason to disbelieve the report when he watched it and that he considers Barker to be the gold standard of reporting.  Powell made the decision to terminate Walton's position about three months after taking office -- Powell took office on January 3, 2011, and made the decision to terminate Walton's position on April 6, 2011.  See Underwood v. Bd. of

Cnty. Comm'rs, 415 F. App'x at 104 (noting that a four month period of time was, standing alone, too long to establish a causal link between protected activity and termination, but holding that it was still a factor to consider); Ortiz v. San Miguel Cnty., 955 F. Supp. at 1343 (noting that close temporal proximity between election and employee's termination was evidence of retaliation based on political affiliation). Powell expressed animosity towards Walton by making faces at her while she gave presentations at meetings and by telling her that he would be glad to help her find a new place to work if she did not like her job at the Land Office.

The strongest evidence of retaliation is Powell's statements at the April 14, 2011, meeting. At that meeting, Powell referred to the Barker report, which featured Walton and referred to her as a political crony, and then complained about "protected employees" who were unqualified and received directions from the front office to bypass the ordinary chain of command. While Powell denies that he was referring to Walton when making those statements, circumstantial evidence evidences the contrary. This meeting took place only eight days after Powell made the decision to terminate Walton's position. Powell was glaring at Walton when he made the statements. Moreover, his statements accurately described Walton's circumstances during her time in the Lyons administration: Lyons directed her to bypass Lopez -- the normal chain of command -- to reclassify her position to a Manager I position, which is a classified position with certain protections under the State Personnel Act -- a protected position. Additionally, Powell mentioned the Barker report earlier in the meeting, which referred to Walton as Lyons' political crony and stated that she was unqualified. Taking these facts as a whole, and viewing them in a light most favorable to Walton, a reasonable jury could conclude that Powell was referring to Walton when discussing protected employees. All of this circumstantial evidence, in spite of Powell's testimony to the contrary, at least creates a genuine

issue of material fact, which is better left resolved by a jury, than the Court at the summary judgment phase.  See PNH Corp. v. Hullquist Corp. 843 F.2d at 593 (finding a genuine issue of material fact when non-movant relied solely on circumstantial evidence to contradict movant's direct evidence in the form of depositions).  See also Durant v. Indep. Sch. Dist. No. 16 of LeFlore Cnty., State of Okla., 990 F.2d 560, 564 (10th Cir. 1993)("Indeed, allegations of retaliation are often supported only by circumstantial evidence.").  The Court, therefore, finds that there is a genuine issue of material fact regarding whether Walton's political affiliation with the Lyons administration was a substantial or motivating factor in the decision to terminate Walton's position.  See Gann, 519 F.3d at 1092-93.

The Defendants argue that, even if Walton has established a prima facie case of retaliation, they are entitled to summary judgment, because they have presented sufficient evidence to establish a legitimate, nondiscriminatory reason for the decision to terminate Walton's position.  Specifically, the Defendants argue that the RIF was legislatively mandated, that Olah was unaware of Walton's affiliation with Lyons when she designed the RIF, that Olah considered the structure and mission of the Land Office in designing the RIF, that Olah chose Walton's position because there were two General Manager I positions in the Commercial Resources division, that Walton's position was chosen over the other General Manager I position because the other General Manager I had been with the Land Office longer, and that Olah did not choose two vacant positions because of a desire to cut the Land Office budget as well as meet the Appropriations Act's requirement of cutting two FTE positions.  While this evidence may support a finding of a legitimate, nondiscriminatory reason for choosing Walton's position for the RIF, the Court finds that Walton has produced sufficient evidence for a jury to conclude that the Defendants' proffered reasons are pretextual.  See Laidley v. McClain, 914 F.2d at 1393-94.

After terminating Walton's position, Powell sent a statewide electronic mail transmission notifying all of the Land Office staff that Walton had been terminated, which Walton asserts had never been done in her thirty years of government work.   There were two vacant positions available when Walton's position was terminated, but she was not offered either position, in violation of State Personnel Board Rule 1.7.10.9(C)(5), N.M. Admin. Code § 1.7.10.9.   While Walton's division had two General Manager I positions, so did other divisions within the Land Office.   Additionally, the Appropriation Act's requirements could have been accomplished by terminating vacant positions, which would not have resulted in a loss of Walton's position.   This evidence, in addition to the evidence above, could lead a reasonable jury to conclude that the Defendants' proffered reason for terminating Walton's position is pretextual.   See Laidley v. McClain, 914 F.2d at 1393-94 (holding that defendant's proffered budget-cutting reasoning for termination may have been pretextual).

The Defendants argue that this case is similar to the Seventh Circuit case, Nelms, because the only evidence is that Walton was a Republican and that she was fired.   In Nelms, the plaintiff asserted that he was fired because of his political affiliation, but the person who made the decision was unaware of the plaintiff's political affiliations.   See Nelms 153 F.3d at 818.   While other employees, who were not involved in the decision making process knew of the plaintiff's political affiliations, and made comments about them, because the decision makers were unaware of his political affiliations, the Seventh Circuit held that the plaintiff failed to establish a prima facie case of retaliatory discharge.   See 153 F.3d at 819-20.   Here, Walton has produced evidence that Powell -- the decision maker -- knew of her political affiliation.   Cf. Nelms, 153 F.3d at 819-20.

The Court, therefore, concludes that Walton has produced sufficient evidence for a reasonable jury to conclude that Walton was terminated because of her political affiliation with the Lyons administration in violation of her First Amendment rights.

