## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PEGGY WALTON,

      Plaintiff,

vs.                                                             No. CIV 13-0343 JB/KBM

NEW MEXICO STATE LAND OFFICE,
RAY POWELL, DONALD BRITT and
DELMA BEARDEN,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) Defendant Ray Powell's Motion in Limine Regarding Alleged Acts of Commissioner Powell, His Exempt Assistant Commissioners and Del Bearden, Forming the Basis for Claims of Discrimination on the Basis of Race, Gender, National Origin or Any Other Protected Basis Aside From that Under the First Amendment's Political Association Rights, filed October 24, 2016 (Doc. 114)("Bearden Motion"); (ii) Powell's Motion in Limine Regarding Issues Involving Sandra Lopez, filed October 24, 2016 (Doc. 118)("Lopez Motion"); and (iii) Powell's Motion in Limine to Bar Evidence of or Argument About Any Statement or Actions of Donald Britt of an Allegedly Discriminatory Nature, filed October 24, 2016 (Doc. 119)("Britt Motion"). The Court held a hearing on November 8, 2016. The primary issues are: (i) whether the Court should exclude from trial evidence or arguments concerning alleged acts or statements of discrimination against Plaintiff Peggy Walton on any basis other than the First Amendment's protection of political association rights; (ii) whether the Court should bar evidence, mention of, or argument about certain issues regarding Sandra Lopez, the New Mexico State Land Office's Human Resources Manager; and (iii) whether the Court should bar from trial evidence or

argument concerning any alleged discriminatory statements or actions that Defendant Donald Britt took against Walton. For the reasons stated on the record at the hearing, the Court concludes that the proffered evidence is relevant and non-prejudicial. Accordingly, the Court will deny all of Powell's motions in limine and admit the proffered evidence.

## **FACTUAL BACKGROUND**

The Court discussed this case's factual background at length in the Court's Memorandum Opinion, filed September, 12, 2014 (Doc. 91)("QI MO"), disposing of (i) the Defendants' Motion for Summary Judgment on Plaintiff's Second Amended Complaint to Recover Damages for Discrimination and Retaliation and for Violations of Constitutional Rights, filed November 6, 2013 (Doc. 38)("MSJ"); and (ii) the Motion for Summary Judgment of Defendant's Ray Powell, David [sic] Britt and Delma Bearden as to Count VI of the Second Amended Complaint on Grounds of Qualified Immunity, filed November 27, 2013 (Doc. 52)("QI Motion"). The Court will review the facts that it found undisputed in the QI MO and then turn to the procedural background.

Walton was employed at the Miner's Colfax Medical Center in Raton, New Mexico, from January 1988 to December 2001. See QI MO at 3. While there, Walton, a registered Republican, became acquainted with Patrick Lyons, at the time a Republican New Mexico State Senator. See QI MO at 3-4. Lyons was subsequently elected to serve as the New Mexico State Land Commissioner for a term beginning January 1, 2007. See QI MO at 4. Walton applied for employment at the State Land Office several times after Lyons was elected, but she did not receive a response to her applications. See QI MO at 4. In January, 2008, Walton informed Lyons of these unsuccessful attempts and asked whether there were any open positions for which she was qualified. See QI MO at 4. Lyons said that there were open positions and urged Walton to keep applying. See QI MO at 4.

On June 18, 2008, Walton applied for a classified position at the State Land Office.  See QI MO at 5.  Walton was offered an exempt Secretary II position instead of a classified position, however.  See QI MO at 5.  Walton accepted the offer and, on August 25, 2008, began work.  See QI MO at 5.  Exempt State Land Office employees serve at the agency head's will and do not have the protections afforded to classified employees under the State Personnel Act, N.M. Stat. Ann. § 10-9-4(D).  See QI MO at 5.  Exempt positions exist so that the agency head can hire employees to assist in implementing his or her policies.  See QI MO at 5.  Historically, in the State Land Office, exempt employees serve under one elected official and then leave office with that official, thereby allowing newly elected officials to appoint new people to serve in that position.  See QI MO at 6.  Powell, who served terms as Land Commissioner both before and after Lyons, is aware of this practice.  See QI MO at 6.

Walton's first assignment as Secretary II involved working as a special projects coordinator and lease analyst in the State Land Office's Commercial Resources Division.  See QI MO at 7.  A few months after beginning work in that role, on October 22, 2008, Walton accepted a position as Director of the Commercial Leasing Section of the Commercial Resources Division.  See QI MO at 7.  As Director, Walton supervised lease analysts, including Defendant Delma Bearden, whom the first Powell administration originally hired.  See QI MO at 7.

In early 2009, Lyons instructed Lopez, the State Land Office's Human Resources Manager, to transfer Walton from the exempt Secretary II position to an Economist A position, at the time the only vacant classified position in the Commercial Resources Division.  See QI MO at 7.  Lyons concomitantly instructed Lopez to reclassify that Economist A position to a General Manager I position.  See QI MO at 7.  Walton lacked the credentials to fill the Economist A position, and Lopez

knew she was not qualified; Walton was qualified, however, to serve as a General Manager I.  See QI MO at 7.

Lyons' directive notwithstanding, Lopez refused to initiate the requisite paperwork with the State Personnel Office to reclassify Walton's Economist A position to a General Manager I position. See QI MO at 7-8.  After Lopez repeatedly refused to initiate paperwork for more than a year, Lyons directed Walton to bypass Lopez and work directly with the State Personnel Office to accomplish the reclassification, which Walton did.  See QI MO at 8.  Lopez later informed Elaine Olah, Assistant Commissioner of the Administrative Services Division, that she thought reclassification of Walton's Economist A position to a General Manager I position was improper.  See QI MO at 8-9.

Walton's reclassification from Economist A to General Manager I was approved effective September 8, 2010, and Walton continued to serve as Director of the Commercial Leasing Section of the Commercial Resources Division.  See QI MO at 11.  Walton's management responsibilities as General Manager I included decisions to correct and discipline Commercial Resources Division staff exhibiting an unwillingness to perform their duties ethically, professionally, and in a non-hostile manner.  See QI MO at 11.  Indeed, the most challenging aspect of Walton's role as General Manger I, according to the position assignment documentation form, was the "correction of inappropriate staff behaviors."  QI MO at 11 (quoting QI MSJ ¶ 11, at 5)(internal quotation marks omitted). Walton's performance in this capacity, including her establishment of standards of performance and preparation of employee evaluations, was evaluated on February 22, 2011.  See QI MO at 11.

Lyons served as Land Commissioner for two terms, the second of which expired December 31, 2010.  See QI MO at 11.  Lyons did not run for re-election.  See QI MO at 11.  In the November 2, 2010, general election, Powell, a Democrat who had served as Land Commissioner immediately

before Lyons' first term, defeated Matthew Rush, the Republican candidate for Land Commissioner. See QI MO at 11-12.  The campaign for Land Commissioner was contentious.  See QI MO at 12. During the campaign, Powell repeatedly attacked Lyons' record and accused Lyons of engaging in unethical conduct and mismanaging State Trust Lands.  See QI MO at 12.  Powell publicly stated that Rush, if elected, would continue the same policies as Lyons.  See QI MO at 12.

During the summer and fall of 2010, Walton attended numerous Republican campaign events, including rallies for Susana Martinez -- a Republican gubernatorial candidate -- at which Rush was also present.  See QI MO at 12.  Walton likewise attended a campaign event for Rush at Rancho de Chimayo restaurant in Española, New Mexico, along with Lyons and other State Land Office employees.  See QI MO at 12.  Walton's support of Lyons and affiliation with the Republican Party was no secret within the State Land Office; indeed, Walton openly displayed in her office a photograph of herself with Martinez as well as a photograph of Lyons with a personal note from Lyons attached.  See QI MO at 12.  Walton observed Lopez studying these photographs one time during the fall of 2010.  See QI MO at 12.

Walton voted for Rush in the November 2010 election.  See QI MO at 14.  Powell won, however, and was elected Land Commissioner.  See QI MO at 14.  The day after the election, Walton informed Bearden that she had voted for Rush, and Bearden told Walton that she had voted for Powell.  See QI MO at 14.

On November 17, 2010, Mark Corley, an associate of KRQE investigative reporter Larry Barker, approached Walton at the back entrance to the State Land Office building when she arrived at work.  See QI MO at 14.  Corley informed Walton that he had acquired Walton's personal human resources information.  See QI MO at 14.  Corley then interviewed Walton by asking her questions

about the circumstances of her hiring, her transfer from the exempt Secretary II position to the classified Economist A position, and the reclassification of the Economist A position to the General Manager I position.  See QI MO at 14.  Walton believed, from the context of the interview, that KRQE intended to portray these events in a negative light.  See QI MO at 14.  Walton also suspected that Lopez was instrumental in furnishing Walton's personal employment information to KRQE.  See QI MO at 14-15.  Lopez was, in fact, instrumental in providing Walton's information to KRQE by helping the State Land Office respond to an Inspection of Public Records Act ("IPRA") request from KRQE television asking for Walton's personnel file.  See QI MO at 15.

The next day, November 18, 2010, Walton contacted Powell by telephone to tell him about her interview with Corley.  See QI MO at 16.  Walton hoped to alert Powell that KRQE was going to broadcast a negative story about Walton and the State Land Office.  See QI MO at 16.  Powell, along with Harry Relkin, the State Land Office's general counsel, returned Walton's call on November 21 or 22, 2010.  See QI MO at 16.  During the call, Walton informed Powell and Relkin about the circumstances of her hiring, her transfer to the Economist A position, Lyons' directive to Lopez to reclassify that position to General Manager I, and Lopez' refusal to follow Lyons' instructions.  See QI MO at 16.

