## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PEGGY WALTON,

      Plaintiff,

vs.                                                                            No. CIV 13-0343 JB/KBM

NEW MEXICO STATE LAND OFFICE,
RAY POWELL, DONALD BRITT and
DELMA BEARDEN,

      Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Plaintiff's Objections to Defendants' Requested Jury Instructions (Doc. 139), filed November 9, 2016 (Doc. 146)("Objections").  The Court held a hearing on November 14, 2016.  The primary issue is whether the Court should instruct the jury that Plaintiff Peggy Walton can succeed on her political retaliation claim under the First Amendment to the Constitution of the United States of America only if she proves, by a preponderance of the evidence, that her political association with Patrick Lyons was a "substantial motivating factor" in Defendant Ray Powell's decision to terminate her employment, or whether the Court should instruct the jury that Walton's political association must have been a "substantial <u>or</u> motivating factor" in her termination.  The Court concludes that the jury should be instructed that Walton can prevail only if her political association with Lyons was a "substantial motivating factor" in Powell's decision to terminate her employment, but that the jury should also be instructed that there is no difference between "substantial" and "motivating" in this context.

## **FACTUAL BACKGROUND**

The Court discussed this case's factual background at length in the Court's Memorandum Opinion, filed September, 12, 2014 (Doc. 91)("QI MO"), disposing of (i) the Defendants' Motion for Summary Judgment on Plaintiff's Second Amended Complaint to Recover Damages for Discrimination and Retaliation and for Violations of Constitutional Rights, filed November 6, 2013 (Doc. 38)("MSJ"); and (ii) the Motion for Summary Judgment of Defendant's Ray Powell, David [sic] Britt and Delma Bearden as to Count VI of the Second Amended Complaint on Grounds of Qualified Immunity, filed November 27, 2013 (Doc. 52)("QI Motion"). The Court will review the facts that it found undisputed in the QI MO and then turn to the procedural background.

Walton was employed at the Miner's Colfax Medical Center in Raton, New Mexico, from January 1988 to December 2001. See QI MO at 3. While there, Walton, a registered Republican, became acquainted with Patrick Lyons, at the time a Republican New Mexico State Senator. See QI MO at 3-4. Lyons was subsequently elected to serve as the New Mexico State Land Commissioner for a term beginning January 1, 2007. See QI MO at 4. Walton applied for employment at the State Land Office several times after Lyons was elected, but she did not receive a response to her applications. See QI MO at 4. In January, 2008, Walton informed Lyons of these unsuccessful attempts and asked whether there were any open positions for which she was qualified. See QI MO at 4. Lyons said that there were open positions and urged Walton to keep applying. See QI MO at 4.

On June 18, 2008, Walton applied for a classified position at the State Land Office. See QI MO at 5. Walton was offered an exempt Secretary II position instead of a classified position, however. See QI MO at 5. Walton accepted the offer and, on August 25, 2008, began work. See QI MO at 5. Exempt State Land Office employees serve at the agency head's will and do not have the

protections afforded to classified employees under the State Personnel Act, N.M. Stat. Ann. § 10-9-4(D).  See QI MO at 5.  Exempt positions exist so that the agency head can hire employees to assist in implementing his or her policies.  See QI MO at 5.  Historically, in the State Land Office, exempt employees serve under one elected official and then leave office with that official, thereby allowing newly elected officials to appoint new people to serve in that position.  See QI MO at 6.  Powell, who served terms as Land Commissioner both before and after Lyons, is aware of this practice.  See QI MO at 6.

Walton's first assignment as Secretary II involved working as a special projects coordinator and lease analyst in the State Land Office's Commercial Resources Division.  See QI MO at 7.  A few months after beginning work in that role, on October 22, 2008, Walton accepted a position as Director of the Commercial Leasing Section of the Commercial Resources Division.  See QI MO at 7.  As Director, Walton supervised lease analysts, including Defendant Delma Bearden, whom the first Powell administration originally hired.  See QI MO at 7.

In early 2009, Lyons instructed Lopez, the State Land Office's Human Resources Manager, to transfer Walton from the exempt Secretary II position to an Economist A position, at the time the only vacant classified position in the Commercial Resources Division.  See QI MO at 7.  Lyons concomitantly instructed Lopez to reclassify that Economist A position to a General Manager I position.  See QI MO at 7.  Walton lacked the credentials to fill the Economist A position, and Lopez knew she was not qualified; Walton was qualified, however, to serve as a General Manager I.  See QI MO at 7.

Lyons' directive notwithstanding, Lopez refused to initiate the requisite paperwork with the State Personnel Office to reclassify Walton's Economist A position to a General Manager I position.

- 3 -

See QI MO at 7-8.  After Lopez repeatedly refused to initiate paperwork for more than a year, Lyons directed Walton to bypass Lopez and work directly with the State Personnel Office to accomplish the reclassification, which Walton did.  See QI MO at 8.  Lopez later informed Elaine Olah, Assistant Commissioner of the Administrative Services Division, that she thought reclassification of Walton's Economist A position to a General Manager I position was improper.  See QI MO at 8-9.

Walton's reclassification from Economist A to General Manager I was approved effective September 8, 2010, and Walton continued to serve as Director of the Commercial Leasing Section of the Commercial Resources Division.  See QI MO at 11.  Walton's management responsibilities as General Manager I included decisions to correct and discipline Commercial Resources Division staff exhibiting an unwillingness to perform their duties ethically, professionally, and in a non-hostile manner.  See QI MO at 11.  Indeed, the most challenging aspect of Walton's role as General Manger I, according to the position assignment documentation form, was the "correction of inappropriate staff behaviors."  QI MO at 11 (quoting QI MSJ ¶ 11, at 5)(internal quotation marks omitted).  Walton's performance in this capacity, including her establishment of standards of performance and preparation of employee evaluations, was evaluated on February 22, 2011.  See QI MO at 11.

Lyons served as Land Commissioner for two terms, the second of which expired December 31, 2010.  See QI MO at 11.  Lyons did not run for re-election.  See QI MO at 11.  In the November 2, 2010, general election, Powell, a Democrat who had served as Land Commissioner immediately before Lyons' first term, defeated Matthew Rush, the Republican candidate for Land Commissioner.  See QI MO at 11-12.  The campaign for Land Commissioner was contentious.  See QI MO at 12.  During the campaign, Powell repeatedly attacked Lyons' record and accused Lyons of engaging in

unethical conduct and mismanaging State Trust Lands.  <u>See</u> QI MO at 12.  Powell publicly stated that Rush, if elected, would continue the same policies as Lyons.  <u>See</u> QI MO at 12.