### B.   THE RIGHT TO BE POLITICALLY AFFILIATED WITH A PRIOR ADMINISTRATION WAS CLEARLY ESTABLISHED.

The second prong that Walton must overcome is that the law was clearly established when Powell terminated her position.   For a right to be clearly established it must be "'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"   Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Saucier v. Katz, 533 U.S. at 202).   The Court concludes that Walton's right to not be retaliated against because of her political affiliation with the Lyons administration was clearly established when Powell terminated her position.

In Dickeson, the Tenth Circuit held that a political affiliation/association with a prior administration -- a sheriff -- was a constitutionally protected right.   See Dickeson, 844 F.2d at 1444.   There, the Court held that the First Amendment protections from Elrod and Branti included the right to political association with the former sheriff.   See Dickeson, 844 F.2d at 1444-45 ("We hold, however, that plaintiffs' First Amendment claims do . . . implicate a genuine issue of material fact as to whether defendant Quarberg actually discharged plaintiffs due to their association with the former sheriff.").   Again in Laidley v. McClain, an employee supported the district attorney in the Democratic Primary election, and when the defendant won the election and took office, he terminated the employee.   See 914 F.2d at 1392-93.   The Tenth Circuit held that the plaintiff's support and affiliation with the prior administration was "protected First

Amendment activity," which could not be "a substantial or motivating factor in her dismissal," without violating the First Amendment.  914 F.2d at 1394.

This case is also factually analogous to <u>Elrod</u>.  <u>See</u> 427 U.S. at 347.  In <u>Elrod</u>, when the new sheriff resumed office, he fired all of the employees who were politically affiliated with the political party of the prior administration.  <u>See</u> 427 U.S. at 350-51.  In this case, Powell replaced Lyons as Commissioner.  Powell is from a different political party than Lyons.  Around three months after taking office, Powell decided to terminate Walton, who is politically affiliated with the prior administration -- which is a different political party than Powell.

The Defendants argue that generally a political affiliation claim consists of support for a particular political party, candidate for election, or political ideology.  This argument, however, does not take into account for the plain language of Tenth Circuit cases and factually analogous Supreme Court precedent.  Additionally, the case that the Defendants cite in support of that proposition, <u>Gann</u>, undermines their argument.  <u>See</u> 519 F.3d at 1095-96.  In <u>Gann</u>, an employee was fired for his political non-affiliation rather than for his political affiliation.  <u>See</u> 519 F.3d at 1092.  There, the defendant argued that he was entitled to qualified immunity, because no case had been decided based solely on the plaintiff's right to non-affiliation.  <u>See</u> 519 F.3d at 1095. The Tenth Circuit rejected that argument by noting that the Supreme Court and Tenth Circuit had both stated that the right to political affiliation included the right to affiliation and non-affiliation, and that "'there need not be a precise factual correspondence between earlier cases and the case at hand . . . . [A] general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'"  519 F.3d at 1095-96 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 913-14)(alterations in original)(internal quotation marks omitted)).

Even though most political affiliation claims involve an election or campaign, and Powell did not run against Lyons in an election -- although Powell publicly attacked Lyons' record and ethics during the campaign -- the Tenth Circuit has been clear that the First Amendment protects political affiliation with a prior administration or a political figure.  See Dickeson, 844 F.2d at 1444-45 ("their association with the former sheriff"); Jantzen, 188 F.3d at 1252 ("Given [the defendant's] repeated demands of 'unswerving allegiance' from his subordinates, and given the evidence that [the plaintiffs'] were fired *because of their affiliation with Haugland*, there remains a genuine dispute as to whether political affiliation and/or beliefs were a substantial or motivating factor in [the plaintiffs'] terminations.")(emphasis added); Bass v. Richards, 308 F.3d at 1090 ("[The plaintiff's] *affiliation with Vorhies* and lack of affiliation with the Sheriff were the motivating factors behind the removal of his commission.")(emphasis added).  Because the Tenth Circuit has repeatedly held that retaliation based on an employees' political affiliation with a prior administration or a political figure violates the employee's First Amendment rights, any reasonable official would understand that such action is improper.  See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186.  Additionally, because Dickeson, Jantzen, and Bass v. Richards were all decided before 2003, see Dickeson, 844 F.2d at 1435 (1988); Jantzen, 188 F.3d at 1247 (1999); Bass v. Richards, 308 F.3d at 1081 (2002), it was "beyond debate in" 2011 that terminating a public employee because of her political affiliation with the prior administration violated her First Amendment Rights, Kerns v. Bader, 663 F.3d at 1183.  As Walton notes, Powell admitted that it would be improper to terminate Walton based on her political affiliation with the Lyons administration.  See Reply (QI) at 11 n.3 (citing Powell Depo. at 36:25-38:6).

Accordingly, because a reasonable official, based on Supreme Court and Tenth Circuit precedent, would know that a public employee had the right not to be terminated based on her

political affiliation with a prior administration, the Court finds that the right was clearly established at the time Powell terminated Walton's position.

**IT IS ORDERED** that the Defendants' Motion for Summary Judgment on Plaintiff's Second Amended Complaint to Recover Damages for Discrimination and Retaliation and for Violations of Constitutional Rights, filed November 6, 2013 (Doc. 38), is granted in part and denied in part.  Furthermore, the Motion for Summary Judgment of Defendants' Ray Powell, David Britt and Delma Bearden as to Count VI of the Second Amended Complaint on Grounds of Qualified Immunity, filed November 27, 2013 (Doc. 52), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Jack N. Hardwick
Sommer, Udall, Sutin, Hardwick & Hyatt
Santa Fe, New Mexico

   *Attorneys for the Plaintiff*

Scott P. Hatcher
Hatcher & Tebo
Santa Fe, New Mexico

   *Attorneys for the Defendants*