KRQE television broadcast Barker's investigative report, entitled "[c]ronies move up as officials move out," on November 23, 2010.  QI MO at 16.  KRQE anchor-reporter Dick Knipfing introduced the segment by asserting that Walton was "distinctly unqualified" for her position and that her hiring was "rigged."  QI MO at 16.  Barker then narrated: "Meet State Land Office employee Peggy Walton. How she went from low-level political appointee to high-level division manager in two short years is a fascinating case study in abuse of power."  QI MO at 17.  Barker

reported that the Lyons administration hired Walton for an exempt position and then moved her into classified service before the election -- but that Lyons did so in a misleading and inaccurate manner. See QI MO at 17.  Barker also described the circumstances of Walton's hiring and the sequence of events that led to her placement in the General Manager I position.  See QI MO at 17.  State Personnel Office Director Sandra Perez, who had approved Walton's Economist A to General Manager I reclassification, was interviewed during the Barker report, but Perez deferred to Lyons to explain the reclassification.  See QI MO at 17.  Knipfing concluded the investigative report, stating: "Governor-elect Susana Martinez has promised to fire any political appointee who has been improperly shifted into a classified job . . . .  New Land Commissioner Ray Powell will inherit Walton. It is not clear whether her job is protected."  QI MO at 17.  Powell viewed the Barker investigative report online a few days after KRQE broadcast it.  See QI MO at 18.

Powell took office as Land Commissioner on January 1, 2011, bringing with him numerous exempt employees who replaced the outgoing Lyons administration's exempt employees.  See QI MO at 18.  Among these new employees were Powell's Deputy Commissioner Robert Jenks as well as a handful of employees who reported directly to Jenks, including Chief Legal Counsel Relkin, Assistant Commissioner of the Commercial Resources Division Donald Britt, and Assistant Commissioner of the Administrative Services Division Olah.  See QI MO at 18.  Before their arrival, Powell posted notes on incoming exempt employees' office doors "reserving" those offices.  QI MO at 19.  Powell mistakenly reserved Walton's office in this fashion for Britt.  See QI MO 19.

Powell held a meeting with the Commercial Resources Division staff along with Jenks and Britt on January 3 or 4, 2011.  See QI MO at 19-20.  During the meeting, Powell opined that the Lyons administration's stewardship and leasing of State Trust Lands was improper and stated that

there would be federal investigations into the matter.  See QI MO at 20.  Powell declared that "men in suits with guns" would come to the office and implied that they would arrest anyone involved in any wrongdoing.  QI MO at 20.  Britt and Bearden later accused Walton of illegally administering a land sale that closed during Lyons' term in late December 2010.  See QI MO at 20.  Rattled by these events, Walton asked her attorney, Linda Hemphill, to contact Powell regarding Walton's concerns that she was being mistreated because of her prior association with Lyons.  See QI MO at 20.  Lopez accordingly sent a letter to Powell on January 27, 2011, requesting that Powell admonish his staff of the illegality of harassing Walton because of her association with Lyons.  See QI MO at 21.  Powell does not recall taking any action to address the letter's concerns.  See QI MO at 21.

At a February 8, 2011, Commercial Resources Division meeting, questions were raised about two leases that the Lyons administration had handled.  See QI MO at 23.  Bearden singled out two female Hispanic, Republican State Land Office employees who worked in the front office with Lyons and implied that they were aware of the improper handling of the leases.  See QI MO at 23.  Walton, believing Bearden's conduct constituted harassment, reported this encounter to Britt.  See QI MO at 23-24.

On February 9, 2011, Walton was instructed to attend an Assistant Commissioners' meeting.  See QI MO at 24.  At the meeting, Walton reported a request she had received for leasing acreage.  See QI MO at 24.  Relkin rolled his eyes and exchanged glances with Powell as Walton spoke.  See QI MO at 24.  Walton was subsequently called into a meeting with Powell on February 16, 2011, at which Relkin, Jenks, Olah, Britt, Lopez, and Amy Atchley, a management analyst whom Walton supervised, were all present.  See QI MO at 24-25.  The meeting was called to inform Walton that Atchley, who also served in the Lyons administration, was being moved from the Legal Division to

the Commercial Resources Division, where Walton would supervise her.  See QI MO at 25.  No reason was given for the transfer.  See QI MO at 25.  Walton was surprised by the transfer, because Atchley had worked under her in Commercial Resources during the Lyons administration, and Walton had written Atchley up for performance and misconduct on several occasions.  See QI MO at 25.  Jenks and Lopez smirked at Walton during the meeting.  See QI MO at 25-26.

Walton and Lyons had lunch on February 18, 2011.  See QI MO at 26.  Walton expressed her concerns to Lyons about the allegations that Walton administered an illegal land sale.  See QI MO at 26.  Other State Land Office employees were present in the restaurant, and, shortly thereafter, Assistant Commissioner Ralph Gallegos informed Walton that Powell does not believe in having lunch with employees.  See QI MO at 26.  Walton took this statement to mean that Powell was aware of her lunch with Lyons.  See QI MO at 26.

In January, February, and March, 2011, Britt made several comments to Walton referring to Walton's "buddy Pat."  QI MO at 26-27.  Related to those comments, on February 22, 2011, Britt told Walton that "no one in the Land Office respects you."  QI MO at 27.  On February 24, 2011, Britt told Walton about a meeting Powell and others had with Barker and taunted Walton by referring to Barker as "your friend Larry."  QI MO at 27.  Britt also moved Bearden's office next to his own, met often with Bearden behind closed doors, and began to direct Bearden's work, although Walton remained Bearden's actual supervisor.  See QI MO at 27-28.  Bearden grew increasingly insubordinate and hostile towards Walton during this same timeframe, making derogatory comments of a sexual and racial nature.  See QI MO at 27-28.  For example, Bearden stated that she believed a "man" was needed to deal with one particular client.  QI MO at 28. Walton's superiors, however, never commented that a male should hold her General Manager I position.  See QI MO at 29.

Moreover, Bearden's statements were made in Walton's presence but were not directed at Walton. See QI MO at 29.

Walton believed that Bearden's comments were inappropriate and violated NSMLO's non-harassment policy. See QI OM at 28, 30. Pursuant to that policy, Walton verbally reported her concerns about Bearden's conduct to Britt on numerous occasions in February, March, and April 2011. See QI MO at 30. Walton also sent Britt emails raising these same concerns on April 7 and 8, 2011. See QI MO at 30-31. Britt did not respond to Walton's emails, however, and, to Walton's knowledge, Britt took no action against Bearden to address Walton's concerns. See QI MO at 31.

On April 14, 2011, Walton attended a meeting of the State Trust Lands Advisory Board, which assists the Land Commissioner in the formation of policies and programs for the Trust. See QI MO at 31. Britt instructed Walton to appear thirty minutes into the meeting, and, when Walton arrived, Board members Powell, Britt, and Olah, and other State Land Office employees were already seated, and the meeting was well-underway. See QI MO at 31. Walton took the only available seat, positioned directly across the conference room table from Powell. See QI MO at 31-32. During the meeting, Powell addressed the Board, referring to the Barker report and expressing concern about employees in inappropriate "protected" roles. QI MO at 32. Powell posited that these "protected" employees "for some reason didn't have to meet the leadership criteria within the division, and somehow got directions from the front office." QI MO at 32 (alterations in original). Powell did not mention Walton by name, but he glared at her in a threatening and serious manner as he made these remarks. See QI MO at 32. Powell was not, however, referring to Walton as a "protected" employee, but rather two other State Land Office employees. QI MO at 32-33.

Bearden's conduct escalated throughout April 2011.  See QI MO at 33.  Bearden frequently made comments that struck Walton as sexually or racially inappropriate, and which she suspected could subject the State Land Office to liability for creating a sexually or racially hostile work environment.  See QI MO at 33.  When Walton verbally confronted Bearden about this behavior, Bearden became more contentious and accusatory.  See QI MO at 34.  Walton decided to escalate, and in memoranda to Britt dated April 29 and April 30, 2011, Walton complained about what she believed was illegal sexual, racial, and religious harassment by Bearden.  See QI MO at 34.  Walton did not, however, deliver these memoranda to Britt until May 6, 2011.  See QI MO at 35.  Britt then forwarded Walton's complaints to Lopez, who, despite State Land Office policy, opted not to investigate Walton's allegations against Bearden.  See QI MO at 35.  All the while, Bearden continued to make comments to Walton of a sexual and racial nature.  See QI MO at 35.  All this notwithstanding, Walton never prepared a formal written statement or report concerning Bearden's behavior, never reported Bearden up the chain of command to Powell, and never reported Bearden to Lopez.  See QI MO at 36.

From February, 2011, through the end of her employment, Walton attended weekly leadership meetings that Powell and Jenks headed and which various State Land Office management employees attended.  See QI MO at 36.  Frequently when Walton presented reports, expressed opinions, or participated in discussion, Powell and Jenks were aloof, interruptive, and intentionally distracting.  See QI MO at 36.  On multiple occasions, Powell intimidated and threatened Walton during those meetings by making comments such as: "[I]f you don't like it here we will be glad to help you find a place of your liking."  QI MO at 36-37.