During the summer and fall of 2010, Walton attended numerous Republican campaign events, including rallies for Susana Martinez -- a Republican gubernatorial candidate -- at which Rush was also present.  <u>See</u> QI MO at 12.  Walton likewise attended a campaign event for Rush at Rancho de Chimayo restaurant in Española, New Mexico, along with Lyons and other State Land Office employees.  <u>See</u> QI MO at 12.  Walton's support of Lyons and affiliation with the Republican Party was no secret within the State Land Office; indeed, Walton openly displayed in her office a photograph of herself with Martinez as well as a photograph of Lyons with a personal note from Lyons attached.  <u>See</u> QI MO at 12.  Walton observed Lopez studying these photographs one time during the fall of 2010.  <u>See</u> QI MO at 12.

Walton voted for Rush in the November 2010 election.  <u>See</u> QI MO at 14.  Powell won, however, and was elected Land Commissioner.  <u>See</u> QI MO at 14.  The day after the election, Walton informed Bearden that she had voted for Rush, and Bearden told Walton that she had voted for Powell.  <u>See</u> QI MO at 14.

On November 17, 2010, Mark Corley, an associate of KRQE investigative reporter Larry Barker, approached Walton at the back entrance to the State Land Office building when she arrived at work.  <u>See</u> QI MO at 14.  Corley informed Walton that he had acquired Walton's personal human resources information.  <u>See</u> QI MO at 14.  Corley then interviewed Walton by asking her questions about the circumstances of her hiring, her transfer from the exempt Secretary II position to the classified Economist A position, and the reclassification of the Economist A position to the General Manager I position.  <u>See</u> QI MO at 14.  Walton believed, from the context of the interview, that

KRQE intended to portray these events in a negative light.  See QI MO at 14.  Walton also suspected

that Lopez was instrumental in furnishing Walton's personal employment information to KRQE.

See QI MO at 14-15.  Lopez was, in fact, instrumental in providing Walton's information to KRQE

by helping the State Land Office respond to an Inspection of Public Records Act ("IPRA") request

from KRQE television asking for Walton's personnel file.  See QI MO at 15.

The next day, November 18, 2010, Walton contacted Powell by telephone to tell him about

her interview with Corley.  See QI MO at 16.  Walton hoped to alert Powell that KRQE was going to

broadcast a negative story about Walton and the State Land Office.  See QI MO at 16.  Powell, along

with Harry Relkin, the State Land Office's general counsel, returned Walton's call on November 21

or 22, 2010.  See QI MO at 16.  During the call, Walton informed Powell and Relkin about the

circumstances of her hiring, her transfer to the Economist A position, Lyons' directive to Lopez to

reclassify that position to General Manager I, and Lopez' refusal to follow Lyons' instructions.  See

QI MO at 16.

KRQE television broadcast Barker's investigative report, entitled "[c]ronies move up as

officials move out," on November 23, 2010.  QI MO at 16.  KRQE anchor-reporter Dick Knipfing

introduced the segment by asserting that Walton was "distinctly unqualified" for her position and

that her hiring was "rigged."  QI MO at 16.  Barker then narrated: "Meet State Land Office

employee Peggy Walton. How she went from low-level political appointee to high-level division

manager in two short years is a fascinating case study in abuse of power."  QI MO at 17.  Barker

reported that the Lyons administration hired Walton for an exempt position and then moved her into

classified service before the election -- but that Lyons did so in a misleading and inaccurate manner.

See QI MO at 17.  Barker also described the circumstances of Walton's hiring and the sequence of

events that led to her placement in the General Manager I position.  See QI MO at 17.  State Personnel Office Director Sandra Perez, who had approved Walton's Economist A to General Manager I reclassification, was interviewed during the Barker report, but Perez deferred to Lyons to explain the reclassification.  See QI MO at 17.  Knipfing concluded the investigative report, stating: "Governor-elect Susana Martinez has promised to fire any political appointee who has been improperly shifted into a classified job . . . .  New Land Commissioner Ray Powell will inherit Walton. It is not clear whether her job is protected."  QI MO at 17.  Powell viewed the Barker investigative report online a few days after KRQE broadcast it.  See QI MO at 18.

Powell took office as Land Commissioner on January 1, 2011, bringing with him numerous exempt employees who replaced the outgoing Lyons administration's exempt employees.  See QI MO at 18.  Among these new employees were Powell's Deputy Commissioner Robert Jenks as well as a handful of employees who reported directly to Jenks, including Chief Legal Counsel Relkin, Assistant Commissioner of the Commercial Resources Division Donald Britt, and Assistant Commissioner of the Administrative Services Division Olah.  See QI MO at 18.  Before their arrival, Powell posted notes on incoming exempt employees' office doors "reserving" those offices.  QI MO at 19.  Powell mistakenly reserved Walton's office in this fashion for Britt.  See QI MO 19.

Powell held a meeting with the Commercial Resources Division staff along with Jenks and Britt on January 3 or 4, 2011.  See QI MO at 19-20.  During the meeting, Powell opined that the Lyons administration's stewardship and leasing of State Trust Lands was improper and stated that there would be federal investigations into the matter.  See QI MO at 20.  Powell declared that "men in suits with guns" would come to the office and implied that they would arrest anyone involved in any wrongdoing.  QI MO at 20.  Britt and Bearden later accused Walton of illegally administering a

land sale that closed during Lyons' term in late December 2010. <u>See</u> QI MO at 20. Rattled by these events, Walton asked her attorney, Linda Hemphill, to contact Powell regarding Walton's concerns that she was being mistreated because of her prior association with Lyons. <u>See</u> QI MO at 20. Lopez accordingly sent a letter to Powell on January 27, 2011, requesting that Powell admonish his staff of the illegality of harassing Walton because of her association with Lyons. <u>See</u> QI MO at 21. Powell does not recall taking any action to address the letter's concerns. <u>See</u> QI MO at 21.

At a February 8, 2011, Commercial Resources Division meeting, questions were raised about two leases that the Lyons administration had handled. <u>See</u> QI MO at 23. Bearden singled out two female Hispanic, Republican State Land Office employees who worked in the front office with Lyons and implied that they were aware of the improper handling of the leases. <u>See</u> QI MO at 23. Walton, believing Bearden's conduct constituted harassment, reported this encounter to Britt. <u>See</u> QI MO at 23-24.