In June, 2011, a legislatively mandated Reduction in Force ("RIF") reduced the State Land Office fiscal year 2012 budget, which began January 1, 2011, by $609,000.00 and reduced the number of full-time equivalent ("FTE") positions within the State Land Office from 153 to 151.  See QI MO at 37.  Lyons originally proposed the budget and FTE reductions in September, 2010, before the November, 2010, general election in which Powell was elected Land Commissioner.  See QI MO at 37-39.  Powell and his staff made significant efforts to save the State Land Office from these reductions when Powell assumed office; nonetheless, the New Mexico Legislature and Governor, through the General Appropriations Act of 2011, imposed Lyons' proposed budget cuts and RIF reductions.  See QI MO at 39.

Olah designed the RIF in February 2011.  See QI MO at 39.  Olah determined that, to reduce the two FTE positions and the budget as the Appropriations Act required, the optimal solution was to eliminate one vacant and one filled position.  See QI MO at 39.  Ultimately, after reviewing the State Land Office's organizational structure and mission, Olah proposed to eliminate a General Manager I position in the Commercial Resources Division, which had two such redundant positions.  See QI MO at 39.  Because one General Manager I position had numerous subordinates while the other had none, Olah proposed that the two positions be combined to consolidate management into a single General Manager I position.  See QI MO at 42.  Of the two positions considered for elimination, Walton's position was selected.  See QI MO at 43.  Walton had less seniority at the State Land Office, and, pursuant to SPO Regulations, "the order of layoff due to reduction in force shall be by service date which is determined based upon the agency hire date."  QI MO at 43.

At the time she designed the RIF, Olah had no knowledge of the Barker report.  See QI MO at 43.  Nor was she aware that Walton reported Bearden's alleged racially and sexually inappropriate

behavior to Britt until after Walton's position was eliminated and the RIF fulfilled.  See QI MO at

45.  Indeed, Olah was unaware of any complaints that Walton may have made concerning her

working conditions at the State Land Office or concerning the manner in which the State Land

Office operated.  See QI MO at 47.  Moreover, nothing in Walton's personnel file indicated -- and

Olah therefore did not consider -- that Walton was registered Republican, that she supported the

Republican Party, that she supported Lyons when he was elected, that she engaged in any political

activity, or that she espoused any political ideology.  See QI MO at 46.

Olah did not set out to eliminate Walton's position or terminate her employment.  See QI MO

at 47.  Olah was charged with eliminating two FTE positions, and was thereby required to evaluate

the State Land Office's organizational structure and act to preserve the State Land Office's

functionality.  See QI MO at 47.  Olah did not, however, consider available alternatives to

eliminating Walton's position.  See QI MO at 49-50.  See id. at 50 (noting that "the Commercial

Resources Division of the Land Office now has more managerial positions than when Walton was

employed there").  Nor did she document any of her analysis or process in making the determination

to eliminate Walton's position.  See QI MO at 47-48.  Olah did not even consult with Powell

regarding her recommendations until after the RIF plan was fully developed.  See QI MO at 48.

Olah first presented her RIF design for approval in a meeting with Powell, Jenks, Relkin, a

personnel representative, and outside counsel on April 6, 2011.  See QI MO at 48.  At the meeting,

Powell approved Olah's plan to eliminate Walton's General Manager I position.  See QI MO at 48.

Britt had no input or involvement in the formulation or approval of the RIF; it was only after Powell,

Jenks, and Relkin made a final determination regarding the plan that Britt learned that Walton's

position was slated for elimination.  See QI MO at 49.  When Jenks and Olah informed Britt that the

Commercial Resources Division would be losing Walton's position, Olah was still not aware that Walton had submitted a written complaint to Britt regarding Bearden.  See QI MO at 49.

Powell submitted the RIF plan to the State Personnel Office on June 10, 2011.  See QI MO at 50.  The State Personnel Office approved the RIF that same day and slated the plan for an effective date of June 30, 2011.  See QI MO at 50.  Later that day, after the RIF approval, Walton was called into a meeting with Olah, Britt, and Lopez, and informed that her employment was being terminated effective June 30, 2011.  See QI MO at 50.  Olah, Britt, and Lopez explained the RIF and informed Walton that she would be placed on paid administrative leave effective immediately through June 30, 2011.  See QI MO at 50.  Walton was directed to pack her personal belongings, turn in her keys, and leave the building immediately.  See QI MO at 50.  Before this meeting, Walton was never informed that her position could possibly be eliminated through an RIF.  See QI MO at 50.

By email dated June 10, 2011, at 1:09 p.m., Powell informed the entire statewide State Land Office staff that Walton's employment had been terminated.  See QI MO at 51.  Walton was embarrassed and humiliated by this transmission.  See QI MO at 51.  In her almost thirty years working in State government, Walton had never seen such an announcement of the termination of an employee.  See QI MO at 51.

**PROCEDURAL BACKGROUND**

Walton commenced this action on April 2, 2013, asserting claims against the State Land Office for: (i) discrimination on the basis of sex (female) and national origin (Hispanic) in violation of the New Mexico Human Rights Act, N.M. Stat. Ann. § 28-1-7(A) ("NMHRA"); (ii) unlawful retaliation for reporting that discrimination, in violation of the NMHRA § 28-1-7-(I); (iii) discrimination on the basis of sex and national origin in violation of Title VII of the Civil Rights Act

- 14 -

of 1964, as amended, 42 U.S.C. § 2000e; (iv) unlawful retaliation for reporting that discrimination, in violation of Title VII of the Civil Rights Act; and (v) a violation of the New Mexico Whistleblower Protection Act, N.M. Stat. Ann. § 10-16C-1 ("NMWPA").   Second Amended Complaint to Recover Damages for Discrimination and Retaliation and for Violations of Constitutional Rights ¶¶ 22-40, at 5-8, filed August 1, 2013 (Doc. 20)("Complaint").   Walton also brought claims pursuant to 42 U.S.C. § 1983 against Powell, Britt, and Bearden (the "Individual Defendants") for violations of constitutional rights -- political association/speech -- that the First and Fourteenth Amendments protect.   See Complaint ¶¶ 41-5, at 8-9.

On November 6, 2013, all Defendants moved for summary judgment on the Complaint.   See MSJ at 1.   The Defendants argued that Walton's Title VII and NMHRA retaliation claims should be examined under the burden-shifting analysis in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)("McDonnell Douglas").   See MSJ at 15.   This analysis, they contended, requires a showing that: (i) Walton engaged in "protected opposition to discrimination"; (ii) she was subject to a "materially adverse" action; and (iii) the protected activity was causally related to the materially adverse action.   MSJ at 15-16 (citing Webb v. Padilla, 2009 WL 3379034 (D.N.M. 2009)(Vazquez, C.J.)).   The Defendants conceded that Walton's termination was an "adverse employment action," MSJ at 16, but argued that Walton did not engage in protected opposition to discrimination, because there was no evidence that she was targeted on the basis of her "gender, national origin or some other protected class," MSJ at 17 (citing Sandoval v. City of Boulder, Colo., 388 F.3d 1312, 1327 (10th Cir. 2004)), and because Olah had no knowledge of Bearden's alleged discriminatory conduct towards Walton, so there could be no causal connection between any protected activity by Walton and Olah's designation of Walton for the RIF, see MSJ at 18.   Similarly, regarding Walton's

NMWPA claim, the Defendants argued that the claim fails, because Walton cannot establish a causal connection between the State Land Office's adverse employment action against Walton and Walton's complaints about Bearden's conduct.  See MSJ at 18-20 (citing Desantis v. Napolitano, 716 F. Supp. 2d 1100, 1107 (D.N.M. 2010)(Browning, J.)).  Finally, with respect to Walton's political affiliation claim, the Defendants contended that there is no evidence that Olah -- who was solely responsible for designing the RIF -- acted with intent to discriminate against Walton on the basis of Walton's political affiliation as a Republican.  See MSJ at 22.  In any event, the Defendants argued, Walton's termination was the result of a legislatively mandated organizational restructuring, not Walton's politics.  See MSJ at 24-25.  Further, the Defendants added, Walton's claim is directed at Powell, Britt, and Bearden, yet there "is no evidence any of these individuals had any involvement with the RIF."  MSJ at 24.

On November 27, 2013, the Individual Defendants also moved for summary judgment on Walton's § 1983 political association claim on the basis of qualified immunity.  See QI Motion at 1. The Individual Defendants argued that such a claim requires evidence of retaliation based on support for a "political party, candidate for election, or political ideology."  QI Motion at 12 (citing Gann v. Cline, 519 F.3d 1090, 1092-93 (10th Cir. 2008)).  Here, however, the Individual Defendants argued, Walton does not allege that she was chosen for the RIF because of her registration as a Republican, her support for the Republican Party, her support for Lyons' election, "or any other political activity or ideology."  QI Motion at 12.  Rather, the Individual Defendants contended, Walton asserts that she suffered retaliation based on her "loose association" with Lyons, Powell's predecessor.  QI Motion at 12.  The Individual Defendants argued that, absent a claim that Walton's affiliation with Lyons is based on political beliefs, her affiliation by way of employment alone is not protected.  See

QI Motion at 13 (citing <u>Jantzen v. Hawkins</u>, 188 F.3d 1247, 1247 (10th Cir. 1999)).  As a result, the Individual Defendants maintained that they are entitled to qualified immunity on Walton's § 1983 claim, because Walton did not have a clearly established right not to be subject to an RIF based on her original hire by Lyons as an exempt employee.  <u>See</u> QI Motion at 11.