On February 9, 2011, Walton was instructed to attend an Assistant Commissioners' meeting. <u>See</u> QI MO at 24. At the meeting, Walton reported a request she had received for leasing acreage. <u>See</u> QI MO at 24. Relkin rolled his eyes and exchanged glances with Powell as Walton spoke. <u>See</u> QI MO at 24. Walton was subsequently called into a meeting with Powell on February 16, 2011, at which Relkin, Jenks, Olah, Britt, Lopez, and Amy Atchley, a management analyst whom Walton supervised, were all present. <u>See</u> QI MO at 24-25. The meeting was called to inform Walton that Atchley, who also served in the Lyons administration, was being moved from the Legal Division to the Commercial Resources Division, where Walton would supervise her. <u>See</u> QI MO at 25. No reason was given for the transfer. <u>See</u> QI MO at 25. Walton was surprised by the transfer, because Atchley had worked under her in Commercial Resources during the Lyons administration, and

Walton had written Atchley up for performance and misconduct on several occasions.  See QI MO at 25.  Jenks and Lopez smirked at Walton during the meeting.  See QI MO at 25-26.

Walton and Lyons had lunch on February 18, 2011.  See QI MO at 26.  Walton expressed her concerns to Lyons about the allegations that Walton administered an illegal land sale.  See QI MO at 26.  Other State Land Office employees were present in the restaurant, and, shortly thereafter, Assistant Commissioner Ralph Gallegos informed Walton that Powell does not believe in having lunch with employees.  See QI MO at 26.  Walton took this statement to mean that Powell was aware of her lunch with Lyons.  See QI MO at 26.

In January, February, and March, 2011, Britt made several comments to Walton referring to Walton's "buddy Pat."  QI MO at 26-27.  Related to those comments, on February 22, 2011, Britt told Walton that "no one in the Land Office respects you."  QI MO at 27.  On February 24, 2011, Britt told Walton about a meeting Powell and others had with Barker and taunted Walton by referring to Barker as "your friend Larry."  QI MO at 27.  Britt also moved Bearden's office next to his own, met often with Bearden behind closed doors, and began to direct Bearden's work, although Walton remained Bearden's actual supervisor.  See QI MO at 27-28.  Bearden grew increasingly insubordinate and hostile towards Walton during this same timeframe, making derogatory comments of a sexual and racial nature.  See QI MO at 27-28.  For example, Bearden stated that she believed a "man" was needed to deal with one particular client.  QI MO at 28.  Walton's superiors, however, never commented that a male should hold her General Manager I position.  See QI MO at 29.  Moreover, Bearden's statements were made in Walton's presence but were not directed at Walton. See QI MO at 29.

Walton believed that Bearden's comments were inappropriate and violated NSMLO's non-harassment policy.  See QI OM at 28, 30.  Pursuant to that policy, Walton verbally reported her concerns about Bearden's conduct to Britt on numerous occasions in February, March, and April 2011.  See QI MO at 30.  Walton also sent Britt emails raising these same concerns on April 7 and 8, 2011.  See QI MO at 30-31.  Britt did not respond to Walton's emails, however, and, to Walton's knowledge, Britt took no action against Bearden to address Walton's concerns.  See QI MO at 31.

On April 14, 2011, Walton attended a meeting of the State Trust Lands Advisory Board, which assists the Land Commissioner in the formation of policies and programs for the Trust.  See QI MO at 31.  Britt instructed Walton to appear thirty minutes into the meeting, and, when Walton arrived, Board members Powell, Britt, and Olah, and other State Land Office employees were already seated, and the meeting was well-underway.  See QI MO at 31.  Walton took the only available seat, positioned directly across the conference room table from Powell.  See QI MO at 31-32.  During the meeting, Powell addressed the Board, referring to the Barker report and expressing concern about employees in inappropriate "protected" roles.  QI MO at 32.  Powell posited that these "protected" employees "for some reason didn't have to meet the leadership criteria within the division, and somehow got directions from the front office."  QI MO at 32 (alterations in original).  Powell did not mention Walton by name, but he glared at her in a threatening and serious manner as he made these remarks.  See QI MO at 32.  Powell was not, however, referring to Walton as a "protected" employee, but rather two other State Land Office employees.  QI MO at 32-33.

Bearden's conduct escalated throughout April 2011.  See QI MO at 33.  Bearden frequently made comments that struck Walton as sexually or racially inappropriate, and which she suspected could subject the State Land Office to liability for creating a sexually or racially hostile work

environment.  See QI MO at 33.  When Walton verbally confronted Bearden about this behavior, Bearden became more contentious and accusatory.  See QI MO at 34.  Walton decided to escalate, and in memoranda to Britt dated April 29 and April 30, 2011, Walton complained about what she believed was illegal sexual, racial, and religious harassment by Bearden.  See QI MO at 34.  Walton did not, however, deliver these memoranda to Britt until May 6, 2011.  See QI MO at 35.  Britt then forwarded Walton's complaints to Lopez, who, despite State Land Office policy, opted not to investigate Walton's allegations against Bearden.  See QI MO at 35.  All the while, Bearden continued to make comments to Walton of a sexual and racial nature.  See QI MO at 35.  All this notwithstanding, Walton never prepared a formal written statement or report concerning Bearden's behavior, never reported Bearden up the chain of command to Powell, and never reported Bearden to Lopez.  See QI MO at 36.

From February, 2011, through the end of her employment, Walton attended weekly leadership meetings that Powell and Jenks headed and which various State Land Office management employees attended.  See QI MO at 36.  Frequently when Walton presented reports, expressed opinions, or participated in discussion, Powell and Jenks were aloof, interruptive, and intentionally distracting.  See QI MO at 36.  On multiple occasions, Powell intimidated and threatened Walton during those meetings by making comments such as: "[I]f you don't like it here we will be glad to help you find a place of your liking."  QI MO at 36-37.

In June, 2011, a legislatively mandated Reduction in Force ("RIF") reduced the State Land Office fiscal year 2012 budget, which began January 1, 2011, by $609,000.00 and reduced the number of full-time equivalent ("FTE") positions within the State Land Office from 153 to 151.  See QI MO at 37.  Lyons originally proposed the budget and FTE reductions in September, 2010, before

the November, 2010, general election in which Powell was elected Land Commissioner.  See QI MO at 37-39.  Powell and his staff made significant efforts to save the State Land Office from these reductions when Powell assumed office; nonetheless, the New Mexico Legislature and Governor, through the General Appropriations Act of 2011, imposed Lyons' proposed budget cuts and RIF reductions.  See QI MO at 39.