On February 24, 2014, the Court issued an order dismissing with prejudice certain claims that the Complaint asserts.  <u>See</u> Stipulated Order of Dismissal of Certain Claims at 1, filed February 24, 2014 (Doc. 69)("Order of Dismissal").  The Court dismissed Walton's claims of discrimination asserted against the State Land Office pursuant to Title VII of the Civil Rights Act and the NMHRA. <u>See</u> Order of Dismissal ¶¶ A, B, at 1.  The Court also dismissed Walton's § 1983 political retaliation claim asserted against Bearden and Britt.  <u>See</u> Order of Dismissal ¶ C, at 1.  Finally, the Court dismissed Walton's § 1983 political retaliation claim as against Powell to the extent it alleged a violation of Walton's First Amendment right to speak about matters of public concern.  <u>See</u> Order of Dismissal ¶ D, at 1.  The Court left intact Walton's retaliation claims under Title VII of the Civil Rights Act and the NMHRA; Walton's claim asserted pursuant to the NMWPA; and Walton's § 1983 claim against Powell, to the extent it alleges retaliation by Powell for Walton's political association with the Lyons administration.

The Court issued two orders on August 27, 2014: (i) granting in part and denying in part the Defendants' MSJ, <u>see</u> Order, filed August 27, 2014 (Doc. 85)("MSJ Order"); and (ii) denying the QI Motion, <u>see</u> Order, filed August 27, 2014 (Doc. 86)("QI Order").  In the MSJ Order, the Court granted summary judgment on Walton's claims asserted against the State Land Office under Title VII of the Civil Rights Act, the NMHRA, and the NMWPA, but denied summary judgment with respect to Walton's § 1983 political association/speech claim asserted against the Individual

Defendants.  See MSJ Order at 1.  In the QI Order, the Court denied the Individual Defendants'

assertion of qualified immunity with respect to the § 1983 claim.  See QI Order at 1.

At a pretrial conference held September 3, 2014, the Defendants informed the Court that they

intended to file an immediate interlocutory appeal from the Court's QI Order.  See Clerk's Minutes

at 1, filed September 3, 2014 (Doc. 89).  This action exerted pressure on the Court to quickly issue a

memorandum opinion detailing the rationale for its decision so that the United States Court of

Appeals for the Tenth Circuit would have the benefit of the Court's reasoning while reviewing the

appeal.  To expedite the process, the Court bifurcated its analysis between two memoranda opinions:

(i) on September, 12, 2014, the Court issued a memorandum opinion explaining its qualified

immunity ruling, see QI MO at 1; and (ii) on July 7, 2015, the Court issued a supplemental

memorandum opinion explaining its disposition of all remaining issues in the MSJ Order, see

Supplemental Memorandum Opinion at 1, filed July 7, 2015 (Doc. 102)("MSJ MO").

In the QI MO, the Court explained that it denied the QI Motion, because Walton "produced

sufficient evidence for a reasonable jury to conclude that her constitutional rights under the First and

Fourteenth Amendments were violated . . . ."  QI MO at 101.  Walton's § 1983 claim is not based on

a "loose affiliation" with Lyons or an affiliation with the Republican Party, the Court reasoned;

rather, the Court construed Walton's claim as "asserting that Powell retaliated against her because of

her political affiliation with the Lyons administration."  QI MO at 103.  The Court held that the First

Amendment protects such affiliation with a political figure, see QI MO at 106, and that there is a

genuine issue of material fact whether Walton's political affiliation with the Lyons administration

was a "substantial or motivating factor" in the decision to terminate her position, see QI MO at 109

(citing Gann v. Cline, 519 F.3d at 1092-93).  The Court, moreover, concluded that, regardless

- 18 -

whether the Individual Defendants can point to a legitimate, nondiscriminatory reason to terminate Walton's position, Walton "produced sufficient evidence for a jury to conclude that the Defendants' proffered reasons are pretextual."  QI MO at 109 (citing Laidley v. McClain, 914 F.2d 1386, 1393-94 (10th Cir. 1990)).  Regarding qualified immunity's second prong -- whether the allegedly violated right was clearly established -- the Court concluded that "Walton's right to not be retaliated against because of her political affiliation with the Lyons administration was clearly established when Powell terminated her position."  QI MO at 111.

The Court subsequently issued the MSJ MO on July 7, 2015, addressing the remaining issues that the QI MO left unresolved.  The Court first granted the MSJ as it pertained to Walton's retaliation claims under Title VII and under the NMHRA.  See MSJ MO at 25-30.  The Court explained that, although Walton engaged in protected activity by complaining about Bearden's conduct, see MSJ MO at 26 ("Complaints to superiors about discriminatory conduct constitute protected activity")(citing O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1255 (10th Cir. 2001)); and although the RIF was an adverse employment action, see MSJ MO at 26 ("Termination of employment constitutes an adverse employment action.")(citing Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 744 (1998)); Walton failed to demonstrate a causal connection between Walton's activity and the RIF, because Powell and Olah had no knowledge of Bearden's allegedly discriminatory conduct when they made the decision to terminate Walton's position, see MSJ MO at 27-28.  See also id. at 26 (noting that a causal connection between protected conduct and adverse action is required)(citing Proctor v. United Parcel Serv., 502 F.3d 1200, 1208 (10th Cir. 2007)).  The Court also granted the MSJ as it pertained to Walton's NMWPA claim.  See MSJ MO at 30-37.  The Court concluded that Walton engaged in a protected disclosure under the NMWPA by reporting

Bearden's conduct which she believed, in good faith, was unlawful or at least improper under the State Land Office's harassment policy.  See MSJ MO at 33 (citing N.M. Stat. Ann. § 10-16C-3(A)).  Here again, the Court concluded that the Defendants took an adverse action against Walton by creating and implementing the RIF.  See MSJ MO at 34 (citing Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dept. of Labor, 717 F.3d 1121, 1121 (10th Cir. 2013)).  As with Walton's Title VII and NMHRA claims, however, the Court held that Walton failed to establish a causal connection between the RIF and Walton's protected disclosures about Bearden's conduct -- that Walton failed to show that the disclosure was a "contributing factor" in the RIF decision.  MSJ MO at 34-35 (citing Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dept. of Labor, 717 F.3d at 1129).

The Tenth Circuit issued an opinion resolving the Defendants' interlocutory appeal from the Court's QI Order on April 19, 2016.  See Walton v. Powell, 821 F.3d 1204 (10th Cir. 2016).  After discussing various procedural issues at some length,[1] the Tenth Circuit concluded that a triable issue

---

[1]In his discussion of procedure, the Honorable Neil Gorsuch criticized the Court's apparent misapplication of the McDonnell Douglas test -- developed in the context of retaliation claims asserted under Title VII -- to Walton's First Amendment retaliation claim.  See 821 F.3d at 1210 ("When assessing Ms. Walton's claim of unlawful retaliation under the First Amendment, the district court used the *McDonnell Douglas* heuristic to guide its analysis.").  The Court is perplexed by this criticism.  The Court did not discuss, much less apply, the McDonnell Douglas test anywhere in its analysis of Walton's § 1983 claim for political retaliation.  See QI MO at 100-114.  It is true that the Court referenced the Defendants' reliance on McDonnell Douglas for their Title VII and NMHRA retaliation claims in the context of the Court's discussion of the MSJ in its procedural background section.  See QI MO at 54 (citing MSJ at 15).  Indeed, the Court comprehensively reviewed in the procedural background all legal theories that both the MSJ and QI Motion raised.  See QI MO at 52-83.  Yet the Court, as noted above, bifurcated its analysis of the qualified immunity issue that the QI Motion raised and its analysis of the remaining issues in the MSJ between two memoranda opinions -- the QI MO, which the Tenth Circuit reviewed, expressly limited its analysis to the issue of qualified immunity.  See QI MO at 1 n.1 ("Because the Defendants intend to file an interlocutory appeal solely on the denial of qualified immunity, the Court will address only that issue . . . .").  Thus, although the Court mentioned the McDonnell Douglas test when reviewing the MSJ's Title VII and NMHRA arguments, it did not apply that test in the QI MO's analysis, because the QI MO deals only with the qualified immunity defense to Walton's § 1983 political retaliation claim.  The

- 20 -

exists regarding whether Powell violated Walton's political association rights.  See Walton v. Powell, 821 F.3d at 1214.  The Tenth Circuit noted that, generally, a plaintiff alleging retaliation by a government employer on the basis of political association must show that "her conduct involved a matter of 'public concern.'"  Walton v. Powell, 821 F.3d at 1213 (quoting Merrifield v. Bd. Of Cty. Comm'rs, 654 F.3d 1073, 1083 (10th Cir. 2011)).  The Tenth Circuit noted that the Court's QI MO did not acknowledge or apply the public concern test, but concluded that Powell nonetheless "fail[ed] to give [] sufficient reason to think the test unsatisfied here."  Walton v. Powell, 821 F.3d at 1213.  See id. (stating that firing a public employee for "failing to endorse or pledge allegiance to a particular political ideology" generally raises a triable claim for retaliation)(citing Gann v. Cline, 519 F.3d at 1093-94)(internal quotation marks omitted).  Similarly, the Tenth Circuit concluded that, based on the facts set forth in the QI MO, a reasonable jury could find that "Walton's political affiliation was a substantial or motivating factor in her dismissal."  Walton v. Powell, 821 F.3d at 1214.  Finally, the Tenth Circuit held that Powell was not entitled to qualified immunity with respect to Walton's § 1983 claim, because, as early as 2008, before the events of this case, "firing a civil service employee for refusing to show allegiance to a particular political cause was already a 'clearly established' violation of the First Amendment."  Walton v. Powell, 821 F.3d at 1214 (quoting Gann v. Cline, 519 F.3d at 1095-96).