Olah designed the RIF in February 2011.  See QI MO at 39.  Olah determined that, to reduce the two FTE positions and the budget as the Appropriations Act required, the optimal solution was to eliminate one vacant and one filled position.  See QI MO at 39.  Ultimately, after reviewing the State Land Office's organizational structure and mission, Olah proposed to eliminate a General Manager I position in the Commercial Resources Division, which had two such redundant positions.  See QI MO at 39.  Because one General Manager I position had numerous subordinates while the other had none, Olah proposed that the two positions be combined to consolidate management into a single General Manager I position.  See QI MO at 42.  Of the two positions considered for elimination, Walton's position was selected.  See QI MO at 43.  Walton had less seniority at the State Land Office, and, pursuant to SPO Regulations, "the order of layoff due to reduction in force shall be by service date which is determined based upon the agency hire date."  QI MO at 43.

At the time she designed the RIF, Olah had no knowledge of the Barker report.  See QI MO at 43.  Nor was she aware that Walton reported Bearden's alleged racially and sexually inappropriate behavior to Britt until after Walton's position was eliminated and the RIF fulfilled.  See QI MO at 45.  Indeed, Olah was unaware of any complaints that Walton may have made concerning her working conditions at the State Land Office or concerning the manner in which the State Land Office operated.  See QI MO at 47.  Moreover, nothing in Walton's personnel file indicated -- and

Olah therefore did not consider -- that Walton was registered Republican, that she supported the Republican Party, that she supported Lyons when he was elected, that she engaged in any political activity, or that she espoused any political ideology.  See QI MO at 46.

Olah did not set out to eliminate Walton's position or terminate her employment.  See QI MO at 47.  Olah was charged with eliminating two FTE positions, and was thereby required to evaluate the State Land Office's organizational structure and act to preserve the State Land Office's functionality.  See QI MO at 47.  Olah did not, however, consider available alternatives to eliminating Walton's position.  See QI MO at 49-50.  See id. at 50 (noting that "the Commercial Resources Division of the Land Office now has more managerial positions than when Walton was employed there").  Nor did she document any of her analysis or process in making the determination to eliminate Walton's position.  See QI MO at 47-48.  Olah did not even consult with Powell regarding her recommendations until after the RIF plan was fully developed.  See QI MO at 48.

Olah first presented her RIF design for approval in a meeting with Powell, Jenks, Relkin, a personnel representative, and outside counsel on April 6, 2011.  See QI MO at 48.  At the meeting, Powell approved Olah's plan to eliminate Walton's General Manager I position.  See QI MO at 48.  Britt had no input or involvement in the formulation or approval of the RIF; it was only after Powell, Jenks, and Relkin made a final determination regarding the plan that Britt learned that Walton's position was slated for elimination.  See QI MO at 49.  When Jenks and Olah informed Britt that the Commercial Resources Division would be losing Walton's position, Olah was still not aware that Walton had submitted a written complaint to Britt regarding Bearden.  See QI MO at 49.

Powell submitted the RIF plan to the State Personnel Office on June 10, 2011.  See QI MO at 50.  The State Personnel Office approved the RIF that same day and slated the plan for an effective

date of June 30, 2011.  See QI MO at 50.  Later that day, after the RIF approval, Walton was called into a meeting with Olah, Britt, and Lopez, and informed that her employment was being terminated effective June 30, 2011.  See QI MO at 50.  Olah, Britt, and Lopez explained the RIF and informed Walton that she would be placed on paid administrative leave effective immediately through June 30, 2011.  See QI MO at 50.  Walton was directed to pack her personal belongings, turn in her keys, and leave the building immediately.  See QI MO at 50.  Before this meeting, Walton was never informed that her position could possibly be eliminated through an RIF.  See QI MO at 50.

By email dated June 10, 2011, at 1:09 p.m., Powell informed the entire statewide State Land Office staff that Walton's employment had been terminated.  See QI MO at 51.  Walton was embarrassed and humiliated by this transmission.  See QI MO at 51.  In her almost thirty years working in State government, Walton had never seen such an announcement of the termination of an employee. See QI MO at 51.

## PROCEDURAL BACKGROUND

Walton commenced this action on April 2, 2013, asserting claims against the State Land Office for: (i) discrimination on the basis of sex (female) and national origin (Hispanic) in violation of the New Mexico Human Rights Act, N.M. Stat. Ann. § 28-1-7(A) ("NMHRA"); (ii) unlawful retaliation for reporting that discrimination, in violation of the NMHRA § 28-1-7-(I); (iii) discrimination on the basis of sex and national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e; (iv) unlawful retaliation for reporting that discrimination, in violation of Title VII of the Civil Rights Act; and (v) a violation of the New Mexico Whistleblower Protection Act, N.M. Stat. Ann. § 10-16C-1 ("NMWPA").  Second Amended Complaint to Recover Damages for Discrimination and Retaliation and for Violations of

- 14 -

Constitutional Rights ¶¶ 22-40, at 5-8, filed August 1, 2013 (Doc. 20)("Complaint").  Walton also brought claims pursuant to 42 U.S.C. § 1983 against Powell, Britt, and Bearden (the "Individual Defendants") for violations of constitutional rights -- political association/speech -- that the First and Fourteenth Amendments protect.  See Complaint ¶¶ 41-5, at 8-9.