The only unresolved issue in this case is Walton's § 1983 claim asserted against Powell for retaliation against Walton for her political association with Lyons, an association which the First Amendment protects.  See Complaint ¶¶ 41-5, at 8-9.  Powell moves in limine to exclude from trial

Court recognizes, as Judge Gorsuch insists, that the McDonnell Douglas test has "no useful role to play in First Amendment retaliation cases," Powell v. Walton, 821 F.3d at 1210, and, for that reason, the Court did not apply it to Walton's First Amendment claim.

evidence he argues is inadmissible to prove Walton's § 1983 claim based on the Court's rulings in the MSJ MO.  The Court will discuss each motion and their responsive pleadings in turn.

      1.      __The Bearden Motion.__

      Powell moves in limine to exclude from trial any evidence or arguments concerning alleged acts or statements of discrimination on any basis other than the First Amendment's protection of political association rights.  See Bearden Motion at 1.  Walton, Powell notes, testified in her deposition to various instances she alleged "formed the basis of her discrimination claims against other individuals or the agency itself on the basis of gender and national origin."  See Bearden Motion at 2.  Powell notes that Walton alleged that Britt, her supervisor, made derogatory statements about "Indians," for example, and that Walton originally based her claim for discrimination on the basis of national origin on those statements.  Bearden Motion at 2.  Powell also notes that Walton attributed numerous statements to Bearden, her subordinate, which she thought "were discriminatory at least on the basis of gender."  Bearden Motion at 2 (noting that Walton said Bearden made "'rude, sexually inappropriate, and racially inappropriate comments to Walton'")(quoting First Amended Complaint to Recover Damages for Discrimination and Retaliation and for Violations of Constitutional Rights ¶ 13.D, at 3, filed April 22, 2013 (Doc. 10-1)).

      Powell notes that Walton formally reported Bearden's "discriminatory conduct" to Britt on April 7, 2011, and May 6, 2011.  Bearden Motion at 2.  Powell notes, however, that Olah identified Walton's position for termination on March 30, 2011, pursuant to the legislatively mandated 2011 RIF, and that Powell approved the termination plan on April 6, 2011.  See Bearden Motion at 2-3.  Accordingly, Walton argues that the Court concluded in its MSJ MO that Walton failed to establish the "causation" prong of the three-part test for retaliation claims, because Walton filed her formal

complaints only after Olah and Powell had already decided to terminate her position.  Bearden Motion at 2-3 (citing MSJ MO at 27).  Based on this conclusion, Powell asks the Court to "bar evidence of or argument about any statements attributable to any individual . . . which previously formed the basis for Plaintiff's claims that she was discriminated against on the basis of gender or national origin."  Bearden Motion at 3.  Powell also requests that the Court "rule in limine that any evidence of or argument about Plaintiff's April 7 and May 6, 2011 complaints about Del Bearden should be barred from this trial."  Bearden Motion at 3.

Walton responded on October 28, 2016.  <u>See</u> Response to Motion in Limine Regarding Discriminatory Statements and Actions (Doc. 114) at 1, filed October 28, 2016 (Doc. 123)("Bearden Motion Response").  Walton begins by previewing her trial testimony, which she says will be based on her Affidavit.  <u>See</u> Bearden Motion Response at 1 (referring to Affidavit of Peggy Walton (executed December 18, 2013), filed December 19, 2013 (Doc. 55-1)("Walton Aff.")).  Walton notes that she will testify that Bearden was increasingly hostile and insubordinate towards her from January to April 2011, and that Britt moved Bearden's office next to his and assumed a primary supervisory role over Bearden during that time frame.  <u>See</u> Bearden Motion Response at 1 (asserting that Bearden and Britt had a "very close relationship").  Walton says that she will testify that "Bearden increasingly began to make derogatory comments of a sexual and racial nature, which Walton believed, based upon her training, were very inappropriate and violated State Land Office (SLO) policies."  Bearden Motion Response at 1-2 (citing Walton Aff. ¶ 27, at 10).  Walton will testify, she notes, that, during February, March, and April 2011, she "verbally reported her concerns about Ms. Bearden's conduct to Mr. Britt on numerous occasions."  Bearden Motion Response at 2.  She contends that she also sent Britt emails on April 7 and 8, 2011, in which she raised concerns

about Bearden's conduct, but that Britt did not respond.  <u>See</u> Bearden Motion Response at 2 (citing Walton Aff. ¶ 13, at 4-5).  Walton says that she will testify that her emails were not given to human resources and that the State Land Office "took no action to investigate Walton's complaints as required by SLO Policy."  Bearden Motion Response at 2.

Turning to her legal argument, Walton contends that motions in limine "'are fraught with problems,'" Bearden Motion Response at 2 (quoting <u>Kysar v. BP Am. Prod. Co.</u>, 2012-NMCA-036, ¶ 23, 273 P.3d 867 (citation omitted)), and that a motion in limine should therefore "'be used . . . as a rifle and not as a shotgun, pointing out the objectionable material and showing why the material is inadmissible and prejudicial,'" Bearden Motion Response at 3 (quoting <u>Proper v. Mowry</u>, 1977-NMCA-080, 568 P.2d 236, 240-241).  Powell's motion, she argues, "is a shotgun blast[ --] not a rifle shot," because he "broadly seeks to exclude Walton's testimony regarding the evidentiary basis of her discrimination and retaliation claims, but has not pinpointed the specific evidence that he wishes to exclude."  Bearden Motion Response at 3.  In any event, she avers, evidence that the State Land Office did not investigate her complaints about Bearden's behavior is relevant under rule 401 of the Federal Rules of Evidence to her § 1983 political retaliation claim, because it supports a "reasonable inference that Powell had determined, earlier than Powell has admitted, to terminate Walton's employment."  Bearden Motion Response at 3.  She argues, moreover, that this evidence illustrates that Powell was hostile towards her, and a reasonable inference can be drawn that such hostility was "directed or condoned by Powell in retaliation for Walton's association with Patrick Lyons."  Bearden Motion Response at 3.

Walton argues that Powell's, Britt's, and Bearden's further statements and actions, upon which she based her discrimination and retaliation claims, also support her § 1983 First Amendment

claim.  See Bearden Motion Response at 4.  She notes, for example, that Britt made several comments to her referring to her support for Lyons and that, related to those comments, Britt told her that "no one in the Land Office respects you."  Bearden Motion Response at 4.  Walton also contends that Powell was disrespectful towards her when she gave reports, expressed opinions, and participated in discussions at weekly leadership meetings.  See Bearden Motion Response at 4. Finally, she argues that Powell "frequently intimidated and threatened" her in those meetings. Bearden Motion Response at 4 (citing Walton Aff. ¶ 33, at 12-13).  Walton concludes that, because these statements and actions support the remaining § 1983 political retaliation claim, and because Powell has not identified any specific actions or statements that he wishes to exclude, "the Court should not even consider the Motion."  Bearden Motion Response at 4.

        **2.      The Lopez Motion.**

        Powell moves in limine to bar any evidence, mention of, or argument about various issues regarding Lopez, the State Land Office's Human Resources Manager.  See Lopez Motion at 1. Powell notes that Lopez, by means of her position in Human Resources, was familiar with the State Land Office's hiring of Walton into an exempt Secretary II position as well as her subsequent hire into a classified Economist A position, which was then reclassified into the General Manager I position that was ultimately eliminated in the 2011 RIF.  See Lopez Motion at 1-2.  Powell further notes that Lopez was involved in the administrative reclassification of Walton's Economist A position to a General Manager I position which later became the subject of Barker's November 23, 2010, investigative report.  See Lopez Motion at 2 (citing Deposition of Sandra Lopez at 54-74 (taken December 4, 2013), filed October 24, 2016 (Doc. 118-1)("Lopez Depo.")).  Powell argues that Walton intends to testify that Lopez saw Walton as unqualified to hold the Economist A position

and that she may have improperly provided to Barker information regarding the reclassification. <u>See</u> Lopez Motion at 2 (citing Lopez Depo. at 82-89). Powell argues that Walton will also testify that she filed a complaint against Lopez regarding her reclassification to the General Manager I position and that this caused Lopez to have "discriminatory animus" towards Walton, which, in turn, "was a causal agent in the selection, by Elaine Olah, of her GM I position for the RIF in June 2011." Lopez Motion at 2-3.

Powell argues that he expects Walton and Lopez to testify to differing accounts. <u>See</u> Lopez Motion at 3. Walton, he postulates, will testify that Lyons directed Lopez in 2009 to transfer Walton from the Secretary II position to the Economist A job and that, because Lopez knew Walton was not qualified for that position, Lopez was directed to assist in reclassifying the Economist A position to a General Manager I position, for which Walton was qualified. <u>See</u> Lopez Motion at 3. Powell argues that Walton will further testify that Lopez refused to initiate the paperwork for more than a year, at which point Lyons had Walton "bypass HR and work directly with the State Personnel Office for that reclassification." Lopez Motion at 3. Powell argues that Lopez, by contrast, will testify that Lyons asked her to place Walton in the Economist A job, that she did so because she believed Walton was qualified on the basis of experience, and that it was not improper to place Walton into that job even though Lyons later asked her to reclassify Walton into the GM I position. <u>See</u> Lopez Motion at 3. Lopez will further testify, Powell argues, that there were delays in this reclassification, that she did what Lyons asked her to do, and that she never did "anything intentionally to delay the job reclassification for Ms. Walton, nor did she ever hold any discriminatory animus against her." Lopez Motion at 3. Powell argues that, finally, Lopez will testify that she "had no involvement with the KRQE broadcast of Ms. Walton's job history which was in part the subject of the Barker report"

and that she did not act with discriminatory intent when she told KRQE about Walton's allegedly improper reclassification history in response to an IPRA request by KRQE.  Lopez Motion at 3-4.