On November 6, 2013, all Defendants moved for summary judgment on the Complaint.  See MSJ at 1.  The Defendants argued that Walton's Title VII and NMHRA retaliation claims should be examined under the burden-shifting analysis in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)(" McDonnell Douglas").  See MSJ at 15.  This analysis, they contended, requires a showing that: (i) Walton engaged in "protected opposition to discrimination"; (ii) she was subject to a "materially adverse" action; and (iii) the protected activity was causally related to the materially adverse action.  MSJ at 15-16 (citing Webb v. Padilla, 2009 WL 3379034 (D.N.M. 2009)(Vazquez, C.J.)).  The Defendants conceded that Walton's termination was an "adverse employment action," MSJ at 16, but argued that Walton did not engage in protected opposition to discrimination, because there was no evidence that she was targeted on the basis of her "gender, national origin or some other protected class," MSJ at 17 (citing Sandoval v. City of Boulder, Colo., 388 F.3d 1312, 1327 (10th Cir. 2004)), and because Olah had no knowledge of Bearden's alleged discriminatory conduct towards Walton, so there could be no causal connection between any protected activity by Walton and Olah's designation of Walton for the RIF, see MSJ at 18.  Similarly, regarding Walton's NMWPA claim, the Defendants argued that the claim fails, because Walton cannot establish a causal connection between the State Land Office's adverse employment action against Walton and Walton's complaints about Bearden's conduct.  See MSJ at 18-20 (citing Desantis v. Napolitano, 716 F. Supp. 2d 1100, 1107 (D.N.M. 2010)(Browning, J.)).  Finally, with respect to Walton's

political affiliation claim, the Defendants contended that there is no evidence that Olah -- who was solely responsible for designing the RIF -- acted with intent to discriminate against Walton on the basis of Walton's political affiliation as a Republican.  See MSJ at 22.  In any event, the Defendants argued, Walton's termination was the result of a legislatively mandated organizational restructuring, not Walton's politics.  See MSJ at 24-25.  Further, the Defendants added, Walton's claim is directed at Powell, Britt, and Bearden, yet there "is no evidence any of these individuals had any involvement with the RIF."  MSJ at 24.

On November 27, 2013, the Individual Defendants also moved for summary judgment on Walton's § 1983 political association claim on the basis of qualified immunity.  See QI Motion at 1. The Individual Defendants argued that such a claim requires evidence of retaliation based on support for a "political party, candidate for election, or political ideology."  QI Motion at 12 (citing Gann v. Cline, 519 F.3d 1090, 1092-93 (10th Cir. 2008)).  Here, however, the Individual Defendants argued, Walton does not allege that she was chosen for the RIF because of her registration as a Republican, her support for the Republican Party, her support for Lyons' election, "or any other political activity or ideology."  QI Motion at 12.  Rather, the Individual Defendants contended, Walton asserts that she suffered retaliation based on her "loose association" with Lyons, Powell's predecessor.  QI Motion at 12.  The Individual Defendants argued that, absent a claim that Walton's affiliation with Lyons is based on political beliefs, her affiliation by way of employment alone is not protected.  See QI Motion at 13 (citing Jantzen v. Hawkins, 188 F.3d 1247, 1247 (10th Cir. 1999)).  As a result, the Individual Defendants maintained that they are entitled to qualified immunity on Walton's § 1983 claim, because Walton did not have a clearly established right not to be subject to an RIF based on her original hire by Lyons as an exempt employee.  See QI Motion at 11.

On February 24, 2014, the Court issued an order dismissing with prejudice certain claims that the Complaint asserts.  See Stipulated Order of Dismissal of Certain Claims at 1, filed February 24, 2014 (Doc. 69)("Order of Dismissal").  The Court dismissed Walton's claims of discrimination asserted against the State Land Office pursuant to Title VII of the Civil Rights Act and the NMHRA.  See Order of Dismissal ¶¶ A, B, at 1.  The Court also dismissed Walton's § 1983 political retaliation claim asserted against Bearden and Britt.  See Order of Dismissal ¶ C, at 1.  Finally, the Court dismissed Walton's § 1983 political retaliation claim as against Powell to the extent it alleged a violation of Walton's First Amendment right to speak about matters of public concern.  See Order of Dismissal ¶ D, at 1.  The Court left intact Walton's retaliation claims under Title VII of the Civil Rights Act and the NMHRA; Walton's claim asserted pursuant to the NMWPA; and Walton's § 1983 claim against Powell, to the extent it alleges retaliation by Powell for Walton's political association with the Lyons administration.

The Court issued two orders on August 27, 2014: (i) granting in part and denying in part the Defendants' MSJ, see Order, filed August 27, 2014 (Doc. 85)("MSJ Order"); and (ii) denying the QI Motion, see Order, filed August 27, 2014 (Doc. 86)("QI Order").  In the MSJ Order, the Court granted summary judgment on Walton's claims asserted against the State Land Office under Title VII of the Civil Rights Act, the NMHRA, and the NMWPA, but denied summary judgment with respect to Walton's § 1983 political association/speech claim asserted against the Individual Defendants.  See MSJ Order at 1.  In the QI Order, the Court denied the Individual Defendants' assertion of qualified immunity with respect to the § 1983 claim.  See QI Order at 1.

At a pretrial conference held September 3, 2014, the Defendants informed the Court that they intended to file an immediate interlocutory appeal from the Court's QI Order.  See Clerk's Minutes

at 1, filed September 3, 2014 (Doc. 89).  This action exerted pressure on the Court to quickly issue a memorandum opinion detailing the rationale for its decision so that the United States Court of Appeals for the Tenth Circuit would have the benefit of the Court's reasoning while reviewing the appeal.  To expedite the process, the Court bifurcated its analysis between two memoranda opinions: (i) on September, 12, 2014, the Court issued a memorandum opinion explaining its qualified immunity ruling, see QI MO at 1; and (ii) on July 7, 2015, the Court issued a supplemental memorandum opinion explaining its disposition of all remaining issues in the MSJ Order, see Supplemental Memorandum Opinion at 1, filed July 7, 2015 (Doc. 102)("MSJ MO").

In the QI MO, the Court explained that it denied the QI Motion, because Walton "produced sufficient evidence for a reasonable jury to conclude that her constitutional rights under the First and Fourteenth Amendments were violated . . . ."  QI MO at 101.  Walton's § 1983 claim is not based on a "loose affiliation" with Lyons or an affiliation with the Republican Party, the Court reasoned; rather, the Court construed Walton's claim as "asserting that Powell retaliated against her because of her political affiliation with the Lyons administration."  QI MO at 103.  The Court held that the First Amendment protects such affiliation with a political figure, see QI MO at 106, and that there is a genuine issue of material fact whether Walton's political affiliation with the Lyons administration was a "substantial or motivating factor" in the decision to terminate her position, see QI MO at 109 (citing Gann v. Cline, 519 F.3d at 1092-93).  The Court, moreover, concluded that, regardless whether the Individual Defendants can point to a legitimate, nondiscriminatory reason to terminate Walton's position, Walton "produced sufficient evidence for a jury to conclude that the Defendants' proffered reasons are pretextual."  QI MO at 109 (citing Laidley v. McClain, 914 F.2d 1386, 1393-94 (10th Cir. 1990)).  Regarding qualified immunity's second prong -- whether the allegedly violated

right was clearly established -- the Court concluded that "Walton's right to not be retaliated against because of her political affiliation with the Lyons administration was clearly established when Powell terminated her position."  QI MO at 111.