None of these events "have any relevance to the issues which will be presented to the jury in this case," Powell contends.  Lopez Motion at 4.  Powell argues that "[t]here is no evidence linking Ms. Lopez to the decisions to eliminate Plaintiff's position."  Lopez Motion at 4.  Specifically, he argues that Lopez had no involvement in the RIF design or in the selection of Walton's General Manager I position, that Olah was "solely tasked" with the RIF, and that Lopez was not even aware of Olah's design of Walton's General Manager I position until mid-April 2011.  Lopez Motion at 4.  Moreover, Powell argues that the Court's MSJ MO rejected Walton's claims that Lopez' alleged "discriminatory intent" against her formed the basis of Powell's and Olah's actions with respect to the RIF.  Lopez Motion at 4.  Powell reads the Court's MSJ MO as "finding no evidence Ms. Lopez communicated unfavorable facts to those decision makers or otherwise communicated her bias to Mr. Powell and Ms. Olah."  Lopez Motion at 4 (contending that the Court rejected this "Cat's Paw" theory)(citing Staub v. Proctor Hospital, 526 U.S. 411, 416 (2011)).  Consequently, Powell argues, Walton should be precluded from referencing, arguing about, or examining witnesses concerning any aspect of Lopez' involvement with Walton's reclassification into an Economist A and General Manager I position, "nor any issue claiming Ms. Lopez 'tipped off' KRQE concerning Ms. Walton's reclassification history."  Lopez Motion at 4.  Powell argues that such evidence is irrelevant under rule 401 of the Federal Rules of Evidence, see Lopez Motion at 4-5, and that any probative value such evidence may have is "substantially outweighed by considerations under FRE 403," Lopez Motion at 5.

Powell makes one final argument: that the Court should bar from trial evidence or argument concerning any relationship between Lopez and Dennis Garcia, a State Land Office Deputy Commissioner in 2010.  See Lopez Motion at 5.  Powell argues that Lopez' relationship with Garcia "has no bearing on Plaintiff's claim that she was retaliated against by Commissioner Powell for her association with the Lyons' administration."  Lopez Motion at 5.  He contends that this evidence is "irrelevant to the issues in this case."  Lopez Motion at 5.

Walton responded on October 28, 2016.  See Response to Motion in Limine Regarding Issues Involving Sandra Lopez (Doc. 118) at 1, filed October 28, 2016 (Doc. 127)("Lopez Motion Response").  Walton first recounts her version of the relevant facts.  See Lopez Motion Response at 1-3.  Walton notes that Lyons instructed Lopez to transfer Walton from the exempt Secretary II position to the classified Economist A position in early 2009 and then to reclassify that position to a General Manager I position.  See Lopez Motion Response at 1-2.  Walton argues that she expected Lopez to reclassify the position, but that "Lopez repeatedly refused to initiate the paperwork for over a year . . . ."  Lopez Motion Response at 2.  She notes that Lyons finally had Walton bypass Lopez and work directly with the New Mexico State Personnel Office to accomplish the reclassification, which was approved on September 8, 2010.  See Lopez Motion Response at 2.  Walton notes that, shortly thereafter, in mid-November 2010, she informed Powell that a KRQE investigative reporter had interviewed her, and that "KRQE would be broadcasting a negative story about Walton and the [MS]SLO."  Lopez Motion Response at 2.  Walton notes that she told Powell about the circumstances of her reclassification, and that she believed Lopez had "furnished her personnel information to KRQE television."  Lopez Motion Response at 2-3 (citing Walton Aff. ¶ 14, at 5).

As in her Response to Powell's Bearden Motion, Walton argues that Powell has "moved, very broadly, to exclude issues regarding Sandra Lopez, but he has not identified, with particularity the specific evidence that he wishes the Court to exclude."  Lopez Motion Response at 3 (internal quotation marks omitted).  See id. (arguing that "Powell's motion is a shotgun blast[ --] not a rifle shot").  In any event, Walton argues, the chronology of the events surrounding her hiring, transfer, and ultimate reclassification to the General Manager I position that she held at the time Powell terminated her employment "is relevant to show that Walton's transfer from an exempt position to a classified position was not an 'eve of election political favor' to Walton as implied by KRQE's Larry Barker investigative report."  Lopez Motion Response at 3.  Walton also argues that she repeatedly told Powell, both prior to and during his term, that she believed Lopez had a "personal animus towards her," that Lopez had "improperly provided Walton's confidential personnel information to KRQE," and that she "believed that she was being mistreated because of her political association with Patrick Lyons."  Lopez Motion Response 3-4.  Walton contends that a reasonable inference can be drawn from Powell's failure to investigate these allegations "that Powell was determined to terminate Walton's employment, and did not need to investigate."  Lopez Motion Response at 4.  Walton further notes that, because Powell has identified Lopez as a witness, "Walton may properly cross-examine Ms. Lopez, and offer evidence of Ms. Lopez's personal animus towards Walton, to show Ms. Lopez's bias and impeach her credibility."  Lopez Motion Response at 4 (citing Fed. R. Evid. 404(b), 607, and 611(b); United States v. Lara, 956 F.2d 994, 997 (10th Cir. 1992)).  Finally, Walton contends that "evidence of Ms. Lopez's personal animus towards Walton is part of the res gestae," because it is "inextricably intertwined with proper evidence regarding Walton's employment history, Walton's complaints to Powell about the conduct of Sandra Lopez, and

Powell's failure to act on those complaints." Lopez Motion Response at 4 (citing United States v. Ganadonegro, WL 3957549, at *4 (D.N.M. 2011)(citing United States v. McVeigh, 153 F.3d 1166, 1203 (10th Cir. 1999))(internal quotation marks omitted).

### 3.    The Britt Motion.

Powell moves in limine to bar evidence or argument regarding Britt's alleged discriminatory statements or actions. See Britt Motion at 1. Powell notes that Britt, originally a Defendant in this case, was an Assistant Commissioner for the Commercial Resources Division under the Powell administration and was Walton's immediate supervisor. See Britt Motion at 1. Walton charged Britt with violations of Walton's constitutional rights, Powell notes, including discriminatory actions, statements, and retaliation for Walton's constitutionally protected activity "which is alleged to have resulted in her termination through the [RIF] process." Britt Motion at 1. Powell argues that the Court's MSJ MO concluded that Walton "failed to establish any evidence that her separation from the State Land Office was a result of actions taken by Mr. Britt in retaliation to Plaintiff's alleged protected activity." Britt Motion at 1-2. Powell specifically points to the Court's conclusion that Britt did not make the decision to terminate Walton's position, and that he did not "even know or become aware that Walton's position would be eliminated until after Commissioner Powell approved the RIF plan, determined by Elaine Olah on March 30, 2011 at a meeting on April 6, 2011." Britt Motion at 3. He argues that the Court "rightly noted" that Walton's complaints to Britt, largely involving Bearden, were sent after April 6, 2011. Britt Motion at 2. Accordingly, he argues, the Court "found there was no basis for establishing that Don Britt . . . violated [Walton's] rights under Title VII and the [NMHRA] in retaliation for Ms. Walton's reporting of protected activity." Britt Motion at 2 (citing MSJ MO at 27). Indeed, Powell contends, the Court dismissed all claims

against Britt because "'Britt did not decide to terminate Walton's position, and he did not know that Walton's position would be eliminated until after Ray Powell . . . approved the final determination.'" Britt Motion at 2 (quoting MSJ MO at 27). Powell concludes that the Court should bar any evidence of Britt's allegedly discriminatory statements or actions towards Powell. See Britt Motion at 2. Such evidence is irrelevant, he argues, "because Mr. Britt was not involved in the design or approval of the RIF" and because he did not "even become aware of the RIF plan until after Commissioner Powell finally approved Ms. Olah's plan on April 6, 2011." Britt Motion at 2.

Walton responded on October 28, 2016. See Response to Motion in Limine Regarding Issues Involving Donald Britt (Doc. 119) at 1, filed October 28, 2016 (Doc. 128)("Britt Motion Response"). Walton begins by previewing her trial testimony with respect to her interactions with Bearden. See Britt Motion Response at 1. She notes that she will testify that, from January to April 2011, Bearden was increasingly hostile and insubordinate. See Britt Motion Response at 1. She notes that she will further testify that Britt and Bearden appeared to have a "very close relationship," and that Britt became Bearden's primary supervisor. Britt Motion Response at 1. Moreover, she asserts that she will testify that she reported her concerns about Bearden's "derogatory comments of a sexual and racial nature" to Britt on numerous occasions, but that her concerns were not relayed to Human Resources, nor did the State Land Office take any action to investigate her complaints as its policy requires. Britt Motion Response at 1-2 (citing Walton Aff. ¶ 27, at 10 and ¶ 13, at 4-5).

As with her prior responses to Powell's motions in limine, Walton asserts that "Powell has not identified, with particularity, the specific evidence that he wishes the Court to exclude. The Court should deny the Motion on this basis alone." Britt Motion Response at 2. Regardless, she contends, she "intends to testify regarding all of her interactions with Mr. Britt, including statements

of Mr. Britt that Walton perceives were discriminatory."  Britt Motion Response at 2.  She argues

that "[m]ost, if not all, of those statements support Walton's political retaliation claim against Powell

because they show animus towards Walton because of her association with Mr. Lyons' [sic]."  Britt

Motion Response at 2.  She posits that Britt's statements referring to her "buddy Pat [Lyons]" show

Britt's awareness of Walton's relationship with Lyons.  Britt Motion Response at 2 (alterations in

original).  Indeed, she argues, the fact that Britt reported directly to and met frequently with Powell

supports a "reasonable inference . . . that Mr. Britt and Powell discussed Walton's association with

Lyons, notwithstanding their denials."  Britt Motion Response at 2-3.