The Court subsequently issued the MSJ MO on July 7, 2015, addressing the remaining issues that the QI MO left unresolved.  The Court first granted the MSJ as it pertained to Walton's retaliation claims under Title VII and under the NMHRA.  See MSJ MO at 25-30.  The Court explained that, although Walton engaged in protected activity by complaining about Bearden's conduct, see MSJ MO at 26 ("Complaints to superiors about discriminatory conduct constitute protected activity")(citing O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1255 (10th Cir. 2001)); and although the RIF was an adverse employment action, see MSJ MO at 26 ("Termination of employment constitutes an adverse employment action.")(citing Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 744 (1998)); Walton failed to demonstrate a causal connection between Walton's activity and the RIF, because Powell and Olah had no knowledge of Bearden's allegedly discriminatory conduct when they made the decision to terminate Walton's position, see MSJ MO at 27-28.  See also id. at 26 (noting that a causal connection between protected conduct and adverse action is required)(citing Proctor v. United Parcel Serv., 502 F.3d 1200, 1208 (10th Cir. 2007)).  The Court also granted the MSJ as it pertained to Walton's NMWPA claim.  See MSJ MO at 30-37.  The Court concluded that Walton engaged in a protected disclosure under the NMWPA by reporting Bearden's conduct which she believed, in good faith, was unlawful or at least improper under the State Land Office's harassment policy.  See MSJ MO at 33 (citing N.M. Stat. Ann. § 10-16C-3(A)).  Here again, the Court concluded that the Defendants took an adverse action against Walton by creating and implementing the RIF.  See MSJ MO at 34 (citing Lockheed Martin Corp. v. Admin.

Review Bd., U.S. Dept. of Labor, 717 F.3d 1121, 1121 (10th Cir. 2013)).  As with Walton's Title

VII and NMHRA claims, however, the Court held that Walton failed to establish a causal connection

between the RIF and Walton's protected disclosures about Bearden's conduct -- that Walton failed to

show that the disclosure was a "contributing factor" in the RIF decision.  MSJ MO at 34-35 (citing

Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dept. of Labor, 717 F.3d at 1129).

The Tenth Circuit issued an opinion resolving the Defendants' interlocutory appeal from the

Court's QI Order on April 19, 2016.  See Walton v. Powell, 821 F.3d 1204 (10th Cir. 2016).  After

discussing various procedural issues at some length,[1] the Tenth Circuit concluded that a triable issue

exists regarding whether Powell violated Walton's political association rights.  See Walton v.

Powell, 821 F.3d at 1214.  The Tenth Circuit noted that, generally, a plaintiff alleging retaliation by

a government employer on the basis of political association must show that "her conduct involved a

---

[1]In his discussion of procedure, the Honorable Neil Gorsuch criticized the Court's apparent misapplication of the McDonnell Douglas test -- developed in the context of retaliation claims asserted under Title VII -- to Walton's First Amendment retaliation claim.  See 821 F.3d at 1210 ("When assessing Ms. Walton's claim of unlawful retaliation under the First Amendment, the district court used the *McDonnell Douglas* heuristic to guide its analysis.").  The Court is perplexed by this criticism.  The Court did not discuss, much less apply, the McDonnell Douglas test anywhere in its analysis of Walton's § 1983 claim for political retaliation.  See QI MO at 100-114.  It is true that the Court referenced the Defendants' reliance on McDonnell Douglas for their Title VII and NMHRA retaliation claims in the context of the Court's discussion of the MSJ in its procedural background section.  See QI MO at 54 (citing MSJ at 15).  Indeed, the Court comprehensively reviewed in the procedural background all legal theories that both the MSJ and QI Motion raised.  See QI MO at 52-83.  Yet the Court, as noted above, bifurcated its analysis of the qualified immunity issue that the QI Motion raised and its analysis of the remaining issues in the MSJ between two memoranda opinions -- the QI MO, which the Tenth Circuit reviewed, expressly limited its analysis to the issue of qualified immunity.  See QI MO at 1 n.1 ("Because the Defendants intend to file an interlocutory appeal solely on the denial of qualified immunity, the Court will address only that issue . . . .").  Thus, although the Court mentioned the McDonnell Douglas test when reviewing the MSJ's Title VII and NMHRA arguments, it did not apply that test in the QI MO's analysis, because the QI MO deals only with the qualified immunity defense to Walton's § 1983 political retaliation claim.  The Court recognizes, as Judge Gorsuch insists, that the McDonnell Douglas test has "no useful role to play in First Amendment retaliation cases," Powell v. Walton, 821 F.3d at 1210, and, for that reason, the Court did not apply it to Walton's First Amendment claim.

- 20 -

matter of 'public concern.'"  Walton v. Powell, 821 F.3d at 1213 (quoting Merrifield v. Bd. Of Cty.

Comm'rs, 654 F.3d 1073, 1083 (10th Cir. 2011)).  The Tenth Circuit noted that the Court's QI MO

did not acknowledge or apply the public concern test, but concluded that Powell nonetheless

"fail[ed] to give [] sufficient reason to think the test unsatisfied here."  Walton v. Powell, 821 F.3d at

1213.  See id. (stating that firing a public employee for "failing to endorse or pledge allegiance to a

particular political ideology" generally raises a triable claim for retaliation)(citing Gann v. Cline, 519

F.3d at 1093-94)(internal quotation marks omitted).  Similarly, the Tenth Circuit concluded that,

based on the facts set forth in the QI MO, a reasonable jury could find that "Walton's political

affiliation was a substantial or motivating factor in her dismissal."  Walton v. Powell, 821 F.3d at

1214.  Finally, the Tenth Circuit held that Powell was not entitled to qualified immunity with respect

to Walton's § 1983 claim, because, as early as 2008, before the events of this case, "firing a civil

service employee for refusing to show allegiance to a particular political cause was already a 'clearly

established' violation of the First Amendment."  Walton v. Powell, 821 F.3d at 1214 (quoting Gann

v. Cline, 519 F.3d at 1095-96).