Walton further contends that evidence of her numerous complaints to Britt about Bearden is

relevant.  See Britt Motion Response at 3.  In her view, that the State Land Office "did not, contrary

to its own policies, investigate Walton's complaints about Ms. Bearden's discriminatory behavior,

support[s] a reasonable inference that Powell had determined, earlier than Powell has admitted, to

terminate Walton's employment."  Britt Motion Response at 3.  She points to Bearden's statements,

Bearden's association with Britt and Powell, and the "lack of action to remedy the hostile working

environment" as evidence that "Powell and his lieutenants were hostile towards Walton."  Britt

Motion Response at 3.  Based on this, Walton concludes that a reasonable inference can be drawn

that the hostility "was directed or condoned by Powell in retaliation for Walton's association with

Patrick Lyons."  Britt Motion Response at 3.

### 4.    The Hearing.

The Court held a hearing on November 8, 2016.  See Transcript of Motion Hearing held on

11/08/2016 at 1 ("Tr.").[2]  Beginning with the Bearden Motion, the Court asked Powell whether he

---

[2]The Court's citations to the hearing's transcript refer to the court reporter's original,

can identify specific statements that Walton seeks to admit at trial to which Powell objects.  See Tr. at 29:8-11 (Court).  Powell acknowledged that he "can't anticipate everything that Ms. Walton will say," but noted that Walton has previously proffered evidence of racially inappropriate remarks regarding her Native American ethnicity and inappropriate remarks of a sexual nature.  See Tr. at 28:14-29:11 (Hatcher).  Powell noted that "all of these claims were of record before the Court in its supplemental memorandum opinion [where the Court] dismissed everything except for the political association claim against Mr. Powell."  Tr. at 29:13-18 (Hatcher).  Powell explained that his primary concern is that these statements are not relevant to the political association claims.  See Tr. at 29:19-24 (Hatcher).  Powell argued that Britt's comments are not relevant, for example, because the Court concluded in its MSJ MO that Britt had no role in the RIF that resulted in the termination of Walton's position, and that the Court determined that there was no evidence "supporting a claim against Don Britt on retaliating, either discriminating [against] Ms. Walton or retaliating against her for anything, including political association."  Tr. at 30:13-18 (Hatcher).  Powell argued that the Court likewise concluded that Bearden was "not a decision maker," and rejected Walton's claims that Bearden "sabotaged" Walton's work, "harassed" Walton, and "made lewd comments" about Walton's sex and national origin.  Tr. at 31:15-22 (Hatcher).  Powell reiterated that he "fear[s] . . . Walton is going to get up and she's going to testify as to these and perhaps other matters that I can't anticipate."  Tr. at 31:23-32:1 (Hatcher).  Powell noted that Walton's political association claim against Powell is all that remains; comments by "non-decision makers" such as Britt, Bearden, and Lopez are therefore irrelevant, he argued.  Tr. at 32:6-11 (Hatcher).  Powell accordingly asked the

---

unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Court to "restrict any testimony about discriminatory statements or actions taken by other people who were not decision makers in this case."  Tr. at 32:11-15 (Hatcher).

The Court pressed Powell to detail what precise holding he wished the Court to reach with respect to the Bearden Motion.  See Tr. at 33:8-10 (Court).  Powell posited that the Court should exclude any acts or statements by anyone other than Olah or Powell -- the "only two known decision makers" -- and any acts or statements "for any basis other than political association discrimination."  Tr. at 33:11-22 (Hatcher).  Turning to Walton, the Court proposed that Walton articulate which statements she wishes to admit to ascertain whether such a holding would be acceptable.  See Tr. at 34:12-18 (Court).

Walton first argued that she seeks to admit Britt's "disparaging" statements "suggesting that he disapproved of [Walton's] relationship with Patrick [Lyons]."  Tr. at 35:1-5 (Hardwick).  Walton said that she did not, however, intend to offer Britt's statements based on race, gender, or national origin.  See Tr. at 35:18-22 (Court, Hardwick).  With respect to Bearden, Walton noted that she intended to admit evidence of racially and sexually derogatory statements.  See Tr. at 36:10-37:6 (Hardwick).  Walton said that she will proffer evidence that she complained about these statements, but that the State land Office took no investigative action "because there was already a plan in place to dismiss Peggy Walton from employment at the state land office."  Tr. at 37:11-19 (Hardwick).  Walton clarified, however, that the jury need not hear Bearden's actual statements -- that it is sufficient to refer generally to "sexual and racial" comments.  Tr. at 38:5-15 (Court, Hardwick).

In rejoinder, Powell argued that it is immaterial whether Walton proffers the subject evidence in the form of general acts or specific statements.  See Tr. at 39:24-5 (Hatcher).  In Powell's view, the evidence -- whatever the form -- is irrelevant, because "there is no evidence that [Bearden] was a

decision make[r]." Tr. at 40:16-20 (Hatcher). Powell also reiterated that the Court's MSJ MO concluded that Powell's decision to terminate Walton was reached without knowledge of Bearden's alleged "discriminatory treatment" of Walton or of Walton's complaints about that treatment. Tr. at 41:3-13 (Hatcher). See id. at 12-13 ("Walton thus does not satisfy the causation prong."). Powell argued that testimony regarding Bearden's actions or statements would therefore wrongly implicate her -- a non-decision maker -- as part of the "team that targeted [] Walton for this RIF by being insubordinate to Ms. Walton," which, in turn, would invite the improper inference that Bearden continued to harass Walton because she was slated for termination anyway because of her political association with Lyons. Tr. at 41:13-42:7 (Hatcher). Powell concluded that the Court should limit evidence of discriminatory animus to that attributed to Powell and Olah, who were "singularly concerned about how to meet the appropriation cuts" resulting in the RIF. Tr. at 42:16-43:6 (Hatcher).

Having heard arguments from both sides on the Bearden Motion, the Court stated that it would review its MSJ MO to see if its reasoning precludes this evidence. See Tr. at 43:12-13 (Court). The Court indicated, however, that it was "inclined to think not," because the "sanitized version" of events that Walton will present at trial will not address with particularity any acts or statements allegedly made with non-political discriminatory animus. Tr. at 43:13-21 (Court). See id. at 43:20-21 ("I'm inclined to allow that story to proceed."). The Court elaborated that the MSJ MO disposed of claims asserted under the NMHRA, the NMWPA, and Title VII, but that it did not make rulings precluding any evidence. See Tr. at 43:22-44:3 (Court).

The parties turned next to the Britt Motion because of its significant argumentative overlap with the Bearden Motion. See Tr. at 44:11-14 (Hatcher). Powell began, arguing that the Court's

MSJ MO found that there were no material issues of fact concerning Britt's alleged discrimination against Walton, because Britt "simply was not part of the decision making team" that terminated Walton.  Tr. at 44:23-45:7 (Hatcher).  Powell stressed that Walton's only remaining claim is for discrimination by Powell based on political association, and any allegation of discrimination by Britt therefore is irrelevant.  See Tr. at 45:7-11 (Hatcher).  Powell noted that there is no evidence that Britt told Powell about any of Walton's complaints about Bearden, and that Britt was not even apprised of the RIF until weeks after Powell approved Olah's RIF design for Walton.  See Tr. at 45:13-20 (Hatcher).  In fact, Powell argues, Britt was unhappy when he eventually learned of the RIF design, because he did not wish to lose a division director working underneath him.  See Tr. at 45:20-24 (Hatcher).

Turning to Walton, the Court asked how the disputed evidence is relevant.  See Tr. at 46:2-12 (Court).  Walton responded that evidence of Britt's statements and actions is relevant to determining the motivation for Walton's termination -- Powell's assertion that Britt was never consulted about terminating Walton is not credible, Walton argued, because Britt was part of Powell's executive staff and head of commercial resources, and because Britt was Walton's direct supervisor.  See Tr. at 46:21-47:9 (Hardwick).  Walton elaborated that she did not necessarily seek to prove that Britt was involved in the final decision to terminate Walton's position, but rather that "he was involved in the discussion that led to Peggy Walton being singled out for the RIF."  Tr. at 48:23-49:2 (Hardwick).  This, Walton avers, is only logical, because Britt heads commercial resources and oversaw Walton, who "supervise[d] most of the employees in that division."  Tr. at 48:21-23 (Hardwick).

Powell briefly responded, again reiterating that the Court's MSJ MO "clearly found that [Britt] wasn't involved" in the decision to terminate Walton.  Tr. at 50:11-16 (Hatcher).  Powell

stated that his fear is that "Walton is just throwing out all of this information" to improperly suggest that Britt, by virtue of his close proximity to Powell, "must have told him about [his] problems with Peggy Walton." Tr. at 51:5-22 (Hatcher). Powell contended that "the rules of evidence require more than that." Tr. at 51:5-7 (Hatcher). Accordingly, Powell requested that the Court to require that Walton "show the Court something other than just simply asking the jury to speculate, that [Britt] must have been part of the team." Tr. at 51. 7-10 (Court).

Having heard arguments from both parties, the Court indicated that it was inclined to deny the Britt Motion and admit the proffered evidence concerning Britt's actions and statements. See Tr. at 51:23-52:1 (Court). The Court then directed the parties to address the Lopez Motion. See Tr. at 85:10-11 (Court).