The only unresolved issue in this case is Walton's § 1983 claim asserted against Powell for

his retaliation against Walton for her political association with Lyons, an association which the First

Amendment protects.  See Complaint ¶¶ 41-45, at 8-9.  Powell's Requested Jury Instructions, filed

November 7, 2016 (Doc. 139)("Powell Instructions"), propose that the jury should be instructed that,

to succeed on her political retaliation claim, Walton must prove by a preponderance of the evidence

1.  That Mr. Powell's actions were "under color" of state law;

2.  That Plaintiff was politically associated with Patrick Lyons or his
    Administration;

3. That Defendant eliminated Plaintiff's General Manager I position through a legislatively mandated reduction in force at the New Mexico State Land Office;

4. That Plaintiff's political association with Patrick Lyons or his Administration was a <u>substantial motivating factor</u> behind the decision to eliminate her General Manager I position;

5. That Plaintiff suffered damages as a result of the RIF.

Powell Instructions at 12 (emphasis added). Walton's Requested Jury Instructions, filed November 7, 2016 (Doc. 141)("Walton Instructions"), recite the same elements, but, in the fourth element, state that Walton must prove by a preponderance of the evidence that her "political affiliation with Patrick Lyons was a substantial <u>or</u> motivating factor in Mr. Powell's decision to terminate Ms. Walton's employment." Walton Instructions at 10 (emphasis added).

Walton has now filed a number of objections to the Powell Instructions. <u>See</u> Objections at 1. Relevant here, Walton objects that the Powell Instructions use "the phrase 'substantial motivating factor' instead of the correct phrase, which is 'substantial or motivating factor.'" Objections at 2 (citing <u>Walton v. Powell</u>, 821 F.3d at 1214). <u>See</u> Objections at 3 (same objection); <u>id.</u> at 4 (same objection); <u>id.</u> at 5 (same objection). At the hearing on the matter, Walton stressed that the Tenth Circuit used the "substantial or motivating factor" language in its <u>Walton v. Powell</u> opinion. <u>See</u> Draft Transcript of Hearing at 2:16-23 (taken November 14, 2016)(Hardwick)("Tr.").[2] In response, Powell noted that the Tenth Circuit has on numerous occasions used the "substantial motivating factor language." Tr. at 3:1-7, 15-22 (Hatcher). Powell admitted, however, that he was unsure why the Tenth Circuit used the word "or" in <u>Walton v. Powell</u>. <u>See</u> Tr. at 4:1-2 (Hatcher). Nonetheless, Powell argued that using "or" here would risk confusing the jury, because it would suggest that

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

"substantial and motivating can be two separate principles."  Tr. at 4:19-5:2 (Hatcher).  Powell

reasoned that omitting "or" makes sense "in a case like this," because there must be "motivating

reasons for retaliatory treatment.  And the motivating part has to be substantial."  Tr. at 5:4-15

(Hatcher).  Walton demurred, contending that there "are two different standards . . . and that's why

the Tenth Circuit used the language in the <u>Walton</u> case."  Tr. at 5:19-24 (Hardwick).

## ANALYSIS

 The Court concludes that the Powell Instructions accurately phrase the fourth element of

Walton's political retaliation claim as requiring that Walton's political association with the Lyons

administration be a "substantial motivating factor" in the decision to terminate her employment.  The

Court will therefore overrule Walton's objection to the use of the "substantial motivating factor"

language in the jury instructions and will instruct the jury with that language.  The Court will,

however, instruct the jury that there is no difference between a "substantial" factor and a

"motivating" factor in this context.

 The Supreme Court established a five-part test for First Amendment retaliation claims in

<u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006).  The Tenth Circuit has described the fourth prong of this

test as requiring plaintiffs to demonstrate "that the constitutionally protected speech was a <u>substantial</u>

<u>motivating factor</u> in the employer's decision to adversely alter the employee's conditions of

employment."  <u>Lobato v. New Mexico Environment Dept.</u>, 733 F.3d 1283, 1297 (10th Cir.

2013)(quoting <u>Couch v. Board of Trustees of Memorial Hospital</u>, 587 F.3d 1223, 1236 (10th Cir.

2009))(emphasis added)(internal quotation marks omitted).  The Tenth Circuit has also relied on a

four-part test for evaluating public employee claims for retaliation based on protected First

Amendment activity derived from <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968), and

Connick v. Myers, 461 U.S. 138 (1983).  See, e.g., Gardetto v. Mason, 100 F.3d 803, 811 (10th Cir.

1996).  The Tenth Circuit has stated that the third prong of the Pickering/Connick test requires the

plaintiff to establish that "the protected activity was a substantial motivating factor in the employer's

decision to take adverse action against him." Cillo v. City of Greenwood Village, 739 F.3d 451, 461

(10th Cir. 2013)(emphasis added)(citing Maestas v. Segura, 416 F.3d 1182, 1187 (10th Cir. 2005)).

The Tenth Circuit has also, however, required a showing of speech being a "substantial or

motivating factor" for these claims.  For example, in Gann v. Cline, 519 F.3d 1090 (10th Cir. 2008),

the Tenth Circuit stated that "[p]olitical patronage need not be the sole reason for an employee's

discharge, it need only constitute a substantial or motivating factor." 519 F.3d at 1093 (citing Mason

v. Oklahoma Turnpike Auth., 115 F.3d 1442, 1451-52 (10th Cir. 1997)(emphasis added)).  The

Tenth Circuit recently recited this same formulation in Walton v. Powell, stating "a First

Amendment retaliation claim also can be pursued using a 'mixed motive' theory -- by proving that

political affiliation was a substantial or motivating (but not the only) factor behind an adverse

employment action."  821 F.3d at 1211 (citing Gann v. Cline, 519 F.3d at 1093)(emphasis added).

The Court's QI MO in this case referred to the "substantial or motivating factor" formulation

of this test.  QI MO at 2, 73, 74, 83, and 102 (emphasis added).  The Court made its recitation of the

standard, however, in the context of citing to and quoting from the parties' own formulation of the

test -- the Court cited no legal authority in its QI MO which used this formulation.  See QI MO at 2,

73, 74, 83, and 102.

Whatever the precise formulation of the test, the Tenth Circuit's varying use or omission of

"or" is ultimately inconsequential.  In applying this test, the Supreme Court has equated

"substantial" factor with "motivating" factor.  Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274,

287 (1977).  In Mt. Healthy City Bd. of Ed. v. Doyle, the Supreme Court stated "the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' -- or, to put it in other words, that it was a 'motivating factor.'"  429 U.S. at 287 (citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 270-71 n.21 (1977)).   The Tenth Circuit, citing this Supreme Court statement, has acknowledged that a "substantial" factor is the same as a "motivating" factor.  Maestas v. Segura, 416 F.3d at 1188 (stating that the Supreme Court in Mt. Healthy City Bd. of Ed. v. Doyle equated "substantial" factor with "motivating factor").