Powell opened by arguing that Walton will portray Lopez as having discriminatory animus towards her, and that Walton will attempt to illustrate that Lopez convinced Powell and Olah -- the RIF decision makers -- to select Walton's position for termination in the RIF. See Tr. at 86:17-23 (Hatcher). Powell contended that the Court's MSJ MO concluded that there is no evidence showing that "Lopez . . . was a decision maker or unduly influenced the decision maker." Tr. at 87:14-17 (Hatcher). The Court interjected, clarifying that the Court's conclusion was made in the context of Walton's Title VII claims and that it "didn't say anything about the [F]irst [A]mendment claims." Tr. at 87:18-20 (Court). Powell conceded this point, but argued that, irrespective of the context, the Court said "there is no evidence showing Ms. Lopez was a decision maker or was involved." Tr. at 88:6-11 (Hatcher). Indeed, Powell argues, Walton is simply relying on Lopez' proximity to Powell to assert -- without evidence -- that Lopez "must have influenced Mr. Powell." Tr. at 88:17-24 (Hatcher). In Powell's estimation, there will not be "any direct evidence other than asking the jury

to purely speculate that Ms. Lopez had anything to do with . . . eliminating Peggy Walton's position." Tr. at 89:9-13 (Hatcher).  Thus, Powell argued, the Court should exclude evidence of Lopez' involvement in the reclassification.  See Tr. at 88:11-13 (Hatcher).

Regarding Powell's inclusion of Lopez on his witness list, Powell noted that he intends to call Lopez to testify to actions by the State Land Office's human resources department to work with the State Personnel Office to approve Walton's termination after the State Land Office designated her position for the RIF.  See Tr. at 89:14-22 (Hatcher).  Lopez will also testify to Walton's rights as a RIF-ed employee, Powell noted.  See Tr. at 89:23-24 (Hatcher).  Powell insisted that he does not intend to proffer testimony by Lopez for any additional purposes.  See Tr. at 89:23-24 (Hatcher).  Powell thus asked the Court to exclude evidence of Lopez' involvement in Walton's reclassification from an Economist A position to a General Manager I position as well as evidence concerning Lopez' involvement in the Barker investigative report.  See Tr. at 90:5-8 (Hatcher).

In response, Walton clarified that she does not seek to have Lopez testify that she was a decision maker or that she influenced the RIF selection process.  See Tr. at 90:14-19 (Hardwick). Rather, Walton asserted, Lopez will testify to her involvement in the protracted, year-long process to reclassify Walton's position.  See Tr. at 91:8-19 (Hardwick).  Walton averred that she also intends to personally testify that she confronted Lopez about the delay, and that she finally filed the paperwork herself.  See Tr. at 91:8-92:2 (Hardwick).  Walton stated that she will testify that she alerted Powell in advance that the Barker report would be misleading in its conclusion that she was unqualified for the Economist A position, because Lopez should have reclassified that position to General Manager I -- a position for which she was qualified -- long before the report aired.  See Tr. at 94:17-25 (Hardwick).  Walton will also testify, she noted, that she informed Powell that she believed Lopez

provided her confidential personnel information to Barker, and that Powell took no investigative action into the matter. See Tr. at 94:25-95:5 (Hardwick). The point of all this, Walton stated, is not to illustrate Lopez' personal animosity or discriminatory intent towards Walton; rather, Walton noted, this testimony is "part of the facts that tell the story in this case." Tr. at 95:8-15 (Hardwick).

Powell interjected, questioning the relevance of this proffered testimony. See Tr. at 97:5-6 (Hatcher). The Court responded that the testimony is relevant, because the Barker story will cast a negative light on Walton given that Walton's position was reclassified right before Powell's election in September 2010. See Tr. at 97:7-11 (Court). There is a significant difference, the Court noted, between the narrative that Walton's position was reclassified on the eve of the election -- suggesting political motive by Lyons -- and the narrative that the reclassification process started in September 2009. See Tr. at 97:9-13 (Court). Walton is entitled to tell the latter narrative, the Court asserted, to rebut the negative inference suggested by the Barker report. See Tr. at 97:13-15 (Court). Powell nevertheless pressed his relevance objection, contending that the point of the Barker report was whether Walton was qualified for her classified positions, not whether the reclassification was tied to the election. See Tr. at 98:15-23 (Court).

Powell also objected to testimony regarding Walton's telephone conversation with Relkin and Powell about the forthcoming Barker report. See Tr. at 99:6-100:3 (Hatcher). Powell contended that such testimony is improper, because it suggests that Powell had a duty yet failed to investigate Walton's allegations, when in reality Walton had not yet taken office and was not even acquainted with Walton at the time. See Tr. at 99:10-100:3 (Hatcher). The Court disagreed, explaining that such testimony illustrates that Powell was on notice when he entered office in January 2011 that a human resources officer was potentially leaking confidential personnel information to the press and

that Powell took no responsive action.  See Tr. at 100:4-10 (Court).  The proper inference from such testimony, the Court reasoned, is that Powell did not initiate an investigation because he knew that he was going to target Walton for the RIF anyway.  See Tr. at 100:12-14 (Court).

Accordingly, the Court denied the Lopez Motion and stated that Walton is entitled to testify to the narrative of how she moved into the General Manager I position prior to Powell's assumption of office.  See Tr. at 101:6-18 (Court).  The Court further stated that Walton may also present testimony regarding her conversation with Relkin and Powell as circumstantial evidence of Powell's animus towards her, because evidence that Powell did not investigate Walton's allegations in that conversation tends to suggest that Powell had already predetermined to eliminate Walton's position in the RIF.  See Tr. at 101:18-102:7 (Court).  In short, the Court concluded that evidence concerning Lopez is admissible to the extent it relates to Walton's conversation with Relkin and Powell and to the year-long reclassification delay.  See Tr. at 102:7-11 (Court).

## LAW REGARDING THE RELEVANCY OF EVIDENCE

The Federal Rules of Evidence "contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  United States v. Gutierrez-Castro, 2011 U.S. Dist. LEXIS 88440, at *3 (D.N.M. 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").  "The standard for relevancy is particularly loose under

- 40 -

rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'" <u>United States v. Ganadonegro</u>, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  <u>See</u> Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## <u>LAW REGARDING RULE 403</u>

Rule 403 of the Federal Rules of Evidence provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  <u>See</u> <u>United States v. Record</u>, 873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." <u>United States v. Pettigrew</u>, 468 F.3d 626, 638 (10th Cir. 2006)(quoting <u>United States v. Sides</u>, 944 F.2d 1554, 1563 (10th Cir. 1991)).  The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."  <u>United States v. Smalls</u>, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, <u>see</u> <u>United States v. Lugo</u>, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, <u>see</u> <u>United States v. Bice-Bey</u>, 701 F.2d 1086, 1089 (4th Cir. 1983); <u>United States v. Masters</u>, 622 F.2d 83, 87-88 (4th

Cir. 1980).  The Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999).  Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee's note).

## ANALYSIS

For the reasons stated on the record at the hearing, the Court will deny all three of Powell's motions in limine.  First, the Court will deny the Bearden Motion, and allow evidence and argument concerning alleged acts or statements of discrimination toward Walton on bases other than the First

Amendment's protection of political association rights. See Tr. at 43:13-21 (Court). As the Court explained at the hearing, the evidence is relevant under rule 401 to Walton's First Amendment claim and there is little risk of unfair prejudice under rule 403, because Walton will present a "sanitized" narrative that will not address with particularity any acts or statements allegedly made with non-political discriminatory animus toward her. Tr. at 43:13-21 (Court). Second, the Court will deny the Lopez Motion, and allow evidence and argument about issues regarding Lopez to the extent such evidence relates to (i) Walton's conversations with Relkin and Powell about Lopez; and (ii) the protracted year-long reclassification of Walton's position. See Tr. at 101:6-18 (Court). The Court explained at the hearing that such evidence is relevant, because it illustrates that Powell was on notice that a human resources officer was potentially leaking confidential personnel information to the press and that Powell took no responsive action. See Tr. at 100:4-10 (Court). The Court noted that such evidence implies animus toward Walton, because Powell's failure to investigate Walton's allegations regarding Lopez suggests that Powell had already predetermined to eliminate Walton's position in the RIF. See Tr. at 101:18-102:7 (Court). Finally, the Court will deny the Britt Motion, and allow evidence and argument regarding Britt's alleged discriminatory statements or actions toward Walton. See Tr. at 51:23-52:1 (Court). As with the Lopez Motion, the Court explained at the hearing that evidence of Britt's failure to take action to investigate Walton's complaints about Bearden's alleged discriminatory behavior towards her implies that Powell had predetermined to terminate her employment. See Tr. at 51:23-52:1 (Court).

**IT IS ORDERED** that: (i) Defendant Ray Powell's Motion in Limine Regarding Alleged Acts of Commissioner Powell, His Exempt Assistant Commissioners and Del Bearden, Forming the Basis for Claims of Discrimination on the Basis of Race, Gender, National Origin or Any Other

Protected Basis Aside From that Under the First Amendment's Political Association Rights, filed October 24, 2016 (Doc. 114), is denied; (ii) Powell's Motion in Limine Regarding Issues Involving Sandra Lopez, filed October 24, 2016 (Doc. 118), is denied; and (iii) Powell's Motion in Limine to Bar Evidence of or Argument About Any Statement or Actions of Donald Britt of an Allegedly Discriminatory Nature, filed October 24, 2016 (Doc. 119), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Jack N. Hardwick
Sommer, Udall, Sutin, Hardwick & Hyatt
Santa Fe, New Mexico

     *Attorney for the Plaintiff*

Scott P. Hatcher
Emma D.B. Weber
Hatcher Law Group, P.A.
Santa Fe, New Mexico

     *Attorneys for the Defendants*