Because the Tenth Circuit has varied in its recitation of the applicable standard, the Court finds instructive pattern jury instructions that other Courts of Appeals use.[3]  The United States Court of Appeals for the Fifth Circuit, for example, requires that the plaintiff's speech "motivated" the defendant's decision to terminate the plaintiff's employment.   Committee on Pattern Jury Instructions, District Judges Association, Fifth Circuit, Pattern Jury Instructions (Civil Cases) at 99, (2014)("Fifth Circuit Instructions").  The comments to the Fifth Circuit Instructions elaborate that "a more frequent articulation of the causation element is that the speech must be a 'substantial or motivating factor.'"  Fifth Circuit Instructions at 100 n.3 (quoting James v. Tex. Collin Cnty., 535 F.3d 365, 376 (5th Cir. 2008)).  The Fifth Circuit Instructions specify, however, that a "substantial" factor is the same as a "motivating" factor in this context.  Fifth Circuit Instructions at 100 n.3 (citing Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. at 287).  The United States Court of Appeals for the Ninth Circuit, by contrast, uses the "substantial or motivating factor" formulation, but equates both a "substantial" and "motivating" factor with a "significant factor."  Ninth Circuit Manual of

_____

[3]The Tenth Circuit does not have pattern jury instructions for civil cases.  Accordingly, the Court looks to other Courts of Appeals for guidance.

- 25 -

Model Jury Instructions (Civil) at 152 (2007)("Ninth Circuit Instructions").

For its part, the Court has previously instructed a jury that a First Amendment political retaliation claim requires that "the plaintiff's exercise of protected First Amendment free speech and rights . . . was a substantial motivating factor" in the defendant's adverse employment decision. Court's First Revised Final Jury Instructions (with citations) in Bhanu v. New Mexico Dep't of Env't, 2007 Jury Instr. LEXIS 1390, at *36 (2007)("Bhanu Instructions").  The Court relied on the Tenth Circuit's decision in Baca v. Sklar, 398 F.3d 1210, 1218-19 (10th Cir. 2005), for this instruction.  See Bhanu Instructions at *36.  In Baca v. Sklar, the Tenth Circuit used the "substantial motivating factor" language.  398 F.3d at 1218.

The Court concludes that it will instruct the jury that Walton's political association must have been a "substantial motivating factor" in Powell's decision to terminate her employment for her to succeed on her political retaliation claim.  Although the Tenth Circuit has occasionally used the "or" formulation of the applicable test for political retaliation claims, it has also frequently required that the plaintiff's speech be a "substantial motivating factor."  Lobato v. New Mexico Environment Dept., 733 F.3d at 1297; Couch v. Board of Trustees of Memorial Hospital, 587 F.3d at 1236; Gardetto v. Mason, 100 F.3d at 811; Cillo v. City of Greenwood Village, 739 F.3d at 461; Maestas v. Segura, 416 F.3d at 1187.  Moreover, the Tenth Circuit has explicitly equated "substantial" and "motivating" factors.  Maestas v. Segura, 416 F.3d at 1188.  The Supreme Court, the Fifth Circuit, and the Ninth Circuit have likewise equated both factors.  See Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. at 287; Fifth Circuit Instructions at 100 n.3; Ninth Circuit Instructions at 152.  Accordingly, to avoid risking confusion of the issues by creating a false distinction between "substantial" and "motivating" factors with the use of the word "or," the Court will instruct the jury that Walton's

political association with the Lyons administration must have been a "substantial motivating factor"

in Powell's decision to terminate her employment. The Court will also, however, instruct the jury

that a "substantial" factor is the same as a "motivating" factor.

      The Court will specifically instruct the jury that, to succeed on her political retaliation claim,

Walton must prove, by a preponderance of the evidence,

> That Mr. Powell's actions were "under color" of state law;
>
> That Ms. Walton was politically associated with Mr. Lyons or with his Administration;
>
> That Mr. Powell eliminated Ms. Walton's employment at the New Mexico State Land Office through the implementation of a reduction in force;
>
> That Ms. Walton's political association with Mr. Lyons was a <u>substantial motivating factor</u> in Mr. Powell's decision to eliminate Ms. Walton's employment through the implementation of a reduction in force;
>
> That Ms. Walton suffered damages because of Mr. Powell's acts and the reduction in force at the New Mexico State Land Office.

Court's Final Jury Instructions (Given)(without citations) at 14-15, filed November 18, 2016, (Doc.

164)("Court's Instructions")(emphasis added)(internal numbering omitted). The Court will further

instruct the jury that

> [t]o prove that her political association was a substantial or motivating factor in Mr. Powell's decision to eliminate her General Manager I position, a "substantial" factor is the same as a "motivating" factor. Political association need not be the only factor to be a substantial motivating factor. Ms. Walton is not required to show that, but for her political association, Mr. Powell's action in eliminating her position would not have occurred. Ms. Walton need only prove that the speech activities were a substantial consideration that made a difference in or influenced Mr. Powell's decision.

Court's Instructions at 15. Finally, the Jury Verdict Form will ask whether the jury finds that

> Plaintiff Peggy Walton has proved to your satisfaction, by a preponderance of the evidence, that Defendant Ray Powell eliminated Ms. Walton's employment at the

New Mexico State Land Office through the implementation of a reduction in force plan, and that a substantial motivating factor in his decision was Ms. Walton's political association with Patrick Lyons or his administration?

Court's Instructions at 30.

**IT IS ORDERED** that: (i) the Plaintiff's Objections to Defendants' Requested Jury Instructions (Doc. 139), filed November 9, 2016 (Doc. 146), are overruled; and (ii) the jury will be instructed that, to succeed on her political retaliation claim, Plaintiff Peggy Walton must demonstrate by a preponderance of the evidence that her political association with the Lyons administration was a "substantial motivating factor" in Defendant Ray Powell's decision to terminate her employment. The Court will also instruct the jury that a "substantial" factor is the same as a "motivating" factor.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Jack N. Hardwick
Sommer, Udall, Sutin, Hardwick & Hyatt
Santa Fe, New Mexico

    *Attorney for the Plaintiff*

Scott P. Hatcher
Emma D.B. Weber
Hatcher Law Group, P.A.
Santa Fe, New Mexico

    *Attorneys for the Defendants/*

- 28 -